JAMES C. BRADSHAW (#3768)
BROWN, BRADSHAW & MOFFAT
422 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 532-5297
Facsimile: (801) 532-5298
jim@brownbradshaw.com
*Attorney for Drew Crandall*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>v.<br><br>DREW WILSON CRANDALL(2),<br><br>    Defendant. | **DEFENDANT'S MOTION<br>FOR REVIEW OF DETENTION<br>BY THE DISTRICT COURT**<br><br>Case No. 2:16-CR-631DAK<br>(Judge Dale Kimball) |

    Pursuant to DUCrimR 57-16(a)(1), the Defendant, DREW CRANDALL, by and through his attorney, moves this Court for review of the Magistrate Judge's order of detention made under 18 U.S.C. §§ 3142, *et. seq.* (D. Hawaii Doc. 11).

    A Detention Hearing was held on May 9, 2017 before United States Magistrate Judge Barry M. Kurren, in the United States District Court for the District of Hawaii. (D. Hawaii Doc. 8).[1] The Magistrate in Hawaii recognized that this Court would be better positioned to make these determinations.[2] The Magistrate noted that he was basing his decision on limited

---

[1] The transcript of the detention hearing is attached as Exhibit A and will be cited to herein as "Det."

[2] At that hearing, the Magistrate was advised that co-conspirators had described Drew Crandall as the "mastermind", that Drew lived the life of a "jetsetter," that Drew had failed to

information, and guided: "I think certainly you can raise these issues if you wish and other matters in the district in which that case is brought to further explore it." (Det. 26). Thereafter, upon ordering detention, the Magistrate again noted: "You know, the matter can be raised anew in the District of Utah." (*Id.*).

Accordingly, the Defendant now requests that this Court engage in the appropriate *de novo* review, and after doing so, find that Mr. Crandall may be released upon appropriate conditions or combination of conditions pursuant to the Bail Reform Act that will reasonably assure his appearance and the safety of any other person and the community.

## **RELEVANT FACTS**

1. Drew Crandall ("Drew" or "Crandall") is 31 years of age. With the exception of a short period when his family moved to California, Drew has lived his entire life in Utah.

2. Drew graduated from Spanish Fork High School and thereafter attended the University of Utah. For a time, he pursued his dream of becoming a mechanical engineer but was unable to sustain an adequate GPA to continue.

3. Drew has no criminal history of any nature.

4. He also comes before the Court with exceptional family support which includes parents and siblings that support Drew without reservation. His father is employed as an IT specialist for a private equity firm and his mother is a private chef. If released, Drew will have full time employment waiting for him and has previously worked for his mother.

---

disclose assets on his financial affidavit, that he had the means to go anywhere in the world, and that he had an express desire not to be in the United States. These statements are not correct.

5. Drew's parents are prepared to offer the deed to their family home to provide the Court with assurances of appearance if requested.

6. Drew is engaged to be married to Ms. Sasha Grant. ("Sasha").

7. The indictment in this matter alleges that co-defendant, Mr. Aaron Michael Shamo ("Shamo"), occupied a position of organizer, supervisor and a position of management. The Government has described Shamo as the "ringleader," has seized 1.5 million dollars from Shamo, and is seeking forfeiture. (Det. 12). The discovery disclosed reveals that all profits from the alleged illegal enterprise were exclusively controlled by Shamo, and that Shamo, in turn, paid a salary or commission to the other more minor participants. There has been no claim for forfeiture filed against Crandall because he received less than $65,000 for almost 2 years of work.

8. Drew and Shamo met as teenagers in Provo, Utah. They were both long-boarders and shared in common the fact that they were both the non-practicing children of devout Mormon families. Although they had common histories and interests, their personalities were markedly different. Shamo was outgoing, charismatic, and focused on finding the next great new idea that was going to make him rich. Drew, on the other hand, has always been extremely shy and was drawn to the more tedious and challenging study of mechanical engineering.

9. After his incarceration in this case, Shamo participated in a newspaper interview wherein he described himself as "fascinated with becoming an entrepreneur." In that same article, Shamo describes Drew as socially awkward and shy, and took credit for teaching Drew

"how to talk to girls." *See* Jesse Hyde, *From Mormon Kid to Alleged Drug Kingpin: Inside the Rise and Fall of Aaron Shamo*, DESERET NEWS, June 22, 2017.[3]

10. Drew's shyness is not simply personality. He has been clinically depressed and has suffered from debilitating anxiety since age 12 when he was diagnosed with depression and ADHD. He was prescribed, and has taken, Zoloft and Wellbutrin since that time. Although the medications provide some assistance, Drew has consistently struggled with low self-esteem and depression.

11. Drew met Sasha Grant in 2015. As their relationship grew, Sasha made it clear that she did not like Aaron Shamo and wanted Drew to get away from him. She relentlessly fought for Drew to break away from Shamo and eventually prevailed, convincing Drew to leave Salt Lake. The couple traveled to New Zealand and to Asia, living a very frugal lifestyle and worked in low level jobs so as to be able to continue traveling. Eventually, they ended-up in Australia where they both found full-time employment.

12. Drew and Sasha planned to wed in Hawaii on May 12, 2017. They were, however, taken into custody upon their arrival in Honolulu when federal agents and prosecutors made the decision to use the wedding as the opportunity to arrest Drew. There had been no prior attempts to speak to Drew or any member of his family. The tactic had an impact not only on Drew, but on his fiancé, her mother, Drew's mother, and the 35 other family members and friends that had arranged their lives in order to celebrate the couple's formal union in Hawaii.

---

[3] Available at https://www.deseretnews.com/article/900000059/from-mormon- kid-to-alleged- drug-kingpin-inside-the-rise-and-fall-of-aaron-shamo.html (last visited October 24, 2017).

4

Sadly, Sasha comes from humble resources, was raised in Duchesne, Utah, and most of her family had undertaken substantial efforts to be able to attend.

## LEGAL AUTHORITIES

"The Supreme Court has long recognized constitutional limits on pretrial detention." *Lopez-Valenzuela v. Arpaio*, 770 F. 3d 772, 777 (9th Cir. 2014). In order to protect fundamental due process, and all the fundamental rights inherent thereto,[4] the U.S. Supreme Court has prohibited excessive bail;[5] required judicial determination of probable cause within 48 hours of arrest;[6] barred punitive conditions of pretrial confinement;[7] prohibited pretrial detention as punishment,[8] and held that restrictions on pretrial release of adult arrestees must be carefully limited to serve a compelling governmental interest.[9]

Further, a court's determination of detention must be based upon the objective factors listed in 18 U.S.C. § 3142(g), and may not be based upon impermissible factors such as race, religion, or other suspect factors. Under 18 U.S.C. § 3142, "[t]he judicial officer *shall order the*

---

[4] Rights such as the unhampered preparation of a defense; the proscription of infliction of punishment prior to conviction; the presumption of innocence; and the protection against excessive bail under the Eighth Amendment. *See, e.g.*, *Arpaio*, 770 F. 3d at 777-780 (detailing fundamental rights at issue).

[5] *See Stack v. Boyle*, 342 U.S. 1, 4-5, 72 S.Ct. 1 (1951).

[6] *See Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S.Ct. 1661 (1991); *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854 (1975).

[7] *See Bell v. Wolfish*, 441 U.S. 520, 535-37, 99 S.Ct. 1861 (1979).

[8] *See United States v. Salerno*, 481 U.S. 739, 746-48, 107 S.Ct. 2095 (1987); *Schall v. Martin*, 467 U.S. 253, 269-74, 104 S.Ct. 2403 (1984).

[9] *See Salerno*, 481 U.S. at 748-51.

*pretrial release* of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court, subject to [conditions] . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." Id. (emphasis added). Thus, there exists an initial presumption that "persons charged with a crime are not detained pre-trial." *United States v. Gerkin*, 570 F. App'x 819, 820 (10th Cir. 2014) (unpublished). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id*. (quoting *United States v. Salerno,* 481 U.S. 739, 755, 107 S.Ct. 2095 (1987)).

When a defendant is charged with specifically enumerated crimes, however, an opposing presumption that the defendant is a flight risk and a danger to the community may be invoked by the Government. *See* 18 U.S.C. § 3142(e).[10] That has happened in this case. The Government filed a motion pursuant to 18.U.S.C. § 3142(f)(2), and the rebuttable presumption arises under 18 U.S.C. § 3142(e) because Mr. Crandall has been charged with one of the enumerated crimes.[11] (*E.g.*, Superceding Indictment, Doc. 32).

---

[10] *See also e.g., United States v. Stricklin*, 932 F.2d 1353, 1354-55 (10th Cir. 1991) (discussing invocation of rebuttable presumption and parties' respective burdens); *United States v. Villapudua–Quintero*, 308 Fed.Appx. 272, 273 (10th Cir.2009) (unpublished) (per curiam) (recognizing that 18 U.S.C. § 3142(e) provides a rebuttable presumption favoring detention in the case of, among other defendants, certain alleged drug offenders).

[11] Specifically, Mr. Crandall has been charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act". 18 U.S.C.A. § 3142(f)(1)(C).

The Tenth Circuit has stated,

> Once the presumption is invoked, the burden of production shifts to the defendant. However, the burden of persuasion regarding risk-of-flight and danger to the community always remains with the government. The defendant's burden of production is not heavy, but some evidence must be produced. Even if a defendant's burden of production is met, the presumption remains a factor for consideration by the district court in determining whether to release or detain.

*Stricklin*, 932 F.2d at 1354-55 (citing authority).

The Government must prove "risk of flight" by a preponderance of the evidence, and it must prove "dangerousness to any other person or to the community" by clear and convincing evidence. *See United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003) (citations omitted). Importantly, with respect to dangerousness, the clear and convincing evidence must prove that the defendant presents "an identified and articulable threat to an individual or the community." *United States v. Salerno*, 481 U.S. 739, 751, 107 S. Ct. 2095, 2103 (1987). Finally, as noted by the Tenth Circuit,

> [I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the judicial officer must consider:
> **(1)** The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
> **(2)** the weight of the evidence against the person;
> **(3)** the history and characteristics of the person, including—
>     **(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>     **(B)** whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending

> trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> **(4)** the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).
>
> If, after the hearing and consideration of the above factors, a judicial officer orders that a defendant be detained, the order must "include written findings of fact and a written statement of the reasons for the detention." *Id.* § 3142(i)(1).

*Cisneros*, 328 F.3d at 617.

"The standard of review for the district court's review of a magistrate judge's detention or release order under § 3145(a) is de novo." *Id.* at 616 n.1.

## ARGUMENT

As noted above, the Magistrate found that the rebuttable presumption arises under 18 U.S.C. § 3142(e) because Crandall has been charged with one of the enumerated crimes. Of note, however, the Magistrate also made a finding that Crandall presented evidence sufficient to rebut the presumption, but ordered detention anyway on the grounds that: 1) the weight of the evidence against the defendant was strong; 2) the Defendant is subject to a lengthy period of incarceration if convicted; and 3) the defendant has significant family or other ties outside the United States. In ordering detention, therefore, the magistrate *did not find* that Crandall was a risk to the safety of any other person and the community, but that "no condition or combination of conditions of release will reasonably assure the defendant's appearance as required."

Considering the aforementioned factors, this Court should review and amend the detention order in this matter for the following reasons.

A. **History And Characteristics Of The Defendant**

1. Drew Has No Prior Record and Poses No Threat to the Community

The Magistrate did not find that Crandall was a risk to the safety of any other person and the community. That finding is correct. Drew has no history of criminal conduct or substance abuse. Under any form of objective analysis, he simply does not pose any risk.

2. Drew Is Not a Flight Risk

While the case admittedly involves allegations involving the distribution of drugs, there are more than ample facts in this situation to rebut any presumption.

As noted in the analysis of another district court within the Tenth Circuit: "The rebuttable presumption in drug-trafficking cases is statutory, and arises out of Congress' concern that individuals involved in drug trafficking often have foreign contacts and the ability to leave the country, and incentives to remain active in the drug trade." *United States v. Holguin*, 791 F.Supp.2d 1082, 1090 (D. N.M. 2011) (citations omitted). These concerns are simply not present here. There is no suggestion that Drew has engaged with any foreign contacts relative to the commission of this offense. Instead, it seems clear that it was Mr. Shamo that had the contacts and the communications with those outside of the U.S. There is likewise nothing to suggest that Drew has any incentive to "get back into the business." Indeed, in 2015, he extricated himself from involvement.[12] Perhaps most importantly during the 6 months between the time of Mr.

---

[12] Anticipating that the Government will argue that Crandall left , but got back into this criminal enterprise, it is important to recognize the extremely limited role that is alleged after he left in 2015. Assuming for purposes of this motion that the Government is correct in their allegation, some perspective in regard to role is essential. Drew Crandall received less than $10,000 of income for the entirety of 2016 for his purported role in filling-in for another in responding to customer service inquiries.

Shamo's arrest and his own detention, Drew showed no behavior which would suggest a temptation to get back involved in criminal conduct. He was uncharged and living in Australia and without any supervision or motivation managed to keep far away from the dark web and criminal conduct.

Most importantly, everything and everyone Drew loves and cares about is here in Utah. Drew's fiancé lives here. His family lives here. His whole support system is in this State. There is no one elsewhere.

### 3. Not All Who Wander Are Criminals

In the prior detention hearing, the Government mistakenly represented and argued that Crandall had "fled" the United States. The Government also argued that the fact Drew has traveled suggests "he does not want to be in the United States" and that he is a "jet-setter". (Det. 13-14). These assertions are without merit.

First, Drew purposefully left the United States to distance himself from those involved in the criminal activity charged in this case. Rather than being rewarded for his taking action to distance himself, the Government instead urges his traveling as is evidence of a flight risk.

Second, this Court must understand that after Mr. Shamo was arrested in November of 2016, Drew's conduct and actions are not suggestive of someone likely to flee. While there are countries Drew and Sasha could have entered that do not have extradition treaties with the United States, Australia is not one of them. Rather than turning tail, and going into hiding, Drew and Sasha began openly living and working in Australia. And, in May of 2017, the couple flew to the United States to celebrate their wedding which had been very publically announced online

10

and elsewhere. This is not the conduct of a fugitive, This is not the conduct of one who is contemplating additional criminal conduct or fleeing.

Third, the Government could have spoken with Drew or his family at any time. But rather that attempting communication, extradition, or some other form of measured approach, it was the Government that unilaterally determined there was an urgent need for a forced occupation of their wedding. (Det. 15, 18-19). The Government must not be allowed to create an appearance of a flight risk by their own conduct.

Overall, Crandall has never missed a court date or failed to act responsibly in any manner and this record suggests that any plausible risk of flight can be effectively managed. The desire to travel and explore the world does not, in any manner, correlate to whether someone is a flight risk. *(e.g.*, Det. 22). Simply because Drew, Sasha, or Drew's family likes to travel does not equate with a risk of Drew absconding the supervision of this court. Indeed, Sasha previously lived in China teaching English; Drew traveled with Sasha and his parents to Mexico in 2015 where they worked in a humanitarian capacity rebuilding housing. These activities certainly do not suggest a risk of flight, but rather, a stability that comes with responsibility and a well-developed moral compass.

**B.    Drew Crandall Is, At Best, A Minor Participant In This Criminal Endeavor**

The "weight of the evidence" factor also falls in favor of pretrial release. Drew had the misfortune of becoming a friend to Aaron Shamo before this criminal enterprise ever took-off. When Mr. Shamo came up with the idea, he enlisted Drew to assist. What began as Mr. Shamo importing and reselling steroids to his gym buddies, quickly grew out of control and all of it

11

made Drew very uneasy. Drew (the worrier) and Mr. Shamo (the carefree entrepreneur) clashed, but Drew was unable to stand-up to him. That dynamic changed when Sasha Grant came into Drew's life. Sasha gave Drew the confidence to set limits with Shamo, including setting a firm date after which Drew would no longer help. When that date came, Drew and Sasha boarded a plane for New Zealand. At the time they left, Fentanyl was not a part of the distribution network.

There is clearly a "main" defendant in this case, and then, there are the "other" participants who were paid, but in a very real sense, manipulated into assisting. While Shamo was making millions, those around him were paid very little (although exposing themselves to the very real possibility of federal prison time). *All of the other co-defendants in this case have been released* due to the Government's recognition that they can be successfully managed in the community. This decision, at least in part, would seem to be based upon the acceptance of the notion that they held a lesser role. Crandall's involvement in this case, however, is by any objective criteria, even less than those who have already been released.[13]

In weighing this factor, the Court should look at the role of Crandall as compared to those others that are currently managed on release. The Government concedes that Drew left to travel the world while others stayed behind, making money, and keeping the operation functioning. While the Government has argued for detention citing Crandall's early involvement, their

---

[13] Again, there is an appearance that Drew is being punished with detention for simply being out of the country. This consequence is apparent from the divergent treatment of co-defendants who were around and available to provide early assistance to law enforcement. Simply because Drew was not residing in the United States, it appears he has lost out on his ability to curry favor with those wielding decision making power. This Court, however, must employ only objective criteria – such as actual role in the offense, the length of time involved in the criminal enterprise, or the money actually made – rather than basing the incarceration decision on "who jumps the quickest" for those charged with investigating and prosecuting.

assessment is incomplete and inaccurate. The other released co-defendants made more money than Crandall and the time period of their involvement is longer. Also, Crandall has no previous criminal history and there is not even the most scant suggestion that he would engage in criminal behavior if released.

Other than the theoretical possibility that exists in every case that a defendant could choose to commit the same crime again, there is no objective reliable evidence to suggest that if released, Drew Crandall would reoffend. While every case allows for a general supposition that a participant might be tempted to get back involved in criminal activity, there is nothing to support such speculation here. If and when he gets another chance, Mr. Crandall will be a law-abiding citizen.

**C.    Any Plausible Risk Can Be Ameliorated With Pretrial Conditions**

The fundamental and requisite consideration is that, *even if* the Court does have concerns, and *even if* Crandall might pose any true risk, there are invariably certain conditions that could be imposed on his release to reasonably assure his appearance and the safety of others. Any legitimate concerns can absolutely be managed.

As to any plausible risk that Crandall might somehow flee, the Court can order, as it routinely does in cases involving defendants with lengthy criminal histories, GPS monitoring and check-ins with a pretrial service worker, as well as restrictions on travel. Drew's family is prepared to post the deed to their family home in Spanish Fork if requested by the Court. Those that know Drew are convinced he will responsibly address the issues with the Court.

As to any plausible risk that Crandall might present a genuine safety concern, the Court can order restrictions on personal associations, places of abode, and prohibitions against contact with specified individuals, all electronically monitored or supervised by Pretrial Services.

Simply, there are ample conditions that can be imposed by the Court that will ameliorate any plausible concerns. Mr. Crandall will willingly comply with any condition reasonably necessary to assure his appearance and the safety of the community or other persons. The fact that non-compliance with any and all court orders would swiftly result in revocation of such pretrial release and further detention, in and of itself, serves as the best deterrent to any violations.

## **CONCLUSION**

The Bail Reform Act recognizes the obvious detrimental effects of pretrial detention upon an individual. Beyond deprivation of liberty, continued detention clearly imperils a person's livelihood, impairs family and social relationships, causes mental and emotional suffering, and undermines the ultimate defense. *See, e.g., United States v. Cos,* 2006 WL 4061168,*5 (D.N.M. Nov. 15, 2006). Such detrimental effects are neither warranted nor justified by the facts and circumstances here.

It is anticipated that the time period between charging and trial in this case will be extensive. As with any multi-defendant conspiracy case, there is a lengthy and complex process that will take place prior to any trial. Drew Crandall respectfully requests that this Court allow his release pending this lengthy process and potential trial.

ACCORDINGLY, and based upon the foregoing and any additional arguments presented at a hearing, this Court should allow the defendant's release pending trial based upon any reasonable conditions the Court sees fit.

SUBMITTED this 24th day of October, 2017.

/s/ James C. Bradshaw
_____
JAMES C. BRADSHAW
BROWN BRADSHAW & MOFFAT
422 North 300 West
Salt Lake City, Utah 84103
Telephone: (801)532-5297
Email: jim@brownbradshaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2017, I electronically filed the foregoing *Defendant's Motion for Review of Detention by the District Court* with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

JOHN W. HUBER,
United States Attorney
VERNON STEJSKAL,
Assistant United States Attorney
MICHAEL GADD,
Special Assistant United States Attorney
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

/s/ Ann Marie Taliaferro
_____

K:\JCB\P\7447-1.wpd