JOHN W. HUBER, United States Attorney (#7226)
VERNON STEJSKAL, Assistant United States Attorney (#8434)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
Attorneys for the United States of America
111 South Main Street, #1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br> vs.<br><br>DREW WILSON CRANDALL,<br><br>     Defendant. | Case No. 2:16-CR-631 DAK<br><br>**UNITED STATES'S MEMORANDUM IN SUPPORT OF MAGISTRATE JUDGE'S ORDER TO DETAIN**<br><br>Judge Dale A. Kimball |

Mr. Crandall represents an unmanageable risk of flight, danger to the community, and obstruction of justice, and for those reasons, the United States submits this memorandum urging the Court, like Magistrate Judge Barry M. Kurren in the District of Hawaii, to order the defendant be detained pending trial.

## Table of Contents

1. STATEMENT OF FACTS ................................................................................ 3
  1.2 Overview ................................................................................................ 3
  1.3 Historical Investigation ......................................................................... 4
  1.4 Interview of Alexandrya Tonge, Pill Packager ................................... 8
  1.5 Interview of Katherine Bustin, Pill Packager .................................... 13
  1.6 Interviews of Mario Noble, Customer Support Provider .................. 14
  1.7 Review of Pharma-Master's online feedback ..................................... 17

1.8     Interview of T.E., Nominee ................................................................. 18

1.9     Crandall's arrest and border search ..................................................... 18

1.10    Financial Investigation into Crandall .................................................. 19

1.11    Interviews with S.G. ........................................................................... 20

    1.11.1     Crandall first admits his involvement with Shamo ................... 20

    1.11.2     S.G.'s 2015 Ultimatum ............................................................. 21

    1.11.3     The pill press ............................................................................ 22

    1.11.4     Co-conspirators ......................................................................... 23

    1.11.5     Packaging and Shipments ......................................................... 24

    1.11.6     Drug proceeds ........................................................................... 25

    1.11.7     Crandall's anger ....................................................................... 26

    1.11.8     Laundering Bitcoin into fiat currency ...................................... 26

    1.11.9     Maintaining contact with Shamo .............................................. 27

    1.11.10    Crandall renews his active participation with Pharma-Master ... 28

    1.11.11    Crandall's customer claims overdose ....................................... 30

    1.11.12    Response to Shamo's arrest ...................................................... 30

    1.11.13    S.G. learns about Fentanyl ....................................................... 32

    1.11.14    Concerned about coming back to the United States ................. 32

2.   ARGUMENT .................................................................................................... 33

2.1     Legal Standard and Burden of Proof .................................................. 33

2.2     Crandall is an Unmanageable Risk of Flight ..................................... 35

    2.2.1     The nature and circumstance of the offense charged ................ 35

    2.2.2     The weight of the evidence against the defendant .................... 38

    2.2.3     The history and characteristics of the defendant ...................... 38

    2.2.4     History of alcohol or substance abuse ...................................... 39

    2.2.5     Subject to lengthy period of incarceration if convicted ........... 39

    2.2.6     Lack of stable employment ....................................................... 40

    2.2.7     Lack of stable residence ............................................................ 40

    2.2.8     Significant ties outside the United States ................................. 40

    2.2.9     Prior attempt to evade law enforcement ................................... 47

2.3     Crandall is an Unmanageable Risk of Danger to the Community ...... 48

2.4     Crandall is an Unmanageable Risk of Obstruction of Justice ............ 49

3.   CONCLUSION ................................................................................................. 50

# 1.    STATEMENT OF FACTS

"The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the detention hearing."[1]  Consequently, the United States intends to proceed by proffer, made both in this pleading and further at the upcoming hearing.[2]

## 1.2    Overview

1.    The organization began with collaboration between Shamo and Crandall, but quickly grew to include dozens of co-conspirators.  Shamo and Crandall purchased pill tableting machines, sometimes called pill presses, dies and stamps to mark pills so the markings would match those of legitimate pharmaceutical drugs, and inert pill ingredients, such as binding agents and colors.  Some items, such as the binding agents and colors were purchased legally, and other inputs, such as Fentanyl and Alprazolam, were purchased and imported into the United States illicitly.  To avoid detection, Shamo and Crandall had many of their inputs shipped to nominees or straw purchasers.  Shamo and Crandall paid their nominees and straw purchasers for their assistance.

2.    The inputs would then be pressed into pills that had the appearance of legitimate pharmaceuticals.  Their fake Oxycodone-type pills and the counterfeit alprazolam tablets were sold on the dark web at a significant profit.  Once sold, Shamo and Crandall used co-conspirators to package the pills and ship the pills to the customers.  Shamo also employed a co-conspirator to provide online customer support—a role that Crandall took up again in 2016 after spending time travelling abroad.

---

[1] 18 U.S.C. § 3142(f).
[2] *United States v. Smith*, 79 F.3d 1208, 1210 (D. C. Cir 1996) ("Every circuit to have considered the matter … [has] permitted the Government to proceed by way of proffer.").

3.      Sales on the dark web marketplace[3] were conducted in bitcoin, a decentralized virtual currency.  Shamo and Crandall expended a fair amount of effort converting their bitcoins into fiat currency, which could be used to support their lifestyles and pay their co-conspirators, among other things.

## 1.3    Historical Investigation

4.      The historical investigation revealed that Shamo and Crandall's organization, using an online marketplace account associated with Shamo, made purchases of manufacturing paraphernalia, including latex gloves, postage, bubble wrap, and empty gelatin capsules in 2014. That same online marketplace account purchased an item described as tablet press mold lab equipment in 2014.

5.      In 2014 and 2015, Crandall, his girlfriend named S.G., Shamo, and other co-conspirators used PayPal my cash cards to launder approximately $50,000 USD back into the financial system.  Investigators frequently see bad actors purchase PayPal cash cards on the dark web, for example, with bitcoin, and then upload the cash cards into PayPal accounts in violation of PayPal policy, where the funds can then be transferred legitimately into the financial system. The PayPal investigators determined that fraud was likely occurring and deactivated all the accounts associated with the organization.

6.      In May, 2015, S.G. lost her job at an online marketplace company as a result of the PayPal my cash card fraud found on her PayPal account.

---

[3] Evidence exists that the organization sold drugs on more than one dark web marketplace, but most of the evidence of sales discussed below concern sales made on one particular dark web marketplace—AlphaBay.  The DOJ announced on July 20, 2017, that AlphaBay had been shut down through a combined law enforcement effort with a number of countries around the world.

7.     On several occasions in 2015, Crandall's debit card was used to purchase postage at numerous post offices throughout the Wasatch Front in Utah.

8.     In October 2015, Crandall was sent a shipment of microcrystalline cellulose—a binding agent used in pill pressing. During October, Crandall also sent four payments to Press Club Nutrition—an online vendor, mentioned below, that supplies pill pressing ingredients and paraphernalia. While only one shipment went to Crandall, other press club shipments in October went to Shamo and J.V., a straw purchaser for the Shamo/Crandall organization.

9.     In November 2016, after developing a handful of confidential sources of information, investigators were able to seize more than 70 packages of pills that had been manufactured by the Shamo/Crandall organization and which were packaged for shipment to customers. The seized packages were mostly envelopes, but agents also seized 10-20 small boxes, and 5 large boxes. All the packages had a fake return address—some stated "Jamaica Green Coffee." One large box was opened and agents found an invoice for the purchase of "French Decaf Coffee." Inside this box were two large, vacuum-sealed, foil bags each containing a large plastic bag filled with small blue pills that appeared to be Oxycodone 30mg blue pills, bearing the stamp "A 215." Each bag had written in the corner "5000." Each bag appeared to contain 5,000 pills. A total of 20,000 pills were in this one box, with a wholesale value of over $400,000. Several other bags were opened with varying amounts of what was appeared to be Oxycodone and Xanax. These packages all had different mailing addresses for customers throughout the United States. The DEA lab has confirmed that the seized packages contained Fentanyl and Alprazolam, for fake Oxycodone and counterfeit Xanax, respectively.

10. Below is a picture of one of the opened packages of fake pills seized during the investigation:



11. Based on the seizures, surveillance, and information from confidential sources, agents were able to secure search warrants for Mr. Shamo's residence and the residence of two of his co-defendants, Ms. Tonge and Ms. Bustin.

12. On November 22, 2016, a search warrant was executed on Shamo's residence and investigators located and seized additional evidence indicative of narcotics trafficking, including suspected precursor chemicals, approximately 70,000 pills that had the appearance of Oxycodone (and which later tested positive for Fentanyl), pill press machines, and approximately $1,227,773 in US currency, which is believed to be proceeds from narcotics trafficking.

13. Below left is a photo of the currency seized and below right is a photo of one of the pill presses found in the residence:

 

14. Shamo was arrested at his residence at the time the search warrant was executed.

15. During the November 22, 2016 execution of the search warrant on Shamo's house, Shamo told agents that he had recently been "unloading bitcoin" and that he had $700,000 to a $1,000,000 in cash. As mentioned above, agents seized over $1,200,000 in cash from Shamo's house.

16. Forensic evidence review of computers seized from Shamo identified communications between Shamo and multiple others who used the Localbitcoins.com site confirming bitcoin transactions where Shamo was selling bitcoin via multiple platforms offered by the site.

17.    Localbitcoins.com is the web site for Local Bitcoins, which is a global Bitcoin exchange available in 248 countries.[4]  Unlike other exchanges, which require ID verification and personal information, Local Bitcoins allows its users to buy bitcoin without connecting their name or other identifiable information to the bitcoin transactions that occur using its site other than an email address.  Users are free to decide on their own prices and limits.

## 1.4    Interview of Alexandrya Tonge, Pill Packager

18.    On November 22, 2016, investigators executed a search warrant at the residence of Alexandrya Tonge and Katherine Bustin, which resulted in the discovery and seizure of Fentanyl, shipping labels, packaging and other evidence indicative of narcotics trafficking.

19.    Tonge, after waiving her Miranda warnings, stated that she and Bustin met Shamo and Crandall while working at an online marketplace company.  Tonge was initially told by Shamo and Crandall that they stopped working at the online marketplace company because they were trading Bitcoin and were making a lot of money.  Tonge stated that she was unsure what trading Bitcoin entailed, but realized the two (Shamo and Crandall) continued to make a lot of money after they quit their jobs at the online marketplace company.  Tonge stated that she maintained a friendship with Shamo on Facebook, and asked Shamo how they made so much money and how she could get involved.  Approximately two years prior to the interview, Shamo and Crandall hired Tonge, and her roommate, Bustin, to work as a "drop"—a role in which they would receive packages sent via commercial courier to their residence, located in South Jordan, Utah, and then turn the packages over to Shamo and Crandall. Tonge explained that Shamo and Crandall would pay them approximately $200 to $300 per package.  Tonge also stated that she knew the packages contained something illegal, but did not know what the contents were at that

_____

[4] According to Localbitcoins.com. Accessed on August 15, 2017.

time. She remembered that a few of the packages came from Florida, and some came from other countries. She thought that some of the packages had Chinese writing on them. She estimated they had received approximately four packages at their residence before June 2015. In June of 2015, Tonge said she asked Shamo and Crandall if her and Bustin could play a different role in the organization to make more money. Tonge stated that Shamo and Crandall allowed Tonge and Bustin to become more involved in their drug trafficking organization by "packaging" narcotics.

20.     Tonge explained that Crandall came over nightly to Tonge and Bustin's residence and instructed them on how to package narcotics. Tonge stated that Crandall showed Tonge and Bustin how to wrap the packages, specifically using a vacuum sealer and Mylar bags, which he told them would make the narcotics undetectable. Tonge explained that she and Bustin used padded envelopes or priority mail envelopes and regular stamps to ship the narcotics. She stated that Crandall brought them envelopes and stamps. If they purchased shipping supplies on their own, they were reimbursed by either Shamo or Crandall. Tonge explained that they were instructed by Crandall to use fictitious company names as the shippers on the package labels. Tonge explained that she and Bustin would receive "drops" of narcotics from both Shamo and Crandall—meaning that Shamo and Crandall would provide the fake pills that Tonge and Bustin would package and ship to customers.

21.     Tonge stated that Crandall left the country approximately a year prior to the interview and moved to New Zealand with his girlfriend. Tonge stated that Shamo had previously told her and Bustin that he had "bought Drew out." From that point forward, Shamo exclusively made all the narcotics deliveries to their residence. Tonge stated during the interview that Crandall was in Laos with his girlfriend, but was once again involved in the

organization—Crandall was sending messages and providing customer service on the Dark Net related to narcotics orders from Shamo's customers.

22.    Tonge explained her and Bustin's role and how the shipping operation worked as follows: the orders from the dark net website ALPHABAY would be decrypted by the customer support personnel, who would send the orders to Tonge and Bustin's dark web email address—Passthepeas@sigaintevyh2rzvw.onion.[5]  Tonge would decrypt the messages sent to their dark web email address, package the pills, and purchase postage labels to fulfill the orders.

23.    Tonge said she and Bustin utilized a bitcoin account, accessible from her MacBook Pro through an app called Multibit, which is a bitcoin wallet funded by Shamo, to pay for postage and generate labels to print out for the parcels.  She said there was approximately $400 USD worth of bitcoins in the account.  Tonge said she assumed Shamo used the same app for his bitcoin accounts.  She said she thought Shamo would often use bitcoin for purchases on Amazon.com.  She said Shamo spoke of meeting people for bitcoin trades in which they paid cash and he transferred bitcoins.  Tonge thought that most of Shamo's money was in bitcoin, and that buyers paid for the narcotics using bitcoin.

24.    Tonge said there was a decryption program on her MacBook computer that allowed her to decrypt the passthepeas@sigaint.org emails.  She said she had deleted some of the emails, but there were approximately 4-5 pages of emails still on the account.

---

[5] Their dark web email address had two different points of access—one on the dark web, one on the surface web. Accordingly, their dark web email address was Passthepeas@sigaintevyh2rzvw.onion, while their surface address appeared as Passthepeas@sigaint.org. These two email addresses belong to the same email account.

25.     Tonge informed investigators that an individual named Noble was the person who dealt with the customer service portion of the organization.  Noble would compile the orders from Shamo's dark net site.  She said, from what she had heard, the dark net site looked very similar to any online marketplace.  She said Shamo started trafficking narcotics on the dark net marketplace called Agora.

26.     Referencing Noble's role in the DTO, Tonge said Noble would sometimes send her and Bustin emails saying, for example, "this customer is unhappy, can you do this?"  Tonge said Noble did not know her or Bustin personally.

27.     Tonge said Shamo had a friend named L., later identified as L.P.  Tonge stated that L.P. helped him press pills at Shamo's home.  Tonge said she had been to Shamo's residence before to pick up product, payment, and packaging materials, but she had only been in one room.

28.     Tonge provided HSI agents with access to the Passthepeas@sigaintevyh2rzvw.onion/ Passthepeas@sigaint.org email account and permission to enter the secure email site using her credentials.  The agents reviewed the emails from that encrypted account and noticed that older emails appeared to have been deleted, but agents found an email with instructions written by Crandall that was dated July 8, 2015.  The email was sent to Passthepeas@sigaint.org from Passthepeas@sigaintevyh2rzvw.onion—meaning it was sent to and from the same account.

29.     The email authored by Crandall was discovered in the "Sent Mail" folder.  It had both public and private keys for PGP encryption attached with instructions.  The email discovered read as follows:

> Subject:        asc file to import
> From:           passthepeas@sigaint.org
> Date:           Wed, July 8, 2015 6:43 am
> To:             passthepeas@sigaintevyh2rzvw.onion
> Priority:       Normal
> here is the asc file attached to this.
> pen the gpg keychain program from your applications folder. then at the
> top go to file > import > and choose this file you've downloaded.
> now when you have a text file to send to us, right click on it >> bottom
> of that menu and choose services > gpg encrypt file
> then the box that comes up, you should choose gene001 key in the top box
> to encrpyt the file with. the bottom box is for signing your message,
> which means aaron can detect any evidence of tampering with the
> encryption. for now dont worry about doing that.
> delete this after reading and importing this asc file.
> Thanks

30.     This email corroborated the statements made by Tonge that not only identified that it was sent from an individual other than Aaron Shamo but also identified that the organization employed operational security in the form of encryption and took measures to conceal evidence of the crime, which is documented with the instruction to delete the message after performing the instructed tasks.

31.     Agents also observed that the account was receiving shipping orders from drw99@sigaint.org, americansteam@sigaint.org, and shortbread66@sigaint.org.

32.      In corroboration, agents subsequently learned that Drew Crandall sent Tonge a $500 USD payment via Venmo.

## 1.5    Interview of Katherine Bustin, Pill Packager

33.    On November 22, 2016, agents interviewed Bustin, who lived with Tonge.  Bustin told agents that both Shamo and Crandall would pay Bustin and Tonge to receive parcels.  Bustin stated that Crandall showed her and Tonge how to package the pills properly so product was not damaged during shipment.  Bustin also informed the agents that Crandall directed her and Tonge to put the pills in Mylar bags because they could not be x-rayed, and to include an invoice inside each package.  Bustin told the agents that in the beginning Crandall would bring narcotics in "Ziploc baggies or gallon baggies" to their residence for repackaging and shipment.

34.    Bustin explained to agents that Tonge would download encrypted "order fulfillment" information from an email sent by Shamo.  Bustin explained that she believed the email account over which Tonge and Shamo communicated was accessed using TOR—an internet browser that allows users to access the dark web.  Bustin stated that Crandall showed Tonge how to access that email account, decrypt the order fulfillment list, and then print the information—which included the quantity and shipping address for each customer.  Emails from that encrypted account were periodically deleted, but agents found an email with instructions written by Crandall that was dated July 15, 2015.

## 1.6     Interviews of Mario Noble, Customer Support Provider

35.     On November 22, 2016, and again on December 7, 2016, agents interviewed Mario Noble, who stated that he worked for Shamo by responding to messages and providing customer service for Shamo's Dark Net "store."  Noble explained that Shamo provided him with access to the Dark Net account that was selling fake Oxycodone-type pills made with Fentanyl. Noble further explained that he would process the orders, answer messages and provide customer service responses to customers.  Noble explained that he would generate the daily order fulfillment list, encrypt it, and send it to the packagers/shippers by using an encrypted email. Noble stated that he sent these emails to passthepeas@sigaint.org, which he was instructed was the shipping team who he never met.  Noble explained that his email account was drw99@sigaint.org and that he would send to and receive encrypted emails from Shamo who was using americansteam@sigaint.org.

36.     Noble stated that during his employment he processed approximately 20-50 orders each day for PHARMA-MASTER.  Noble stated that he worked for Shamo performing his tasks until September 2016 when he took a break for a month after telling Shamo he did not want to do it as much.  Noble stated that, at that time, Shamo explained he had another person doing what Noble was doing.  Further, Noble told the agents that Shamo referred to the other individual as "Drew," stated it was "some guy in India," and at one time referenced "they were traveling to Cambodia, Thailand."  Noble believed that this other person acting as PHARMA-MASTER on the AlphaBay vendor account for Shamo was Drew Crandall.

37.     Noble gave agents his access credentials to the AlphaBay account that was granted "shared" access to the "PHARMA-MASTER" vendor account.  At the time that the agents reviewed the account it had already been banned by AlphaBay.

38.     In reviewing the encrypted emails between drw99@sigaint.org to passthepeas@sigaint.org, there are no messages in September 2016 between the two accounts. Rather, passthepeas@sigaint.org was receiving the daily fulfillment orders from americansteam@sigaint.org (Shamo) and shortbread66@sigaint.org.  Agents believe Crandall was operating as shortbread66@sigaint.org.

39.     The PHARMA-MASTER account shows that the form of accepted payment for the drugs was in Bitcoin.  Noble stated that Shamo showed him how Bitcoins worked and that Shamo had shown Noble, on Shamo's computer, Shamo's Bitcoin wallet; Noble stated that at the time Shamo showed Noble his wallet, Shamo's Bitcoin wallet had over $600,000 worth of Bitcoin in it.  Noble stated that Shamo told him that he trades Bitcoin for cash with people. Shamo made it seem that he had a person he dealt with to trade Bitcoin, but he did not elaborate. Shamo told Noble that he would tell people that he traded Bitcoin for a living.

40.     Here is a screenshot of some of the pills for sale on the PHARMA-MASTER

storefront on AlphaBay:



## 1.7    Review of Pharma-Master's online feedback

41.    Investigators reviewed PHARMA-MASTER's public facing page online. Investigators learned that PHARMA-MASTER's store front on AlphaBay allowed customers to post feedback online. The feedback listed the price (in bitcoin), type, quantity of pills purchased, as well as the date of the purchase. Investigators were able to determine the total revenue and total sales from the sales for which a customer left feedback/finalized their purchases; the totals for the feedback-linked sales are as follows[6]:

|  |  |
|---|---|
| **Revenue:** | $2,817,928.43 |
| **Total Items Sold:** | 872,789 |
| **Total Transactions:** | 5606 |

| Type of Pill | Total Orders | Total Quantity | Total Value |
|---|---|---|---|
| Adderall | 87 | 884 | $8,971.26 |
| Xanax | 1,653 | 405,801 | $283,168.42 |
| Oxycodone | 3,493 | 458,975 | $2,472,306.48 |
| *M Box | 871 | 210,752 | $1,005,760.73 |
| *Roxy | 2,245 | 243,004 | $1,417,448.07 |
| *Fentanyl | 377 | 5,219 | $49,097.68 |
| Etizolam | 105 | 3,930 | $3,830.85 |
| Valium | 75 | 2,010 | $2,172.50 |
| LSD | 82 | 694 | $3,734.53 |
| Mephedrone | 23 | 30 | $1,082.40 |
| Cialis | 25 | 250 | $368.85 |
| MDMA | 27 | 189 | $1,276.77 |
| Ritalin | 7 | 25 | $185.42 |

*Oxycodone total is from M Box, Roxy, and Fentanyl combined into one result.

---

[6] These figures were calculated from feedback posted between Dec 15, 2015, and November 2016, when the storefront was shut down after SHAMO's arrest. The cash value of the bitcoin paid for the fake and counterfeit pills was determined based on the date of sale. Bitcoin has continued to appreciate in value: as of October 13, 2017, 1 bitcoin was worth more than $5,200 USD.

## 1.8    Interview of T.E., Nominee

42.    On December 14, 2016, agents interviewed T.E.  T.E. stated that he had been receiving packages from China on behalf of Shamo and Crandall.  T.E. stated that he worked with Crandall for an online retailer and Crandall had introduced him to Shamo.  T.E. stated that approximately a year prior to the interview he was approached by Crandall inquiring if he would be interested in making a little extra money. Crandall explained that his address would be used to receive shipments on behalf of Shamo and Crandall.  T.E. described Shamo and Crandall using the term "co-partners" while referring to their business.  T.E. estimated that he received approximately five parcels over an estimated six-month period.

## 1.9    Crandall's arrest and border search

43.    On May 5, 2017, Crandall and S.G. flew into Honolulu to get married. Crandall and S.G. were detained as they passed through the Honolulu airport and were interviewed by case agents. Crandall, after hearing his Miranda warnings, agreed to speak with the agents. Crandall claimed to know little about Bitcoins, explaining that he bought one, once, for two dollars. Crandall, when confronted about the conspiracy, invoked his right to have an attorney present.

44.    HSI agents searched Crandall's devices pursuant to their border search authority. During the border search, agents discovered that Crandall's computer viewed an article that discussed the recent arrest of the "Cocaine Cowboy," a "mansion-owning playboy drug smuggler" on the run for 26 years.

45.     Here are two pictures of the article viewed:

 

## 1.10  Financial Investigation into Crandall

46.     Crandall's AFCU account, # 893-1, shows numerous purchases that were made using a debit card.  The purchases include three payments to the Press Club of Toronto Canada in October 2015. The Press Club has been identified as a major supplier of ingredients, including microcrystalline cellulose, FD&C colors, and other substances that are used in pill/tablet production.  There are also numerous debit purchases made to shipping supply companies during the same time period.

47.     Agents identified that Crandall used the moniker "Drewbie" on Localbitcoins.com. Agents performed a google search on drewbie and Bitcoin that showed two

cached listings from the user "drewbie" on the Localbitcoins.com site. One listing offered to sell bitcoins in Salt Lake City, the other in Auckland, New Zealand.

48.     The "Drewbie" profile showed he created the account August 2014; he had more than seventy confirmed trades and the site listed his trade volume between 250-500 Bitcoin. According to the site, the platform supports exchangers in approximately 248 countries.

49.     Subpoenaed records from Bitstamp LTD showed that Crandall, from an IP address in Australia, made a transfer of bitcoin to an address identified as belonging to Localbitcoins.com.

## 1.11   Interviews with S.G.

50.     S.G. was detained with Crandall at the airport in Hawaii. S.G., after hearing her Miranda warnings and agreeing to speak to agents, explained that Crandall had cashed out bitcoins and they were travelling by utilizing those funds. S.G., when confronted with the conspiracy, also invoked.

51.     Subsequently, S.G. and her attorney met with investigators and explained the following:

### 1.11.1   Crandall first admits his involvement with Shamo

52.     S.G. and Crandall started dating in 2014. Crandall first told S.G. he was involved in "something more" at a Christmas party in 2014. Prior to that, S.G. had been pulling away from Crandall and considered breaking things off, as it seemed as though he was keeping things from her. S.G. approached Crandall the night of the party and told him he was very closed-off and not telling her something. Crandall then explained that he and Aaron [Shamo] had been selling drugs as a means for Crandall to pay off his student loan debt. S.G. asked Crandall how much he owed in student loan debt and described his response as between "$30,000 - $40,000," but S.G. could

not recall the exact amount. S.G. described the conversation as a "tearful explanation" of what Crandall was doing and why he did not spend as much time with her. S.G. later recalled Crandall explaining it as, "we're selling drugs and we're doing it online and it's through the dark web." S.G. explained she did not have knowledge of the dark web at that time.

53.     S.G. later explained that she believes Crandall got into the business to pay off student loans but got caught up in it. S.G. mentioned Crandall's friends were wealthy.

## 1.11.2     S.G.'s 2015 ultimatum

54.     S.G. allowed Crandall to use her PayPal account, as explained above, which led to S.G. being fired from her job. The firing spurred a conversation with Crandall in which S.G. gave Crandall an ultimatum. Crandall agreed to remove himself from the venture with Shamo, but indicated it would take time to do so.

55.     S.G. explained she wanted to be with Crandall and believed he was "removing himself from the situation." S.G. knew it would take Crandall time to remove himself from the drug trafficking organization, and did not know what that would mean for Crandall's involvement and what he would be doing during that time. S.G. recalled Crandall explaining that he would slowly push things off onto other people and Shamo would hire other people to assist Shamo or take over what Crandall was no longer doing. S.G. agreed that the summer of 2015 was "definitely a transition period." S.G. was not comfortable with this and then said, "But, I let a lot of things slide that I shouldn't have."

56.     Crandall was unemployed after quitting his job at an online retailer platform until he began working at a local logistics company shortly before leaving the United States. S.G. indicated the money Crandall made from drug sales went toward living expenses. S.G. explained Shamo was in charge of the Bitcoin wallet and Shamo would only pull out money when Shamo

needed it. S.G. thought that when Crandall did get money from Shamo, it was used to pay off old bills. S.G. later explained that from her understanding of Crandall and Shamo, Crandall may not have had joint access to the Bitcoin account because he did not want to be the front runner and understood the consequences of breaking the law more than Shamo.

### 1.11.3    The pill press

57.     S.G. stated she saw the pill press one time at Shamo and Crandall's residence. S.G. described the house and explained that in the basement was a bedroom belonging to Shamo. Attached to Shamo's bedroom was an additional storage space. Crandall had told S.G. that was the area in which he and Shamo used the pill press. S.G. believes she only went into the room containing the pill press one time, maybe twice. S.G. described the room as having a "smaller than usual door," and containing shelves. On the shelves S.G. could see powder and guessed the powder to be drugs. S.G. assumes Crandall was with her in the room as she would not have gone in without him.

58.     Crandall told S.G. he knew how to work the pill press. S.G. said she remembered being in Crandall and Shamo's residence and asking, "What's that sound?" S.G. described the sound as a "thud" and "thumping" and thought it was construction. S.G. was told that sound was a pill press. S.G. estimated the thumping to occur every two seconds. S.G.'s understanding was the pill press would work itself once it got going and said, "So Drew would, or someone, I don't know, would go start it." S.G. said Crandall would go up and down stairs and assumed he was checking on the pill press. S.G. felt this sound was occurring less and less frequently after she gave Crandall an ultimatum. S.G. recalled asking Crandall how to get a pill press. Crandall told S.G., "You just order it online."

### 1.11.4    Co-conspirators

59.    S.G. recalled one night that "Katie [Bustin] and Alex [Tonge]" were at Shamo's residence for what S.G. believed was a meeting. S.G. remembered thinking she did not know the two women were friends with Shamo. This meeting took place in the downstairs living room area. S.G. believes Bustin, Tonge, and Shamo were the only three at that meeting. S.G. remembered Crandall going downstairs during that meeting and S.G. went downstairs to see who was in the house. S.G. said she mentioned to Crandall she did not know Bustin and Tonge were friends with Shamo to which Crandall responded their involvement was a way to move things away from Crandall. S.G. told Crandall she hoped Bustin and Tonge knew the risk involved with the organization and encouraged Crandall to let them know what had happened to S.G. regarding her job at the online retailer platform company, as Tonge and Bustin were also employed by the same company.

60.    Crandall told S.G. that Bustin and Tonge would be "packaging and shipping, handling," for the organization. S.G. assumed the drugs being sold were the same as before and did not recall asking Crandall. When asked what the drugs were before, S.G. responded, "MDMA, LSD, maybe weed, Xanax, I don't know about OxyContin but I suspect."

61.    S.G. believes her knowledge of the organization came from little conversations "here and there" with Crandall or little comments about how things are typically done, or watching documentaries.

### 1.11.5    Packaging and shipments

62.     S.G. explained Crandall had a desktop in his bedroom in Utah at the time and therefore did not access a laptop while the two were spending time together. S.G. stated, "My understanding from Drew was that Aaron was the one that was handling online orders and that sort of thing, and Drew was doing the packaging and shipping and that sort of thing." S.G. went on to explain Bustin and Tonge "coming into the mix" was to take Crandall's packaging job from him. S.G. could recall seeing packaging materials at Crandall's shared residence with Shamo and described seeing the packaging materials downstairs in the living room, in Crandall's room, and in Crandall's backpack. S.G. stated Crandall never packaged anything in front of her while she was there and said she never assisted.

63.     When asked how she learned other people were accepting packages on behalf of the organization, S.G. responded, "Drew told me." S.G. explained she vaguely remembered being present when Crandall picked up a package at someone's house; however, S.G. did not know the person who received that package. S.G. stated that early in her relationship with Crandall, Crandall asked her if she would be comfortable having a package sent to her house. After querying him further, S.G. declined.

64.     When asked if S.G. ever provided Crandall with knowledge regarding the postal service due to her previous employment with the USPS, S.G. responded by saying Crandall occasionally asked her tracking questions. S.G. explained that an Express Mail package had been mailed to California and the tracking showed "Attempted Delivery." Crandall feared the package would be returned. S.G. told Crandall the customer could call the post office and go in to pick it up. S.G. thought this was a drug package containing "Molly," being shipped to California for a festival.  When asked why Crandall was worried the package would be returned, S.G. said,

"because the return address on it was like, to… some random address." S.G. went on to explain the package therefore would not be returned to Crandall but would instead be returned to an "unsuspecting individual."

65.     S.G. was unsure how often packages were returned to random addresses as said she did not know the "ins and outs" of the business. S.G. explained there were periods of time when a group of packages would go missing after being dropped off at a specific post office. S.G. said when this happened the organization would have to reship the orders or return the money.

### 1.11.6     Drug proceeds

66.     When asked the total amount of money Crandall made selling drugs, S.G. responded, "Oh that's hard to say." S.G. then went on to explain Crandall was receiving enough money for monthly bills from the time he left work at the online retailer platform company, however did not know what he made from the business prior to that time. S.G. explained that Crandall's monthly bills would have been paid from drug proceeds from January 2015 until approximately July 2015. S.G. explained the back pay Shamo owed Crandall would fluctuate. S.G. recalled Crandall had approximately $13,000 when the two left for New Zealand but did not know if that was from his job or from "money that Aaron had given him." S.G. stated Crandall still has student loans.

67.     Crandall told S.G. that Shamo was "buying me out" and would cash out the money Crandall invested. S.G. could not recall the amount Shamo was going to pay Crandall and said that number also fluctuated in its telling. S.G. said one day it would be $30,000 and that "it never was what he said it was going to be and that seemed to be a frustration of Drew's as well."

S.G.'s understanding was the business was a partnership as Crandall and Shamo went "in on it together." S.G. thought Shamo invested more money than Crandall into the organization.

### 1.11.7    Crandall's anger

68.    S.G. described Crandall as someone who could go from "mellow to very angry pretty quickly," and recalled one instance where Crandall and Shamo had argued. S.G. recalled Crandall slamming the door and walking out of the residence after speaking with Shamo. S.G. did not hear the conversation, but when she asked Shamo what had happened, he said it was nothing and "not a big deal." S.G. later asked Crandall as she sensed it was still bothering him. Crandall disclosed to S.G. that his roommate, C.C., had "gone in to see Homeland Security." S.G. explained a drug package had been sent to C.C. at Crandall and Shamo's address, however S.G. was unsure if C.C. was even aware the package had been sent. S.G. stated this seizure had happened toward the beginning of the organization. S.G. stated this was why Crandall was upset; he was also upset that Shamo did not take the situation more seriously. S.G. estimated this disagreement occurred spring 2015.

### 1.11.8    Laundering Bitcoin into fiat currency

69.    In the months leading up to November 2015, S.G. stated Crandall was trading Bitcoin for cash "a lot" in preparation for their trip to New Zealand. At that time, Crandall was doing better financially and did not have money problems like he previously had. Crandall even had $5,000 stashed in his bedside table. S.G. would occasionally go with Crandall when he would trade Bitcoin for cash. S.G. explained Crandall would typically go to a coffee shop located near Crandall's residence. The amount Crandall traded for cash would vary depending on how much that individual was willing to trade. Crandall would obtain the cash and split it

with Shamo.  S.G. estimated she went with Crandall approximately "four or five times" over the summer and fall of 2015 to exchange Bitcoin for cash.

70.     S.G. estimated Crandall had approximately $15,000 saved when the two left for New Zealand.  When asked the largest amount she saw Crandall accept during a Bitcoin trade for cash, S.G. stated, "definitely $5,000, I want to say like $10,000, but I don't know if it was quite that much."  When asked the most Crandall ever told S.G. he traded in one transaction, S.G. stated, "Again, I wouldn't say over $10,000, but maybe even seven, eight, nine thousand dollars at a time."  S.G. felt because Crandall was selling his Bitcoin he was not reinvesting it in other things and that he was getting out of the organization.

71.     When the two arrived in New Zealand, S.G. did not know if Shamo had paid Crandall the money he owed, but S.G.'s understanding was Crandall was no longer a part of the organization in any way other than Shamo still owing Crandall money.  S.G. estimates Shamo owed Crandall $12,000 at that time.

**1.11.9     Maintaining contact with Shamo**

72.     S.G. explained Shamo would message Crandall occasionally but she was not sure when Shamo began asking Crandall to assist with customer service.  S.G. explained that Shamo told Crandall he needed someone he "could trust."  S.G. did not know how often Shamo would message Crandall but believed it was frequently, as Shamo would message Crandall through Telegram—an encrypted messaging application.  S.G. stated, "He [Shamo] was always trying to keep people sucked in, not leaving."

73.     S.G. did not know if anyone other than Bustin and Tonge took over Crandall's role when Crandall left the business.  S.G. recalled Crandall telling her he showed Shamo how to use the pill press.

### 1.11.10    Crandall renews his active participation with Pharma-Master

74.    S.G. knew "for sure" Shamo and Crandall were communicating in May or June 2016. S.G. stated Shamo told Crandall the person doing customer service was leaving and told Crandall that Crandall could make some extra money. The way Crandall brought this up to S.G. made her think Shamo had been having this conversation with Crandall for a while and this was not a new topic of conversation.

75.    S.G. explained that while in Auckland, she and Crandall were low on cash and had been working for accommodation and food, however, they were not making any income. S.G. found a job as a temporary employee at an accounting firm; Crandall was becoming anxious about not having a job despite applying for jobs. S.G. stated Shamo stepped in during that time and took advantage of "Drew's panic." S.G. explained they were house sitting at that time and the homeowners liked that their pet would have someone home all day long. By house sitting, Crandall and S.G. were able to stay rent free. Crandall thought rejoining the drug trafficking organization was perfect as he could stay home with the dogs and he would still have income from which to pay student loans. S.G. estimated the time period in which Crandall considered joining Shamo again to be June 2016.

76.    Shamo offered to pay Crandall $1,300 a month and told Crandall he did not pay an hourly rate, just a flat monthly rate. Shamo asked Crandall to do customer service and indicated the hours could fluctuate depending on the volume. Crandall spoke with S.G. about the offer, however, she was hesitant. S.G. asked why he could not get a normal job instead. S.G. explained that Crandall told her that, because they were in another country, it was safer for him to be a part of the drug trafficking organization there than in the United States. Crandall further assured her that no one would know about his involvement. S.G. told Crandall she did not feel

good about it and ultimately S.G. told Crandall he needed to make the decision for himself. Crandall decided to become re-involved in the drug trafficking organization.

77.     S.G. stated Shamo would transfer Bitcoin to Crandall in order to pay him while overseas. S.G. thought Crandall held onto the Bitcoin while he had cash available to him and thought he may have cashed out Bitcoin while in Auckland, New Zealand.

78.     At the time Crandall rejoined with Shamo, S.G. assumed Shamo was selling the same products he had been selling previously. Crandall continued to hound Shamo to pay him for money he felt he was owed. Shamo made payments to Crandall for his work more consistently than in 2015. S.G.'s understanding was Shamo paid Crandall in Bitcoin, apart from one cash deposit. S.G. believed the cash deposit into Crandall's account was because of a delay in payment; Crandall asked Shamo to put the cash into his account. S.G. then stated Crandall may have been paid $1,300, two times a month. S.G. stated she never saw that money and assumed Crandall was putting it toward student loans. S.G. explained she was funding everyday things, such as food, from money she was earning at work.

79.     Crandall would work for the drug trafficking organization while S.G. was at work. S.G. told Crandall she did not want to know about his illicit work. S.G. stated approximately a month in to Crandall becoming re-involved, S.G. told Crandall she felt a great deal of anxiety because he started working with Shamo again. Crandall responded to this by saying he committed to Shamo and could not just leave again. Crandall continued to answer messages while the two traveled to Australia and Thailand; while they travelled, Crandall would shield her from his work by staying up late. S.G. estimated Crandall would work for the organization every other day.

80.     S.G. explained that one time, while in New Zealand, she saw Crandall working and saw his computer screen. S.G. recalled saying, "whoa, what's that?" and then realizing it was the organization's webpage. S.G. described the webpage as looking like an "eBay type," however the listings were pills. S.G. did not spend time looking at the screen and did not read the pill descriptions.

### 1.11.11   Crandall's customer claims overdose

81.     S.G. explained that on one occasion Crandall received a message about a customer's friend overdosing; as a result, the customer was requesting a refund on a large order.

### 1.11.12   Response to Shamo's arrest

82.     S.G. and Crandall were in Laos when they learned of Shamo's arrest after a mutual friend sent them a news article. S.G. felt shock and instant worry. S.G. asked Crandall what he needed to do for himself. Crandall told S.G. the only thing he could do to help Shamo was access the account, delete all messages, and notify the operations people on the dark web that the account was compromised and request they shut it down. S.G. was aware of a jump drive Crandall had in his possession that he said he would wipe clean, but S.G. advised him to get rid of it. S.G.'s understanding was that Crandall smashed the jump drive and threw it in a garbage can. S.G. did not see him throw it in the garbage can but could recall him showing her it was smashed.

83.     Crandall wiped his MacBook after Shamo's arrest, according to S.G., but he did not dispose of any computers and S.G. did not dispose of anything for Crandall. S.G. assumed Crandall deleted his Telegram messages and said she had not used the Telegram application for quite some time. S.G. stated Crandall kept his Telegram application in order for someone to send

him a message warning him that he was being looked into by investigators. S.G. stated he never received a message like that, to her knowledge.

84.    S.G. said there were many conversations in which she asked Crandall who knew he was involved, if he would be contacted, and if he covered his tracks. Crandall told S.G. the only way people would discover his involvement in the drug trafficking organization was if the people that knew he was involved in the organization rolled on him. S.G. believed the only three co-conspirators who knew of Crandall's re-involvement in the organization were Tonge, Bustin, and Shamo.

85.    S.G. and Crandall contacted people asking if they knew what was happening with Shamo. S.G. stated the two notified Crandall's parents to pass along Crandall's information if they were contacted. S.G. put a halt on wedding plans for the moment to see what would happen, and they planned on Crandall having to fly home to resolve the issue. S.G. stated both she and Crandall felt odd that no one had contacted them. S.G. and Crandall, who had become engaged, decided to go on with their wedding plans because they felt they could not put their life on hold.

86.    When asked why Crandall did not contact law enforcement instead of waiting to be contacted, S.G. stated Crandall would not want to be a part of the investigation if he could help it, because he knew it would be a "big deal" and a "big disaster." The thought of Crandall's involvement being more than just as a witness against Shamo was too much to fathom, life consuming, and S.G. explained that she and Crandall did not talk about it.

87.    S.G. believes Crandall only had one Bitcoin left at that point, as he had not been paid. While in Cambodia, S.G. explained, Crandall put up a listing on LocalBitcoin.com asking someone to trade cash for that final Bitcoin. S.G. stated Crandall used LocalBitcoin.com to facilitate all his trades and estimated Bitcoins were worth $750 at that time. Crandall made the

trade while in Cambodia and received U.S. currency. S.G. estimated the trade occurred approximately one and a half weeks after Shamo's arrest.

88.     S.G. reached out to several old friends and associates to find out about Shamo's case and the investigation. S.G. agreed she and Crandall "definitely" also reached out to see there was any heat on Crandall. S.G. stated, "We definitely wanted to hear word from somebody. . . but silence." S.G. recalled Crandall talked with C.C.—his old roommate—after Shamo's arrest. S.G. could tell that Crandall did not want to discuss with S.G. the messages he was receiving.

89.     When asked if she talked with Mario Noble after Shamo's arrest, S.G. stated she messaged him via Snapchat but did not receive a response. S.G. explained before leaving New Zealand, Noble told her he was working for Shamo. To S.G.'s knowledge, Noble did not know Crandall was also working for Shamo.

### 1.11.13    S.G. learns about Fentanyl

90.     The first time S.G. was aware of Fentanyl was when she read the news article following Shamo's arrest. S.G. stated she never asked Crandall about the Fentanyl because she could tell he already knew what kind of mess he was in.

### 1.11.14    Concerned about coming back to the United States

91.     S.G. claimed that she and Crandall did not have a conversation before traveling to Hawaii about the risk in returning to the United States, other than discussing, at times, whether they had been contacted or their parents had been contacted by law enforcement. However, S.G. did have concerns about returning to the United States. S.G. and Crandall had conversations in general about asking for a lawyer, especially following the interrogation at work that led to S.G.'s termination from the online marketplace company.

## 2.   ARGUMENT

This is a detention review. The Court is being asked to review again the facts as they relate to Mr. Crandall to determine whether Crandall is a risk of flight, danger to the community, or obstruction of justice such that he should be detained pending trial. Mr. Crandall indeed represents an unmanageable risk of flight, danger to the community, and obstruction of justice and the United States urges the Court to detain Mr. Crandall pending the resolution of his case.

### 2.1   Legal Standard and Burden of Proof

District Court Judges review *de novo* the detention decisions of Magistrate Judges.[7] When a case involves a serious risk that a defendant will flee or attempt to obstruct justice, the Bail Reform Act of 1984 provides that "a judicial officer shall hold a hearing to determine whether any condition of or combination of conditions … will reasonably assure the appearance of the person as required and the safety of any other person and the community."[8] If after a hearing, the Court "finds that no conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."[9]

And even though "[i]n our society, liberty is the norm, and detention prior to trial is the carefully limited exception,"[10] Congress identified a sub-set of particularly violent and dangerous crimes for which it mandated that a presumption of detention apply.[11] Count 2 of the Superseding Indictment—in which Mr. Crandall is charged with Conspiring to Distribute

---

[7] DUCrim R 57-16(a)(1); *United States v. Lutz*, 207 F. Supp. 2d 1247, 1251 (D. Kan.  2002); *United States v. Madsen*, No. 2:11-CR-127TS, 2011 WL 3847246, * 1 (D. Utah 2011); *see United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).
[8] 18 U.S.C. § 3142(f)(2).
[9] 18 U.S.C. § 3142(e)(1).
[10] *United States v. Salerno*, 481 U.S. 739, 755 (1987).
[11] 18 U.S.C. § 3142(f)(1).

Fentanyl—is among those crimes for which Congress declared that a presumption of detention arises.[12] As a starting point, the Court is required to presume that "no condition or combination of conditions will reasonably assure the appearance of [Mr. Crandall] as required and the safety of the community."[13]

In a case like this where the presumption applies, the defendant must introduce sufficient evidence to rebut the presumption of detention; if he fails to do so, detention should be ordered.[14] If the defendant presents evidence sufficient to rebut the presumption, the Court should then consider evidence presented by the United States and defendant to determine if detention is nevertheless warranted.[15]

If the defendant presents sufficient evidence to rebut the presumption of detention, the Court should then consider the factors set forth in 18 U.S.C. § 3142(g). Specifically, in determining whether there are no conditions that will reasonably assure the defendant's appearance, the Court shall "take into account the available information concerning—(1) the nature and circumstance of the offense charged…; (2) the weight of the evidence against the person; (3) the history and characteristics of the person…; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release…."[16]

Assuming the defendant presents sufficient evidence to overcome the presumption of detention, the United States must then prove a serious, unmanageable risk of flight by "a preponderance of the evidence" for the Court to order the defendant detained.[17]  When the

---

[12] Doc. 32.
[13] 18 U.S.C. § 3142(e)(3).
[14] *United States v. Stricklin*, 932 F.2d 1353, 1354-55 (10th Cir. 1991).
[15] *Id*.
[16] 18 U.S.C. § 3142(g).
[17] *United States v. Cisneros*, 328 F.3d 610, 613 (10th Cir. 2003) (sustaining the district court's determination that "the government had proved by a preponderance of the evidence that Cisneros

United States seeks to detain a defendant based upon danger to the community, the United States' burden of proof is clear and convincing evidence.[18]

## 2.2    Crandall is an Unmanageable Risk of Flight

Crandall presents a risk of flight such that no conditions of release will sufficiently ensure his appearance at trial and the United States urges the Court to detain Crandall as an unmanageable risk of flight.

### 2.2.1    The nature and circumstance of the offense charged

The callous use of Fentanyl to drive up profits and the size and scope of the distribution of Fentanyl set this case apart. Fentanyl is a powerful synthetic opioid analgesic that is similar to morphine but is 50 to 100 times more potent.[19] Because of its high potency, Fentanyl ingestion greatly increases the risk of overdose and death, especially for drug users who are unaware they are consuming Fentanyl.[20]

> Like heroin, morphine, and other opioid drugs, fentanyl works by binding to the body's opioid receptors, which are found in areas of the brain that control pain and emotions. When opioid drugs bind to these receptors, they can drive up dopamine levels in the brain's reward areas, producing a state of euphoria and relaxation. Fentanyl's effects resemble those of heroin and include euphoria, drowsiness, nausea, confusion, constipation, sedation, tolerance, addiction, respiratory depression and arrest, unconsciousness, coma, and death. . . The high potency of fentanyl greatly increases risk of overdose, especially if a person who uses drugs is unaware that a powder or pill contains fentanyl.[21]

---

posed a serious risk of flight such that no conditions of release would reasonably assure Cisnero's presence at trial.").

[18] 18 U.S.C. § 3142(f).

[19] https://www.drugabuse.gov/drugs-abuse/fentanyl (accessed July 2017).

[20] https://www.drugabuse.gov/publications/drugfacts/fentanyl (accessed July 2017).

[21] *Id*.

Fentanyl overdoses have spiked in 2015 and especially 2016; "In 24 of the nation's largest cities and the counties that surround them, fentanyl-related overdose deaths increased nearly 600 percent from 2014 to 2016."[22]

Pharma-Master shipped Fentanyl and Alprazolam across the United States. The map below shows, by dots, where Pharma-Master sent pills in the year leading up Mr. Shamo's arrest in November 2016.



Identified Zip Code Locations of Pharma-Master CONUS Sales

---

[22] https://www.washingtonpost.com/graphics/2017/national/fentanyl-overdoses/?hpid=hp_hp-more-top-stories_fentanyl-1115pm%3Ahomepage%2Fstory&utm_term=.6dea9f126200 (accessed October 2017).

Some of the listings on Pharma-Master's storefront indicated the fake Oxycodone pills for sale contained Fentanyl. Many other listings did not. For listings where Pharma-Master was offering distribution-quantities for sale—as opposed to personal-use quantities, like 10 tablets—it is almost certain that the end users who purchased from Pharma-Master's large customers did not know they were purchasing pills that contained Fentanyl.

For example, agents working in Oregon identified the customer behind the following 10,000 fake Oxycodone pill order below; the customer is a gang member and street-level drug dealer:



It is most unlikely that the addicts buying from this gang member knew he was selling Fentanyl disguised as Oxycodone pills.

### 2.2.2    The weight of the evidence against the defendant

The weight of the evidence against Crandall is strong; there is no doubt he conspired with Shamo and the other co-defendants. The co-conspirators he recruited and trained to join the conspiracy, T.E., Tonge, Bustin, and others, will testify against him. The financial trail leads to him. Crandall's fiancé, S.G., was an eyewitness to his involvement in the conspiracy, both in Utah and abroad, both as a manufacturer, shipper, and handling customer service duties. His fiancé has debriefed with agents, as mentioned above. The United States anticipates calling S.G. as a witness against Crandall.

### 2.2.3    The history and characteristics of the defendant

Mr. Crandall engaged in a long-term conspiracy to manufacture and distribute various controlled substances. Day in and day out, Mr. Crandall made affirmative choices to continue in the conspiracy. Mr. Crandall appears to have been driven to excel in the conspiracy by greed.

Mr. Crandall exhibited sophistication (1) by running a pill press, (2) by engaging in bitcoin transactions to launder proceeds into a fiat currency, (3) by recruiting co-conspirators, (4) by setting up co-conspirators with PGP encrypted dark web email accounts through which the conspiracies business could be conducted outside the view of law enforcement, (5) by gathering and processing dark web orders, and (6) by communicating with dark web customers by using a series of encryption methods and encrypted communication platforms.

### 2.2.4      History of alcohol or substance abuse

In her interview with investigators, S.G. stated Crandall would use MDMA occasionally at clubs, and would also use LSD. S.G. was not aware if Crandall used cocaine or heroin. S.G. also used MDMA occasionally and the two used LSD together. S.G. said she would "sometimes" smoke marijuana but stated "much less often than Drew."

S.G. stated she did not consume any illicit drugs while overseas; however, Crandall used LSD and smoked marijuana while abroad. S.G. explained Crandall told her he brought a few tabs of the LSD with him in his suitcase. Crandall's drug use undoubtedly led to his poor employment history and involvement with the drug trafficking organization. Drug users are more likely to flee than sober-minded defendants.

### 2.2.5      Subject to lengthy period of incarceration if convicted

Crandall is charged with a crime that carries a ten-year, minimum mandatory sentence. For two reasons, Crandall will not be eligible for safety-valve relief: first, he worked as a leader and an organizer within the organization; second, his actions resulted in death and serious bodily injury to some of his customers who ingested Fentanyl. The Base Offense Level for Count 2 is 38. A sentence of such magnitude, especially for someone new to the criminal justice system, provides a strong incentive to flee.

### 2.2.6    Lack of stable employment

Other than his work for the drug trafficking organization, Mr. Crandall has held sporadic employment for short periods of time during the years in which he has been engaged in drug trafficking. Crandall's employment overseas appears to have been punctuated by temporary work to support and supplement his semi-nomadic leisurely lifestyle. Or, in cases such as when he was a dog sitter, it allowed him a place from which and a time at which he could comfortably continue his drug trafficking work.

### 2.2.7    Lack of stable residence

When he lived in the United States, Crandall was a renter who bounced around from apartment to apartment. Overseas, Crandall lived in many places and spent time measured in months touring foreign countries. He has no history where he has exhibited a stable residence.

### 2.2.8    Significant ties outside the United States

Crandall lived outside of the United States for the seventeen months preceding his arrest. Crandall left the United States on November 28, 2015. It does not appear that he returned to the United States at any point during those seventeen months. During that time, S.G. posted pictures of her travel with Crandall on Instagram and on her travel blog. S.G. reported travel to the following destinations:

Thailand:



No better way to get around town! #InstagramHusband #ChiangMai #Scooter #Thailand #Instatravel #Traveler #LoyKrathong

That dress is beautiful

drew picked it out! I love it too!

#InstagramHusband hahahaha

Gorgeous!!!😍😊

Pretty Dress Looks like your Living the Dream I Remember when you was So Little

Thailand:



Sorry to be a photo slut today, but we've had a great time in Koh Phangan! #LegPiece #GlowInTheDark #FullMoonParty #BlackLight #Drasha #Betrothed #Travels #Bae #Thailand #Islands

Ooooh 😍😍😍🙌

New Zealand:



New Zealand:



Singapore:



Singapore:



Laos:



Laos:



Bali:



Sky Garden Kuta

Follow

47 likes                                    14w

█████ Our New Year's Eve at sky Garden. #Kuta #SkyGarden #Bali #Boo #Bae #Betrothed #FreeFlowingDrinks #Travel

Bali:



Ubud, Bali Island

Follow

40 likes                                    17w

█████ Staying in a bamboo tree hut tonight that has an incredible view of the rice paddies. #BambooHuts #TreeHouse #Bali #Ubud #Indonesia #Backpackers #2017 #InstaTravel #RicePaddies #GreatView

Malaysia:



Malaysia:



Cambodia:



Despite their jet-setting lifestyle, it appears that S.G. and Crandall had planned to call Australia home, based on a post on her travel blog.

### 2.2.9    Prior attempt to evade law enforcement

Crandall's efforts when he realized Shamo had been arrested were to (1) shut down the Pharma-Master storefront, and (2) destroy physical evidence. Crandall also fled the United States, at least in part, in an attempt to shield himself from the consequences of his illegal actions.

S.G. took pains to minimize the nature of Crandall's flight, telling investigators, "I would say he left to remove himself from the situation because Aaron is manipulative." But S.G. also told investigators that Crandall felt anger over Shamo's carelessness at importing a drug package by having it sent to their roommate, at their address. Crandall knew that his roommate had been interviewed by HSI.

After Shamo's arrest, S.G. and Crandall worked to contact old friends and associates to find out if they were under investigation. Evasion was not far from Crandall's mind as he prepared to travel to Hawaii to get married. The article found on his computer about the arrest of a long-term-fugitive drug kingpin reveals as much.

If given the opportunity, whether by release on bond or ankle monitor or some other set of conditions, Crandall will flee. The United States urges the Court to detain Crandall.

## 2.3  Crandall is an Unmanageable Risk of Danger to the Community

Crandall presents a risk of danger to the community such that no conditions of release will sufficiently ensure the safety and welfare of the community; the United States urges the Court to detain Crandall as an unmanageable risk of danger to the community. Crandall's chief motivation is greed. Crandall knows pressing fake Oxycodone and counterfeit Alprazolam pills has a high likelihood of leading to immense wealth. Crandall has the knowledge, skills, and ability to run a pill press. Crandall understands the order processing and customer service requirements of a major dark web vendor. Crandall is versed in communicating through encrypted channels on both the surface and dark web. Crandall has the knowledge and ability to launder large sums of Bitcoin into fiat currencies. The investigation that led to his arrest has revealed to Crandall the one or two mistakes the organization made. In short, Crandall is prepared in every way to resume the operations of the conspiracy.

And if he begins anew, death will follow him. Agents are currently conducting several investigations into overdose deaths of customers of Crandall and Shamo. Crandall himself was warned by a customer that the customer's friend had overdosed. Fentanyl, in particular, has deadly potency, as evidenced by a small sampling of news articles linked in the footnote below;

for example, one report shows Fentanyl overdoses have risen 540% over a three-year period.[23] Crandall, because of his knowledge, skills, abilities, and greed, presents an unmanageable risk of danger to the community.

## 2.4    Crandall is an Unmanageable Risk of Obstruction of Justice

Crandall presents a risk of obstruction of justice such that no conditions of release will sufficiently prevent further obstruction; the United States urges the Court to detain Crandall as an unmanageable risk of obstruction of justice.

Crandall obstructed justice by alerting AlphaBay administrators to Shamo's arrest and asking for the Pharma-Master storefront to be taken down. Crandall obstructed justice by destroying his thumb drive that contained evidence of his work for the organization on the dark web. Crandall obstructed justice by wiping clean the contents of his laptop. Crandall has another opportunity to obstruct justice if released: marrying his fiancé and preventing her from testifying.

S.G. is the only eye-witness to Crandall's involvement in the conspiracy in 2016. By marrying S.G.—the United States' hesitant-but-essential witness against Crandall—the defendant could shield himself from the effects of S.G.'s testimony by enabling S.G. to claim spousal privilege. Spousal privilege as recognized in the federal courts has two aspects: (1) the *testimonial privilege*, which permits one spouse to decline to testify against the other during the marriage, and (2), the marital *communications privilege*, which either spouse may assert to prevent the other from testifying to confidential communications made during the marriage.[24] If

---

[23]NY Times: Fentanyl overdoses up 540%; Boy, 10, dies from contact with Fentanyl at swimming pool; Wave of addiction linked to fentanyl worsens; and a particularly thoughtful opinion: Facing Down America's Fentanyl Epidemic.
[24] *United States v. Bahe*, 128 F.3d 1440, 1441–42 (10th Cir. 1997) (citing *Trammel v. United States,* 445 U.S. 40(1980)).

Crandall were released from custody and married his fiancé, S.G., S.G. could claim the testimonial privilege when called to testify against Crandall at trial. In this way, Crandall, if released, could again obstruct justice.

## 3.    CONCLUSION

Because the proffered evidence shows Crandall presents an unmanageable risk of flight, an unmanageable risk of danger to the community, and an unmanageable risk of obstruction of justice, the United States urges the Court to agree with the decision made by Magistrate Judge Barry M. Kurren in the District of Hawaii and detain Crandall pending trial.

Respectfully Submitted this 25th Day of October, 2017.

JOHN W. HUBER
United States Attorney


/s/ Michael Gadd
_____
MICHAEL GADD
Special Assistant United States Attorney