JAMES C. BRADSHAW (#3768)
MARK R. MOFFAT (#5112)
BROWN, BRADSHAW & MOFFAT
422 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 532-5297
Facsimile: (801) 532-5298
jim@brownbradshaw.com
mark@brownbradshaw.com
*Attorneys for Drew Crandall*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>v.<br><br>DREW WILSON CRANDALL,<br><br>    Defendant. | Case No. 2:16-CR-631-DAK<br><br>**RENEWED MOTION FOR DETENTION REVIEW**<br><br>**Judge Dale A. Kimball** |

The Defendant, Drew Crandall, by his attorneys, hereby respectfully move this Court for an order to release him pending sentencing. Since his arrest on May 5, 2017, Mr. Crandall has remained in custody for almost 3 years.

Specifically, on November 21, 2017, the Court issued an order that defendant remain detained pending trial. However, there have been significant changes in circumstances since that order was issued, including the following:

1.   Mr. Crandall entered guilty pleas on October 12, 2018.

2.   Mr. Crandall was called as a trial witness by the Government on August 15,

2019.

3.      Unanticipated factors, including the COVID-19 outbreak[1] and the necessity for ongoing evaluations regarding co-defendant Shamo,[2] have significantly extended the time period before Mr. Crandall's sentencing will take place.[3] At this point in time, it is unknown when Mr. Crandall's sentencing will realistically occur, and additional significant delays are likely.[4]

4.      The Court has now had the benefit of having observed all witnesses, including Mr. Crandall, testify.  Accordingly, this Court is now in a better position to determine the roles played by the charged defendants and in regards to whether the conditions of detention and/or release are appropriate to ensure appearance and mitigate any perceived threat to the community. Other than Mr. Shamo, who has been convicted of far more serious offenses, all other co-defendants have been released throughout the pendency of these proceedings.  Further, similarly situated or more culpable defendants

---

[1] *See* United States District Court, District of Utah, General Order 20-010 (stating "the court will hold in-person criminal hearings only in exceptional circumstances and after the exhaustion of all other available options.").

[2] *See Order for Psychological and Psychiatric Examination and Report as to Aaron Michael Shamo*, *United States v. Shamo*, Case No. 2:16-cr-00631-DAK-PMW (Doc. 321).

[3] As per his agreement with the Government, Mr. Crandall will be the final defendant to be sentenced in this case.

[4] A transcript of Mr. Crandall's testimony is attached hereto as Exhibit A and will be cited to as TR:D.C.(pg#).

have been released on their own recognizance without a requirement of pretrial supervision. *See U.S. v. Paz*, Case No. 2:18-cr-00231-DAK-1 (Doc. 11 & 20 (Court ordering pretrial release with no conditions imposed)).

5. Since retaining counsel Mr. Crandall has been interviewed several times and has testified under oath before a jury. There is no suggestion that he has provided any false or incomplete information.

6. In considering Mr Crandall's previous request to be released, the Court took specific note of the varying ways that the Government and defense counsel portrayed Mr. Crandall, stating that "the parties presented two different people to the court." This Court is now in a position to make its own determination and to specifically consider the characterization previously made by the Government that Drew Crandall was the "mastermind" behind Mr. Shamo's criminal operation.[5] *Detention Hearing: Hawaii*, at 7.[6]

7. In previously considering Crandall's request for release, the Court was presented with information regarding Mr. Crandall and his role in this enterprise. Significant to this motion, it would now appear that in some regards the actual evidence from the trial does not track the proffers presented and adopted by the Court:

---

[5]The Government's position was predictably adopted and advanced by Mr. Shamo at trial. The Government successfully resisted this theory and the jury recognized that it is not supported by the evidence.

[6]A transcript of Mr. Crandall's initial Detention hearing held in Hawaii on May 9, 2017 is attached hereto as Exhibit B.

    a.    "Defendant's claim that he left to break away from Shamo also finds little support in the evidence." *Detention Order* (Doc. 80) at 4-5.

    b.    "[Crandall] appears to be largely motivated by greed and his own self interest" and "the court is uncertain as to assets Defendant may have available to him." *Id.* at 4-5.

    c.    The "Defendant's parents had no idea of Defendant's level of involvement." *Id.* at 3.

    d.    "[O]ther defendants appear to have taken direction from Crandall." *Id.* at 6.

8.    The trial witnesses addressed these issues in a manner which generally suggests that Mr. Crandall can be managed on release. More specifically:

    a.    It was the Government that introduced testimony showing why Mr. Crandall left the country and established that he severed all ties with Mr. Shamo when he left. Crandall testified: "I wanted to make a clean break from the organization . . . We left the [country] to get away from that and to make that clean break completely." (TR:D.C.(59-60)). Ms. Bustin supported this proposition stating, "[Drew] decided to travel with his girlfriend Sasha... but when [Drew] left, Aaron basically took over everything that [Drew] would

have been doing."[7] (TR:A.T./K.B.(59-60)); *See also Testimony of Alexandrya Tonge* (TR:A.T./K.B.(44)) (stating that Mr. Crandall left the country to travel with his girlfriend and that "[i]t was always Aaron that we communicated with after Drew was gone.")

b. Testimony also established that Mr. Crandall received far less money than other participants and there was no suggestion from any witness that Mr. Crandall has hidden assets. Mr. Shamo testified that at the time of his arrest he was paying Mr. Crandall a fixed amount of $2,700.00 every two weeks.[8] Shortly before his arrest Mr. Shamo had given his parents $500,000.00 to store for him and when he was arrested with $1.2 million in cash on his dresser.[9] Of particular significance in August of 2018, nine months *after* this Courts previous detention ruling, another charged Defendant delivered approximately $805,990.00 and 33.8211 in Bitcoin to the Government. The money was produced over the course of three separate out of custody meetings with law enforcement, and after the

---

[7] Ms. Bustin's and Ms. Tonge's trial testimony is attached hereto as Exhibit C, and will be cited to as (TR:A.T./K.B.(pg#)).

[8] *See* Shamo testimony attached hereto as Exhibit D, at 91-92.

[9] *Id.* at 95.

      agents were told a series of lies about where these funds had been stored.

c. Mr. Crandall's entire extended family, including his parents and grandparents, were in the courtroom to hear his testimony on August 15, 2019, and their support has not wavered. His parents know exactly what his involvement was and that Mr. Crandall is prepared to face the consequences. They are willing to offer their home and their testimony to show that he will not flee and he will not reoffend. Mr. Crandall's family remains steadfast in their support and are willing to do all that is requested by the Court including: posting the title to their home as a surety; providing employment; and providing a residence with monitored internet connections.

d. There are two distinct chapters in regards to Drew Crandall's involvement with this enterprise and they cannot be analytically lumped together. During the first chapter the operation was not distributing Fentanyl[10] and Mr. Crandall had a more significant role in the operation. He had more knowledge and control over the operation and directed others. Conversely, during the second chapter,

---

[10](TR:D.C.(74-75)) (stating that it was not until after he left the country that Mr. Shamo begun to distribute Fentanyl).

after Fentanyl was being distributed, Drew only provided customer service and he gave directions to no one. (TR:A.T./K.B.(44)) (stating that Fentanyl was only distributed after Mr. Crandall left the country to travel with his girlfriend and that "[i]t was always Aaron that we communicated with after Drew was gone.")

9. Finally, the exceptional circumstances presented by the COVID-19 crisis requires the Court to reexamine Mr. Crandall's detention, including consideration of issues regarding health and safety while in detention and the Eighth Amendment's prohibition of cruel and unusual punishment.[11] There are clear health and safety issues unique to county jail facilities in light of the pandemic, to include the serious concerns raised by the close quarters, a lack of adequate medical care, and the continual rotation of inmates.[12]

---

[11] The Eighth Amendment proscribes more than "physically barbarous punishments," but takes into account "dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Jackson v Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)). This includes deliberate indifference to serious medical needs of prisoners and "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

[12] Nationally, doctors and health experts are concerned that the spread of COVID-19 is almost inevitable in jails and acknowledge that county jail facilities are not capable of adequately managing an outbreak. *See* Amanda Klonskly, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES, March 16, 2020 (available at https://www.nytimes.com/2020/03/16/ opinion/coronavirus-in-jails.html).

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," "may also be less able to participate in proactive measures to keep themselves safe," and that "infection control is challenging in these

**WHEREFORE**, the Defendant respectfully requests an order granting his immediate release pending sentencing.

DATED this 1st day of April, 2020.

/s/ James C. Bradshaw
JAMES C. BRADSHAW
Attorney for Defendant

---

settings." Greg S. Gonsalves, et al., *Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States*, (March 2, 2020) (available at https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf).

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2020, I electronically filed the foregoing *Renewed Motion for Detention Review* with the Clerk of Court using the CM/ECF system which sent notification of such filing to the to all parties and co-defendants.

*/s/ Kayla Marker*
