JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DREW WILSON CRANDALL,<br><br>Defendant. | Case No. 2:16-cr-631 DAK<br><br>OPPOSITION TO RENEWED MOTION FOR DETENTION REVIEW<br><br>Judge Dale A. Kimball |

---

The United States urges the Court to deny the defendant's Renewed Motion for a Review of Detention without a hearing because (1) the defendant has failed to prove that the United States intends to seek a no-jail sentence—the United States will recommend to the Honorable Dale A. Kimball that the defendant serve a significant period of additional imprisonment; (2) the defendant has failed to prove by clear and convincing evidence that he is not a risk of flight; and (3) he has failed to prove by clear and convincing evidence that he is not a danger to any other person in the community. Failure to prove any one of those three items requires the Court to keep the defendant detained pending sentencing.

**1. Background**

Shortly after his arrest in May 2017, the defendant was ordered detained by the Honorable Barry Kurren, Magistrate Judge for the District of Hawaii. After an evidentiary hearing in November 2017, the Honorable Dale A. Kimball ordered that the defendant remain in custody pending trial. (Doc. 80).

On October 17, 2018, the defendant pleaded guilty to Counts 2, 3, and 13 of the Superseding Indictment, the most serious of which—Conspiracy to Distribute Fentanyl— carries a ten-year minimum-mandatory sentence and a maximum sentence of life imprisonment.

**2. Standard of Proof**

By pleading guilty to a drug trafficking crime that carries a maximum sentence of life imprisonment, the defendant placed himself under the requirements of subsection (a)(2) of Title 18, United States Code, Section 3143. In order for the Court to release the defendant pending sentencing, the Court must make these findings:

1. an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

2. by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.[1]

If the Court cannot make these findings, the defendant must be detained. *Id.*

---

[1] 18 U.S.C. 3143(a)(2). Subsection (a)(2)(A)(i) applies to defendant's who elected to have a trial.

2

### 3. Burden of Proof

Once the defendant pleaded guilty, the burden of proof fell upon him to prove to the Court that he met the requirements of subsection (a)(2) of Title 18, United States Code, Section 3143.[2]

### 4. Argument

The defendant has not met his burden to prove any of the required findings the Court must make in order to release him while he awaits sentencing. Title 18, United States Code, Section 3143(a)(2) requires the defendant to show that (1) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; (2) by clear and convincing evidence that he is not likely to flee; and (3) by clear and convincing evidence that he is not a danger to any other person in the community. The United States will address each of these factors below.

### 4.1 The United States intends to ask the District Court to send the defendant to prison

The United States is going to ask the Honorable Dale A. Kimball to sentence the defendant to a significant period of additional imprisonment. The United States cannot recommend a no-additional-jail sentence; it must consider the wishes of those who have been adversely affected by his crimes, the factors listed in Title 18, United States Code, Section 3553(a), the defendant's cooperation and testimony against Mr. Shamo, and the

---

2 Fed. R. Crim. P. 46(c); *United States v. Affleck*, 765 F.2d 944, 946 (10th Cir. 1985); *United States v. Strong*, 775 F.2d 504, 505-06 (3d Cir. 1985).

sentencing guidelines—which, by the United States' calculations, place him in the life-imprisonment range. The defendant has not—and cannot—show that the United States has recommended a no-additional-jail sentence. He has failed to satisfy the first requirement of subsection (a)(2) of Title 18, United States Code, Section 3143. He cannot be released.

### 4.1.1 The defendant's crimes should not be divided into separate parts

In an effort to avoid greater liability for the manufacture and distribution of Fentanyl, the defendant argued that his criminal conduct should be divided into two distinct chapters that should not be lumped together—his hands-on conduct in 2015 and his remote, computer-based conduct in 2016.[3] But the defendant's efforts in 2015 are a significant reason why the enterprise was so successful at manufacturing and distributing Fentanyl in 2016. The defendant helped recruit participants. He helped train Ms. Tonge and Ms. Bustin in their role as packagers and shippers. And most importantly, he mastered the use of the pill press.

Successfully assembling, calibrating, maintaining, and running a pill press requires a certain set of knowledge, skills, and abilities, all of which the defendant possessed and used. The efforts made by Mr. Shamo and Mr. Paz in 2016 stood on the shoulders of the defendant's work in 2015.

---

3 Defendant's Renewed Motion for Detention Review, at 6-7.

In addition, the defendant argued that when he returned to criminal conduct in 2016 he "only provided customer service and he gave directions to no one."[4] However, the defendant must have felt more involved when he listed his work for the Pharma-Master enterprise as the top entry on his résumé:[5]

<u>**Drew Crandall**</u>

28 princess Street, Kangaroo Point

Brisbane QLD

+61 431 474 304

**Work Experience**

*Freelance customer service and software work  (06/'16 – 11/'16)*

- Answered customer service emails and made sure all questions were answered within 48 hours.
- Wrote simple WPF programs to help track sales, daily totals, and issue tracking.
- Used simple scripting to output results to Excel to visualize the data.
- Created a simple recipe and inventory management program to help a customer budget, eat healthier, and reduce food waste.

Customer service only begins to describe his involvement in 2016. And he was particularly proud of his efforts in mastering the pill press—he lists his formula applications in the last bullet point.

Th email shown below from the defendant to Ms. Tonge and Ms. Bustin reveals that the defendant was not a disinterested, hourly employee for Pharma-Master; he was still working towards the shared, mutual benefit of those with him in the enterprise:

---

4 Defendant's Renewed Motion for Detention Review, at 7.
5 Bates number 002-008-116-00045.

5

```
Subject:     10-5reships
From:        shortbread66@sigaint.org
Date:        Wed, October 5, 2016 11:06 am
To:          passthepeas@sigaint.org
Cc:          americansteam@sigaint.org
Priority:         Normal

Your scales are still coming up slightly short on some orders. (3-6% short
or so)
I'm going to list a reason for the reship from now on, not to criticize
you at all because you guys are awesome, but just so you are aware of them
and hopefully we can spot trends better this way

Thanks :)

Attachments:
10-5PassThePeas.txt
10-5Pharma.txt
[10-5PassThePeas.txt]
```

Ms. Tonge and Ms. Bustin did not hand-count pills for shipment; they estimated quantities by weighing groups of pills. The defendant explained in his email that their scales were giving incorrect weights. The bad scales led to orders being 3-6% short on pills. He explained that when he sends Ms. Tonge and Ms. Bustin a list of customers to whom they need to reship pills, he is going to start to list the reason why. That way, he explained, "we" can better spot trends. He did not say "you can spot trends" or "Aaron Shamo can spot trends." He said "we."

The defendant, understandably, would like to distance himself from the manufacture and distribution of Fentanyl. The facts, however, show his efforts were integral to the enterprise.

The United States has previously indicated where the defendant's culpability falls in relationship to his co-defendants:



There was nothing presented at the trial of Mr. Shamo that has changed where the defendant or his co-conspirators fell in this pyramid showing relative culpability.

The United States cannot serve the interests of justice without seeking an appropriate sentence for the defendant. After a significant reduction to account for his cooperation and testimony, the United States intends to recommend he be sentenced to a significant period of additional incarceration. Because the United States cannot recommend a no-additional-jail sentence, the defendant cannot meet the first requirement of subsection (a)(2) of Title 18, United States Code, Section 3143. He must be detained.

**4.2 The defendant has not met his burden to show that he is not likely to flee if released**

The defendant has likewise failed to show that he has transformed himself to a degree that he is no longer a risk of flight. The Honorable Dale A. Kimball found that the defendant was a risk of flight after hearing evidence and argument at the November 2017 evidentiary hearing. Several of the defendant's renewed arguments were made previously, including that he was cooperating with law enforcement, had support from his family, had employment options, and was not as culpable as other defendants. The defendant has done little to explain why those arguments now support a finding that the district court did not make when he first advanced them.

Before, the defendant was facing the possibility of a lengthy sentence if convicted. Now, the defendant knows he will face the district court at his sentencing and that the sentence may be lengthy. He knows better now than he did in 2017 the wide-ranging and devastating effect caused by the enterprise. He also knows that Mr. Shamo's trial strategy was partly to paint the defendant as the most-capable, most-likely-leader of the organization. His incentive to flee has increased, not decreased.

Finally, the defendant argues that he is not a flight risk because he could work for his mother's catering company if released. That argument was made in 2017. In response, it should be noted that the defendant has not earned an honest wage in the United States since the fourth quarter of 2015, as this wage data from the Department of Workforce Services shows:

| | | | | | |
|---|---|---|---|---|---|
| SSN: ▮▮▮▮▮▮ | Name: DREW CRANDALL | | | | |
| Employer ID | Employer Name | Quarter | Wages | Name | Used |
| 3487131-1 | DATA2LOGISTICS, LLC | 4/15 | 5,202 | D CRANDA | N |
| 3487131-1 | DATA2LOGISTICS, LLC | 3/15 | 2,589 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 1/15 | 396 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 4/14 | 7,851 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 3/14 | 6,883 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 2/14 | 7,893 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 1/14 | 6,512 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 4/13 | 7,805 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 3/13 | 7,045 | D CRANDA | N |
| 2015741-1 | CATCHA CAMA INC | 2/13 | 513 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 2/13 | 567 | D CRANDA | N |
| 4507430-0 | 360 SECURITY SOLUTIONS LLC | 1/13 | 1,613 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 4/12 | 2,799 | D CRANDA | N |
| 0674535-5 | ADECCO USA, INC. | 3/12 | 202 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 3/12 | 4,221 | D CRANDA | N |
| 0674535-5 | ADECCO USA, INC. | 2/12 | 769 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 2/12 | 3,109 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 1/12 | 4,228 | D CRANDA | N |
| 1947390-0 | A PLUS BENEFITS OF IDAHO, INC. | 4/11 | 1,269 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 4/11 | 2,560 | D CRANDA | N |
| 1947390-0 | A PLUS BENEFITS OF IDAHO, INC. | 3/11 | 5,719 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 2/11 | 1,820 | D CRANDA | N |
| 1947390-0 | A PLUS BENEFITS OF IDAHO, INC. | 2/11 | 2,872 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 1/11 | 3,081 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 4/10 | 3,438 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 3/10 | 4,766 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 2/10 | 4,086 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 1/10 | 4,296 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 4/09 | 640 | D CRANDA | N |
| 3049381-1 | HERITAGE MANAGEMENT SERVICES, INC. | 4/09 | 2,689 | D CRANDA | N |
| 3049381-1 | HERITAGE MANAGEMENT SERVICES, INC. | 3/09 | 444 | C DREW | N |
| 7057060-0 | PAY PROS OF UTAH, LLC. | 3/09 | 2,400 | D CRANDA | N |

The defendant held many jobs, but none for very long. Jobs for the defendant, are easy-come, easy-go. A promise to work for his mother's catering company during a pandemic when the restaurant and catering industry is imploding does not meet his burden to prove he is no longer a flight risk.

**4.3 The defendant has not met his burden to show that he is not a danger to another person if released**

It is the defendant's burden to prove by clear and convincing evidence that he no longer poses a danger to any person in the community. He has failed to do so. The danger the defendant poses to the community arises from the combination of his greed and abilities. Neither has waned since his arrest.

Successfully assembling, calibrating, and running a pill press is no mean feat. Anecdotally, DEA agents and the undersigned prosecutor investigated two other groups who attempted to press Fentanyl pills in Utah in 2016 and 2017.[6] The first group had a pill press, inert ingredients, and a Fentanyl analogue. Their pills were poorly pressed; their quality control was deeply disturbing—they would test batches of pills on themselves, causing more than one overdose event. Their inability to press pills that even closely resembled real oxycodone pills prevented them from causing widespread harm.

The second group obtained a pill press and Fentanyl, but they were wholly unable to press powder into pills. By contrast, the defendant mastered the use of a pill press in 2015. Mr. Shamo and Mr. Paz stood on his figurative shoulders when they converted the press into a Fentanyl press. The defendant was able to do what other criminals could not—he assembled, calibrated, and ran a pill press.

---

6 *United States v. Jetter*, 2:16-cr324-DB; *United States v. Jepson*, 2:17-cr-431-TC.

The defendant understands how to communicate with co-conspirators using encrypted communication applications and processes. He understands how best to avoid detection when shipping contraband through the mail. He knows how to use cryptocurrency to hide the paper trail that accompanies traditional drug trafficking offenses. He has been educated on how the Pharma-Master enterprise was caught—and given a blueprint for how to avoid arrest next time.

His abilities, combined with his greed, make the possibility that he would return to drug trafficking too high to risk his release pending sentencing. Knowing that he faces a potentially lengthy sentence would further erode his incentive to live crime-free in the short window of time in which he would be released.

### 4.4 The problems associated with COVID-19 do not support the defendant's release

The defendant argues that it would be improper under the Eighth Amendment to keep him in a county jail during the COVID-19 crisis. Courts in the District of Utah and elsewhere have recently denied similar claims, even in pretrial detention settings where the burden is not on the defendant.[7]

---

7 *See e.g.*, *United States v. Holt,* 2:19-cr-413-CW, minute entry at ECF No. 22 (D. Utah Mar. 22, 2020) (district judge upholds detention order and notes because of "[t]he current COVID-19 pandemic, pretrial is not able to adequately supervise the defendant."); *United States v. Jones*, No. 1:17-CR-00582 – CCB-2, 2020 WL 1323109, at *1 (D. Md. Mar. 20, 2020) (recognizing the serious health risk of COVID-19 and underlying health conditions of the defendant but ordering defendant's continued detention under the 3142(g) factors notwithstanding); *See also*, *United States v. Hamilton*, NO. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (finding COVID-19 pandemic insufficient reason to justify release under the circumstances of the case); *United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (defendant has not shown that the COVID-19 plan

11

The defendant relies on the speculative prospect of a COVID-19 outbreak at the Tooele County Jail, the pretrial facility where he currently is housed. The criminal justice system's response to COVID-19 cannot simply be to release prisoners who are a danger to the community or a risk of flight.  Doing so would put the public at serious danger and shift the burden of supervision from the jail facility to the already taxed U.S. Pretrial Services Offices. Moreover, the U.S. Marshals Service and many of its local contractual partners have taken, and continue to take, precautionary measures to prevent transmission of COVID-19.  To that end, the defendant's motion should be denied, without a hearing.

## 4.4.1 Releasing the defendant and others similarly situated would place an undue danger on the community and an unmanageable burden on pretrial services

The United States appreciates the defendant's concerns about COVID-19.  This is an unprecedented crisis that is also resulting in great anxiety for people outside of jail. The United States may be more receptive to some defendants' motions for release if the traditional supervision by U.S. Pretrial Services were in place.  However, U.S.

---

proposed by the BOP is inadequate to manage the pandemic within defendant's correctional facility or that the facility is unable to adequately treat the defendant); *United States v. Martin,* No. CR PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020) (noting that as concerning as the COVID-19 pandemic is, resolving an appeal of detention must be an individualized assessment of the factors required by the Bail Reform Act, and finding the defendant's underlying health conditions insufficient to rebut the proffer by the United States regarding precautionary and monitoring practices sufficient to protect detainees from exposure to the virus); *But see United States v. Stephens,* No. 15-CR-95 (AJN), --- F. Supp. 3d ---, 2020 WL 1295155, at *1-2 (S.D.N.Y. Mar. 19, 2020) (finding that COVID-19 was a "compelling reason" for release under § 3142(i) but releasing defendant due to new evidence that belied that defendant was a danger to the community).

12

Probation's ability to supervise defendants in the community during the COVID-19 pandemic is, understandably, greatly curtailed.

It is the United States' understanding that Pretrial Service Officers currently are unable to participate in field work.  Home visits are not being conducted.  Instead, Pretrial Service Officers are relegated to far less effective video-telephonic products such as FaceTime.  Additionally, defendants released on conditions including supervision are unable to meet with their Pretrial Services Officer at the Probation Office.  This means Pretrial Services is unable to provide in-person contacts with supervised defendants.  Without face-to-face interactions, the Pretrial Service Officers are unable to monitor defendants effectively.

Additionally, while vendors are still conducting drug testing, defendants need only claim illness, knowing they will be excused from this testing.  Moreover, for defendants in need of recovery support, neither drug and alcohol nor mental health group meetings are being held.  Additionally, community group recovery meetings are not being held during this crisis.[8]  While Pretrial Services Officers may be using FaceTime, or other technological means of checking in with pretrial defendants, these tools are an ineffective substitute for in person contacts and are inadequate to accurately determine whether defendants are complying with their terms of pretrial release.

---

[8]    Utah Support Advocates for Recovery Awareness ("USARA") notes that effective 3/16/2020 "USARA Recovery Community Centers statewide will be closed and there will not be any group recovery meetings held or any individual recovery coaching appointment until after April 1st, pending further public health official notices." https://www.myusara.com.

Also, before a defendant is placed on release, a Pretrial Services Officer usually must vet the proposed residence and meet the proposed third-party custodian and other residents who live there.  A flood of release orders would force these Pretrial Service Officers to place released individuals in unvetted residences, without the usual in-person transition supports and without the many pretrial and community resources typically available.  To be clear, Pretrial Services is currently *unable* to perform its core function of home visits.[9]

The speculative prospect of a COVID-19 outbreak at local jails where pretrial detainees are housed does not diminish the public interest in keeping the defendant off the streets based on the existing judicial finding of dangerousness that cannot be ameliorated by any combination of release conditions.  Because our entire community infrastructure is compromised during this pandemic, courts arguably should detain more dangerous defendants pretrial, not fewer, as Pretrial Services does not have the usual combination of conditions to reasonably assure the safety of the community during this pandemic.  If the Court did release the defendant, and other defendants, such release would not only endanger the community, it would quickly stretch the bandwidth of existing Pretrial Services beyond its breaking point.

---

9       The United States Attorney's Office understands why these in-person and in-home meetings should not occur.  Such meetings would expose all parties to a heightened risk of infection, and its subsequent risk of spreading such infection.  But these limitations underscore the reasons that the defendant should remain incarcerated during this time.  The defendant simply will not be afforded adequate supervision as the "combination of conditions" typically available by Pretrial Services are not currently available.

14

To be sure, one case by itself would not strain the system. But if the Court released the defendant, then undoubtedly an avalanche of defendants would also seek release. Each defendant would make the generic argument, now being made by the defendant, for release to reduce contact with other persons who are detained—notwithstanding that the Court ordered detention to protect the community *from the defendant* and because of the defendant's serious risk of flight.[10]

Awarding relief here, and in similar cases, would place a substantial and unwarranted burden on Pretrial Services. Pretrial Services has a finite number of resources available and a finite number of employees to supervise pretrial defendants. They have a limited number of electronic monitoring devices and resources to monitor these devices. Pretrial Service Officers typically rely on in-person contacts to conduct their work, an area already disrupted during this pandemic.

The United States is greatly concerned about the defendant being released without adequate supervision.

### 4.4.2 The local jails have established procedures to avoid a COVID-19 outbreak

Our local jails have implemented substantial precautionary measures to mitigate this risk of infection. For instance, all the detention facilities utilized by the U.S. Marshals Service in Utah have implemented enhanced screening based on the CDC guidelines. Contracting jails have also ceased in-person visitation. The United States

---

10 Doc. 80; *See, e.g.*, *United States v. Holt,* 2:19-cr-143-CW, minute entry at ECF No. 22.

understands that contracting jails are refusing to accept individuals showing symptoms unless and until they are cleared by a medical professional.  A number of facilities have significantly limited the number of new inmates into the facility.  Some facilities are restricting movement of inmates between pods. Additionally, all state and federal court hearings are being held remotely so inmates are not being transported to and from courthouses.

While the COVID-19 virus is new, health claims by detainees are not.  Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted.[11]  These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside.[12]  In this case, the defendant has not made a factual record that his needs will not be met while detained.

**4.5 The defendant need not wait to be sentenced**

The defendant's sentencing hearing need not be as far off in the future as he suggests. The defendant argued that his sentencing hearing will not occur in the foreseeable future due to the COVID-19 outbreak (addressed above), ongoing evaluations for Mr. Shamo, and the defendant's agreement with the United States to be sentenced last

---

11 *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008).
12 *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999).

among his co-defendants.

But, Mr. Shamo's evaluations have been completed—and the results suggest Mr.

Shamo is now ready to be sentenced. And although the United States has agreed that the

defendant can wait to be sentenced last, the United States is willing to see the defendant

be sentenced first. If the defendant choses to wait to be sentenced last for tactical reasons,

it is his choice to do so. But it is not a good reason to release him prior to his sentencing

hearing.

## 5. Conclusion

For the foregoing reasons, the Court should deny, without a hearing, the

defendant's Renewed Motion for Detention Review.

Dated this 7th day of April, 2020.

JOHN W. HUBER
United States Attorney

/s/ *Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney