JAMES C. BRADSHAW (#3768)
MARK R. MOFFAT (#5112)
BROWN, BRADSHAW & MOFFAT
422 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 532-5297
Facsimile: (801) 532-5298
jim@brownbradshaw.com
mark@brownbradshaw.com
*Attorneys for Drew Crandall*

---

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-CR-631-DAK |
| Plaintiff, | **MOTION FOR REVOCATION OR AMENDMENT OF DETENTION ORDER** |
| v. | |
| DREW WILSON CRANDALL, | Judge Dale A. Kimball |
| Defendant. | |

Pursuant to 18 U.S.C. § 3145(b), the Defendant, Drew Crandall, by his attorneys, hereby moves to revoke or amend the Magistrate's Order denying Crandall's Renewed Motion for Detention Review ("*Renewed Detention Motion*", ECF No. 341), and respectfully moves this Court for an order releasing him pending sentencing upon terms and conditions this Court deems fit.

## INTRODUCTION

On April 1, 2020, Crandall filed a Renewed Motion for Detention Review.  (ECF No. 336).  On April 7, 2020, the Government filed its memorandum in opposition. ("*Opposition*", ECF No. 340).  On the same day, Magistrate Dustin Pead issued an order denying defendant's motion.  ("*Order*", ECF No. 341). The Magistrate based it's denial, in part, on the finding that Crandall does not meet the requisite standard set forth in 18 U.S.C. § 3143(a)(2)(A)(ii), and therefore, cannot "qualify for release on this basis alone." (*Order* at 2).  However, both the Magistrate and the Government overlooked the fact that a district court is authorized to release a defendant pending sentencing pursuant to 18 U.S.C. § 3145(c) despite the Government's sentencing recommendations under 18 U.S.C. § 3143(a).

## ARGUMENT

**A.     This Court Has the Authority to Consider Release Pending Sentencing Pursuant to 18 U.S.C. § 3145(c).**

The Magistrate relied solely upon those factors set forth in 18 U.S.C. § 3143(a)(2) in denying Crandall relief, and in doing so, found that because the Government was not recommending that "no sentence of imprisonment be imposed," the Magistrate could not release Crandall pending sentencing under 18 U.S.C. § 3143(a)(2)(A)(ii).[1]

---

[1] 18 U.S.C. § 3143(a) sets forth factors to consider in determining release or detention pending sentencing and provides, in relevant part:

This Court, however, is authorized to consider Crandall's release pending sentence based upon the exceptional reasons provision set forth in 18 U.S.C. § 3145(c), which provides, in relevant part:

> (c) Appeal from a release or detention order– . . A person subject to detention pursuant to section 3143(a)(2)[2] . . . , and who meets the conditions of release set forth in section 3143(a)(1) . . ., may be ordered released, under appropriate conditions, by the *judicial officer*, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C.A. § 3145(c) (emphasis added).

---

> (a) Release or detention pending sentence.– (1) *Except as provided in paragraph (2)*, the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, . . , be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).
> (2) The judicial officer *shall order* that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 *and is awaiting imposition or execution of sentence be detained unless*--
> (A)(i) . . .; or
> (ii) *an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person*; and
> (B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C.A. § 3143(a) (emphasis added).

[2] Pending sentencing.

3

A majority of courts, including the Tenth Circuit, have found that the term

"judicial officer" in this provision encompasses district court judges, and therefore, grants

district court judges the authority to determine whether exceptional circumstances exist

that warrant release. *See United States v. Jones*, 979 F.2d 804, 806 (10th Cir. 1992) (per

curiam) (joining the majority of circuits "and hold that a district court may consider

whether exceptional reasons exist to release a defendant under § 3145(c)"); *United States*

*v. Meister*, 744 F.3d 1236, 1237 (11th Cir. 2013) ("we clarify that a district court does

have jurisdiction to grant a defendant release pending sentencing and appeal pursuant to

the provisions of 18 U.S.C. § 3145(c)).[3] The Seventh Circuit explained that this

"exceptional reasons" provision of § 3145(c) was added as an avenue of relief from the

mandatory detention provisions and authorizes a judicial officer, under appropriate

conditions, to order release. *See Herrera-Soto*, 961 F.2d at 647. Due to the context of the

---

[3] *Also, e.g., United States v. Goforth*, 546 F.3d 712, 715 (4th Cir. 2008) (concluding that district judge was a "judicial officer" within meaning of statute authorizing the release of a defendant otherwise qualified for mandatory detention when "exceptional reasons" exist); *United States v. Lea*, 360 F.3d 401, 403 (2nd Cir. 2004) (same); *United States v. Garcia*, 340 F.3d 1013, 1014 n. 1 (9th Cir.2003) (same); *United States v. Carr*, 947 F.2d 1239, 1240 (5th Cir.1991) (per curiam) (same); *United States v. Herrera–Soto*, 961 F.2d 645, 647 (7th Cir.1992)(per curiam) (same); *United States v. Mostrom*, 11 F.3d 93, 98-97 (8th Cir.1993)(per curiam) (same); *United States v. Rausch*, 746 F.Supp.2d 1192, 1194 n. 2 (D.Colo.2010) (noting that each of eight circuits "that has considered whether or not district courts have the authority to apply § 3143 have found that they do").

determination to be made, the term "judicial officer" encompasses both lower courts and

courts of appeal. *Id.*[4]

---

[4] As noted, the majority of courts hold that § 3145(c) allows a district court to provide relief from the mandatory statutory detention provisions. If this were not the case, however, and if this Court were found to have absolutely no authority to make an independent determination of release at this juncture based upon section 3143(a)(2)(A)(ii) and the requirement that the Government be recommending no sentence of imprisonment, there would be a number of constitutional concerns that would arise, including, at the forefront, a separation of powers issue. Such requirement would allow *the Government* to usurp this Court's discretion in setting detention conditions and imposing just and fair sentences. The only check on the discretion of an overzealous and unfair prosecutor, however, is the Court.

Also, with respect to this case, and in light of the fact that every other co-defendant who is also awaiting sentencing is out of custody, it would seem that if the Court is "required" to detain Crandall, then the Court would be "required" to detain all the other co-defendants as well. All are facing similar sentences, and as such, the justification that detention is necessary due to the severity of the crime and the potential term of incarceration – making it likely the defendant will flee if released – rings hollow. (*E.g.*, *Order* at 2). If these same statutory provisions and justifications were applied uniformly, it would seem the Court was also required to order detention at the time all the other co-defendants entered their pleas, unless the Government represented they would only be asking for a sentence of credit for time served. And if this did occur, there is a *Giglio* problem if the Government really did, indeed, intend to seek a credit-for-time-served sentence for all the other co-defendants and failed to disclose that to Mr. Shamo's attorneys.

The more likely scenario, and reality of the situation, is that the Government wanted the other co-defendants released in order to aid its prosecution of Mr. Shamo. Because it is highly unlikely, if not impossible, that the Government is going to stand up at each co-defendant's sentencing hearing and argue credit for time served for a convicted defendant that has yet to serve any time, the question remains – What is the good faith reason that all other co-defendants are eligible for release pending sentencing and Crandall is not?

**B.      Crandall Meets the Requisite Conditions for Release and Exceptional Circumstances.**

1.      This Court Should Find by Clear and Convincing Evidence That Crandall Is Not Likely to Flee or Pose a Danger to the Safety of Any Other Person or the Community If Released Pursuant to 18 U.S.C. § 3143(a).

*First*, as noted, the seriousness of the crime and the potential sentence does not make Crandall any more of a flight risk or danger than any other co-defendant who has pled in this case, and who has not been detained pending sentencing. *See* n.4, supra.

*Second*, the information this Court relied on previously in finding there to be an unmanageable risk which precluded Crandall's release has since been clarified or discredited. (*Order* at 2).  As noted in Crandall's Renewed Motion, this Court has now had the benefit of having observed all witnesses testify, including Mr. Crandall. As a result, this Court is now in a much better position to render an informed judgment on whether conditions might be imposed which would ensure Crandall's appearance and mitigate any perceived risk.  (*Renewed Detention Motion* at 4-7).

In considering Crandall's previous request to be released, the Court took note of the varying ways the Government and defense portrayed Crandall, stating that "the parties presented two different people to the court." (*Renewed Detention Motion* at 3-4; *also Order* at 2-3).  Rather than relying upon those former portrayals, this Court is now in a position to make its own determination.  Indeed, since the Court's prior consideration, Crandall has been interviewed several times and has testified under oath before a jury.

He has at all times been consistent, open and completely honest, and there is no

suggestion that he has provided any false or incomplete information.  This is in contrast to

other co-defendants, however, who have minimized and been untruthful about their roles

in this matter.  (*See Renewed Detention Motion* at 2-5 and Exhibits B-D attached thereto).

Also, previous concerns raised by the Court in its Detention Order on November

21, 2017, have since been answered through the course of trial, and each concern has

been resolved or answered in a manner which suggests Crandall can be managed on

release.  For example:

• In denying release, this Court observed that "Defendant's claim that he left

to break away from Shamo also finds little support in the evidence."  (ECF No. 80 at 4-5).

At trial, however, the Government itself introduced testimony showing why Crandall left

the country and established that he severed all ties with Mr. Shamo.  Crandall himself

testified: "I wanted to make a clean break. . . We left the [country] to get away from that

and to make that clean break completely." (*See Renewed Detention Motion* at 4 and

Exhibit A attached thereto).[5]

---

[5] It was the Government that introduced testimony showing why Crandall left the
country and established that he severed all ties with Mr. Shamo when he left. Ms. Bustin
supported Crandall's explanation for leaving, stating: "[Drew] decided to travel with his
girlfriend Sasha... but when [Drew] left, Aaron basically took over everything that [Drew]
would have been doing." (TR:A.T./K.B.(59-60)); *See also Testimony of Alexandrya
Tonge* (TR:A.T./K.B.(44)) (stating that Mr. Crandall left the country to travel with his
girlfriend and that "[i]t was always Aaron that we communicated with after Drew was
gone.") (*See Renewed Detention Motion* at 4-5 and Exhibit C attached thereto).

• The Court also commented in its detention order that it was "uncertain as to assets Defendant may have available to him." (ECF No. 80 at 5).  At that time, the Government could not account for all the funds and suggested Crandall was holding back. Although their suspicions were generally well-founded, they were looking at the wrong defendant. Trial testimony thereafter established that Crandall received much less money than other participants, and importantly, testimony included no suggestion that Crandall has hidden assets.[6]  This is directly contrary to the fact that another co-defendants had, in fact, hidden assets and been untruthful to law enforcement.[7]

• And, the Court stated in its previous detention order that Crandall's "parents had no idea of Defendant's level of involvement." (ECF No. 80 at 3).  Now, Crandall's entire extended family, including his parents and grandparents, were in the courtroom to hear his testimony on August 15, 2019, and their support has not wavered. Crandall's parents know exactly what his involvement was and they also know he is

---

[6] Mr. Shamo testified that, at the time of his arrest, he was paying Crandall a fixed amount of  $2,700.00 every two weeks.  Shortly before his arrest, Shamo had given his parents $500,000.00 to store for him, and when he was arrested, there was $1.2 million in cash on his dresser. (*See Renewed Detention Motion* at 5 and Exhibit D attached thereto).

[7] Of particular significance, in August of 2018, nine months *after* this Court's previous detention ruling, another charged co-defendant (who was released on his own recognizance) delivered approximately $805,990.00 and 33.8211 in Bitcoin to the Government.  The money was produced over the course of three separate out-of-custody meetings with law enforcement and only after the agents were told a series of lies about where these funds had been stored. (*See Renewed Detention Motion* at 5-6).

prepared to face the consequences. (*See Renewed Detention Motion* at 6).  Still, they are

willing to post their home and offer him full time employment.[8]  In fact, this Court, too, is

now in a better position to understand the two distinct chapters comprising Crandall's

level of involvement with this enterprise that cannot be analytically lumped together.

During the first chapter – a time where Crandall had a more significant role, had more

knowledge, and directed others – the operation was not distributing Fentanyl. Conversely,

during the second chapter – a time after Crandall left the country, had limited

involvement and gave directions to no one – Fentanyl was distributed.[9]

    *Third*, Crandall is not likely to pose a danger to the safety of any other person or

the community if released.  He has had no history of violence or any criminal record aside

from this incident.  He can be easily monitored by his family and if necessary via GPS.[10]

---

[8]The Government has questioned the viability of Drew working for his mother's catering business, however the extended family can provide employment in other realms. If this court required employment, Drew Crandall would have full time verifiable employment within 30 days of release.  Drew is a hard worker and he is competent, skills that bode well for being successfully supervised.

[9] (*See Renewed Detention Motion* at 6-7 and Exhibits A & C attached thereto). (*Also*, TR:D.C.74-75 (stating that it was not until after he left the country that Mr. Shamo begun to distribute Fentanyl; TR:A.T./K.B.44 (stating that Fentanyl was only distributed after Mr. Crandall left the country to travel with his girlfriend and that "[i]t was always Aaron that we communicated with after Drew was gone.")

[10] *C.f., United States v. Majors*, 932 F.Supp. 853,857-58 (E.D.Tex.1996). (Defendant convicted of drug offenses would be released pending sentencing; defendant demonstrated by clear and convincing evidence that he was not likely to flee and that he did not pose danger to safety of any other person or to the community; conditions and requirement of financial security and additional supervision, were sufficient to assure the

And any minute or plausible "risk" can be managed through probation services or even

his family if resources are strained.  Critically, every concern, without exception, raised to

justify Crandall's theoretical risk of flight or danger to the community applies to every

other co-defendant in this case – all other co-defendants, again, who have been released

pending sentencing.[11]  By their release, the Court and the Government have recognized

that such a threat can be successfully managed.  This recognition holds just as true with

regard to Crandall.

     *Fourth*, the Government's arguments requesting continued detention should be

rejected. The Government plays fast and loose with the facts as presented to the jury in

this matter in arguing that those more-culpable and yet released co-defendant's "stood on

[Crandall's] figurative shoulders" when they set out to manufacture and distribute

fentanyl.  Seemingly blind to the inconsistencies of their position, the Government argues

it is Crandall – alone amongst the co-defendants – that poses a danger to the community

based upon his purported "greed and abilities". (*Opposition* at 10).  These arguments

simply ignore the facts – facts which show Crandall walked away from the illegal

operation precisely at the point it took off financially.[12]

---

court as to both presence and safety).

    [11]*See Unitred States v. Paz*, Case No. 2:18-cr-00231-DAK-1 (Doc. 11 & 20 (Court ordering pretrial release with no conditions imposed)).

    [12] The Government's ignoring of the facts is even more disconcerting since these facts favorable to Crandall were elicited by the Government itself at Mr. Shamo's trial. The facts

Also, the Government essentially argues that anyone who can succeed in a criminal endeavor is necessarily bound to return to it. (*Opposition* at 11). This cynical view ignores the role of character, family, and choice in human decision making. Drew Crandall is not going return to criminal conduct. Not now, not ever. This Court needs to weigh that risk based upon its own review of the roles and testimony and not upon the Government's invitation to engage in unsupported speculation. Competence and work ethic are associated with success in all endeavors. The fact that Crandall has demonstrated competence does not make him more likely to return to crime, but rather, it suggests he can be successful in other fields and endeavors.

*Overall*, as to any potential risk that Crandall may somehow flee, the Court can order, as it routinely does, GPS monitoring and check-ins with a pretrial service worker, as well as restrictions on travel. The Court could request that his family make commitments to the Court to reporting his whereabouts and any deviations. As to any conceivable risk that Crandall may attempt to "influence witnesses," the Court can order, again as it routinely does, restrictions on personal associations, place of abode, and prohibition against contact with other potential witnesses. And indeed, Crandall will willingly comply with any condition reasonably necessary to assure his appearance and

---

show that there were two pill presses that were used to manufacture fentanyl *after* Crandall left and that he never had anything to do with either of them. Shamo started dealing in opiates and Fentanyl when Crandall left, in part, because Crandall had served as a tempering influence on Shamo's avarice.

the safety of the community or other persons.  The fact that non-compliance with any and

all court orders would swiftly result in revocation of release and further detention, in and

of itself, serves as the best deterrent to any violations.

Again, Crandall's entire family were in the courtroom to hear his testimony.  They

understand what he has done and understand the potential consequences.  But, Crandall's

family has always been, and remains, steadfast in their support and willingness to do all

that is required to alleviate any ostensible concerns held by the Government or the Court,

including posting the title to their home as a surety; providing employment; and providing

a residence with monitored internet connections, to ensure that Mr. Crandall can be

properly monitored.  Simply, any potential concerns can be managed through any

conditions imposed by the Court. This should suffice to satisfy any showing.[13]

2.      This Court Should Find Exceptional Circumstances Exist for Release

Finally, it should go without saying, that exceptional circumstances are present in

light of the worldwide COVID-19 pandemic that is currently impacting the United States,

including Utah, and has a substantial risk of reaching Utah correctional facilities if it has

not already.  The unique circumstances presented by the COVID-19 crisis requires this

---

[13] *C.f., United States v. Mahabir*, 858 F.Supp. 504, 507 (D.Md.1994) (Defendant
convicted of drug offenses satisfied requirement for release on bail pending sentencing
that he would not likely flee and did not pose risk of danger to other persons or
community; defendant had resided in United States for 24 years, he and many members of
his extended family were ready to pledge family home and other properties as surety for
release, and if he fled entire family would suffer).

Court to reexamine Crandall's detention in light of these pressing issues regarding health

and safety while in detention and the Eighth Amendment's prohibition of cruel and

unusual punishment.

As of April 16, 2020, there were 2683 confirmed cases of COVID-19 and 21

deaths in Utah, spread across several counties, including: Salt Lake, Summit, Davis,

Tooele, Wasatch, Utah, and Weber Counties.[14]  Salt Lake City and Summit County

residents have been ordered to stay at home except for essential travel, and Governor

Herbert has directed residents to do the same statewide.[15] Among other directives,

Governor Herbert has recommended that individuals maintain "a 6-foot distance at all

times from other individuals" and that they not attend "any gathering of any number of

people" outside of their household.[16]  Additionally, the Utah Supreme Court issued an

order halting all non-essential court functions, and directs that all District Court and

Justice Court trials be continued until after June 1, 2020.[17]  The Federal District Court of

---

[14] *Overview of COVID-19 Surveillance*, UTAH DEPT. OF HEALTH,
https://coronavirus.utah.gov/case-counts/ (last visited, April 17, 2020 at 10:30 a.m.)
(website is updated daily at 1:00pm with new counts as reported from various counties).

[15] Taylor Stevens & Paighten Harkins, *Utah Governor Asks, Salt Lake City Mayor Orders Residents to Stay Home to Slow the Spread of the Coronavirus*, SALT LAKE TRIB. (March 27, 2020),https://www.sltrib.com/news/2020/03/27/utah-governor-issue-new/.

[16] *Id.*

[17] Matthew Durrant, *Administrative Order for Court Operations During Pandemic*, Utah Supreme Court (March 21, 2020), https://www.utcourts.gov/alerts/docs/

Utah has also ordered that "the court will hold in-person criminal hearings only in exceptional circumstances and after the exhaustion of all other available options" amid concerns of the pandemic.[18] In fact, the Federal District Court has specifically recognized the danger of the virus in detention facilities, stating that "transporting inmates to and from detention facilities to the courthouse for hearings, . . . currently increases the risk of exposure to and the spread of the virus."[19]

The global COVID-19 pandemic has put incarcerated people in severely increased risk of serious injury or death while incarcerated. Nationally, doctors and health experts are concerned that the spread of COVID-19 is almost inevitable in jails and acknowledge that county jail facilities are not capable of adequately managing an outbreak.[20] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," "may also be less able to participate in proactive measures to keep themselves safe," and that "infection control is challenging in these settings."[21] As a

_____

20200320%20-%20Pandemic%20Administrative%20Order.pdf.

[18] *See* United States District Court, District of Utah, General Order 20-010.

[19] *Id.*

[20] *See* Amanda Klonskly, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES, March 16, 2020 (available at https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html).

[21] Greg S. Gonsalves, et al., *Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States*, (March 2, 2020)

result, multiple efforts have been made at all levels in an attempt to reduce the number of

incarcerated individuals in Utah's prisons and jails to decrease the likelihood and severity

of a health and medical crisis in Utah's correctional facilities. These efforts include direct

advocacy with law enforcement, sheriffs, prison administrators, parole board

administrators, judges, prosecutors, and the governor's office to change policies and

practices to stem the spread of COVID-19 within the criminal justice system.  These

efforts have resulted in numerous individuals being released from custody.

As of April 9, 2020, it has been reported that COVID-19 has spread to hundreds of

prisoners and staff in city jails, state prisons and federal prisons.[22] In fact as of April 10,

2020, nine inmates in the U.S. Bureau of Prisons system have died of covid-19.[23] And in

Utah, it has been reported that an inmate at the Oxbow Jail in Salt Lake County tested

positive for COVID-19 within a day of his release, even though the County had

proactively implemented screening measures and had already lowered the jail's

---

(available at https://law.yale.edu/sites/default/files/area/center/ghjp/documents/
final_covid-19_letter_from_public_health_and_legal_experts.pdf).

[22] *See* Ashley Rubin, *Prisons and jails are coronavirus epicenters – but they were once designed to prevent disease outbreaks* , THE CONVERSATION (Apr. 9, 2020), https://theconversation.com/prisons-and-jails-are-coronavirus-epicenters-but-they-were-once-designed-to-prevent-disease-outbreaks-136036.

[23] Kimberly Kindy, *Inside the deadliest federal prison, the seeping coronavirus creates fear and danger*, WASH. POST (April 10, 2020) https://www.washingtonpost.com/national/inside-the-deadliest-federal-prison-the-seeping-coronavirus-creates-fear-and-danger/2020/04/09/deeceb6e-75b4-11ea-a9bd-9f8b593300d0_story.html.

population.[24] In total, as of April 8, 2020, six people who are incarcerated at Salt Lake

County jail facilities have tested positive for the coronavirus, along with seven jail

staffers, four officers, and one civilian staff members from the Oxbow jail.[25]  Thus, there

are clear health and safety issues unique to county jail facilities in light of the pandemic,

to include the serious concerns raised by the close quarters, a lack of adequate medical

care, and the continual rotation of inmates.

These clear health and safety concerns implicate the Eighth Amendment, which

proscribes more than "physically barbarous punishments," but takes into account "dignity,

civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)

(quoting *Jackson v Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)).  The Eighth Amendment

also proscribes deliberate indifference to serious medical needs of prisoners and

"unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (quoting *Gregg v.*

*Georgia*, 428 U.S. 153, 173 (1976)). And, the Eighth Amendment proscriptions also

---

[24] Jessica Miller, *Utah Attorney Says Her Client Got the Coronavirus While Locked Up at the Salt Lake County Jail*, SALT LAKE TRIB. (Mar. 30, 2020), https://www.sltrib. com/news/ 2020/03/30/utah-attorney-says-her/. (reporting that a released inmate tested positive for COVID-19 shortly after release);  Pat Reavy, *Coronavirus Prevention: Utah Prisons Suspend Visitation, Volunteer Work*, DESERET NEWS (Mar.13, 2020), https://www.deseret.com/utah/2020/3/13/ 21178353/jails-prison-preparing-for-covid19-coronavirusinmates-corrections-incarcerated-visits.

[25]Jessica Miller, *Six inmates, seven staffers at the Salt Lake County jails have coronavirus*, SALT LAKE TRIB. (Apr. 8, 2020) https://www.sltrib.com/news/2020/04/07/six-inmates-seven/

include indifference to *future* harm. *See Helling v. McKinney,* 509 U.S. 25, 33 (1993).[26]

A risk of future harm is serious enough to be constitutionally unacceptable when that risk

is "so grave that it violates contemporary standards of decency to expose *anyone*

unwillingly to such a risk. In other words, [when the prisoner shows] that the risk of

which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S.

at 36 (emphasis in original).  With the virus spreading quickly through Utah detention

facilities, and facilities throughout the country, the risk to inmates is cruel and unusual

under both the Utah and federal constitutions because today's society has chosen not to

tolerate the risk of mass gatherings, communal living, or insufficient hygiene. This bar

has extended to schools, restaurants, sporting events, and religious services as public

health and government officials urge everyone to practice social distancing regardless of

whether they have symptoms.  With this is mind, the "mass gatherings", communal living,

---

[26] In *Helling*, the Court ruled that it is cruel and unusual punishment when prison authorities "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Id.* at 33 (holding that an inmate had the right to be free from sustained exposure to secondhand smoke under the Eighth Amendment even if the inmate was not currently suffering from the effects of secondhand smoke). *Also C.f., Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001) ("There is no requirement that an inmate suffer serious medical problems before the condition is actionable."). Of particular note to the present situation, *Helling* analogized a case in which inmates were crowded in conditions that put them at risk of contracting infectious diseases to support the proposition that the Eighth Amendment protects against future harm, even though the inmates in question had not alleged that the likely harm from infection would not occur immediately nor would everyone exposed inmate be harmed. 509 U.S. at 33 (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)).

and daily influxes of new people at jails pose grave risks to all inmates. With the death count rising in jails and prisons, it is now true that holding someone in a detention facility could mean a potential death sentence.

This Court should find that the COVID-19 pandemic is a compelling and exceptional reason that warrants Crandall's immediate release.

**WHEREFORE**, the Defendant respectfully requests that this Court now revoke or amend the Magistrate's Order Denying Crandall's Renewed Motion for Detention Review and grant Crandall's release pending sentencing based upon any conditions the Court deems proper and just.

DATED this 17th day of April, 2020.

/s/ James C. Bradshaw
JAMES C. BRADSHAW
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2020, I electronically filed the

foregoing *Motion for Revocation or Amendment of Detention Order* with the Clerk of Court

using the CM/ECF system which sent notification of such filing to the to all parties and

co-defendants.

*/s/ Kayla Marker*