JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>DREW WILSON CRANDALL,<br><br>        Defendant. | Case No. 2:16-cr-631 DAK<br><br>OPPOSITION TO MOTION FOR REVOCATION OR AMENDMENT OF DETENTION ORDER<br><br>Judge Dale A. Kimball |

The defendant is a healthy, thirty-three-year-old male housed at a jail that has never had a confirmed case of COVID-19. But he wants the Court to find that the mere possibility of contracting COVID-19 is an exceptional circumstance that should justify his release. The United States urges the Court to deny the defendant's fourth request to be released because (1) the defendant has failed to prove by clear and convincing evidence that he is not a risk of flight; (2) he has failed to prove by clear and convincing evidence that he is not a danger to any other person or the community; and (3) the defendant has failed to prove that exceptional circumstances exist to justify his release.

Failure to prove any one of those three items requires the Court to keep the

defendant detained pending sentencing. Further, because the defendant has not proven the third prerequisite to his release—exceptional circumstances—a fourth prerequisite also bars his release under Title 18, United States Code, Section 3143: (4) the defendant must prove that the United States intends to seek a no-jail sentence. As explained in its prior response, the United States will recommend to the Court that the defendant serve a significant period of additional imprisonment.[1]

## Table of Contents

1. Background ........................................................................................................................ 3

2. Standard of Proof .......................................................................................................... 4

3. Burden of Proof.............................................................................................................. 5

4. Argument ........................................................................................................................ 5

    4.1 Detention decisions focus on the individual; comparisons between defendants are neither appropriate, nor do they advance the defendant's cause........................................................ 5

    4.2 The defendant's crimes should not be divided into separate parts ..................................... 8

    4.3 The defendant has not met his burden to show that he is not likely to flee if released  ... 11

    4.4 The defendant has not met his burden to show that he is not a danger to another person if released .............................................................................................................................. 13

    4.5 The problems associated with COVID-19 do not support the defendant's release .......... 14

        4.5.1 Releasing the defendant and others similarly situated would place an undue danger on the community and an unmanageable burden on Pretrial Services ............................ 16

        4.5.2 The local jails have established procedures to avoid a widespread COVID-19 outbreak.................................................................................................................... 19

    4.6 Alternatively, the defendant can be moved to an isolation cell ...................................... 21

    4.7 The defendant need not wait to be sentenced ................................................................ 22

5. Conclusion ................................................................................................................... 22

---

[1] While the United States intends to ask the Court to reduce the defendant's sentence based upon his cooperation and testimony against Mr. Shamo, it cannot recommend a no-additional-jail sentence; it must consider the wishes of those who have been adversely affected by his crimes, the factors listed in Title 18, United States Code, Section 3553(a), the defendant's cooperation, and the sentencing guidelines—which, by the United States' calculations, place the defendant in the life-imprisonment range.

## 1. Background

Shortly after his arrest in May 2017, the defendant was ordered detained by the Honorable Barry Kurren, Magistrate Judge for the District of Hawaii. After an evidentiary hearing in November 2017, the Court ordered that the defendant remain in custody pending trial. (Doc. 80).

On October 17, 2018, the defendant pleaded guilty to Counts 2, 3, and 13 of the Superseding Indictment, the most serious of which—Conspiracy to Distribute Fentanyl—carries a ten-year minimum-mandatory sentence and a maximum sentence of life imprisonment.

The defendant sought again to be released based on argument that being incarcerated during the COVID-19 pandemic was an exceptional circumstance that, along with changes in circumstances such as his guilty pleas and testimony against a co-defendant, should warrant his release.[2] On April 7, 2020, the Honorable Dustin B. Pead denied the defendant's motion for release.[3]

Contrary to the defendant's assertion, Judge Pead did not deny the defendant's motion for release solely because the United States is not going to recommend a no-additional-jail sentence. Judge Pead determined that risk of flight posed by the defendant was "very real and tangible."[4]

---

2 Doc. 336.
3 Doc. 341.
4 Doc. 341, at 2-3.

Judge Pead also specifically concluded that COVID-19 was not a compelling or exceptional reason for the defendant's release.[5] In short, Judge Pead correctly and fully applied the law when he denied the defendant's request for release.[6]

## 2. Standard of Proof

By pleading guilty to a drug trafficking crime that carries a maximum sentence of life imprisonment, the defendant placed himself under the requirements of subsection (a)(2) of Title 18, United States Code, Section 3143. In order for the Court to release the defendant pending sentencing, the Court must make these findings:

1. an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

2. by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.[7]

If the Court cannot make these findings, the defendant must be detained. *Id*.

However, if exceptional circumstances exist that make a defendant's detention inappropriate, *and* the Court finds that by clear and convincing evidence that the

---

5 Doc. 341, at 3.

6 In like manner, the United States did not base its opposition to the defendant's release solely on his inability to prove that the United States would recommend a no-jail sentence. While a page of the United States' memorandum addressed that point, the bulk of the United States' argument then (and now) was to show: a.) the defendant had failed to meet his burden to show he was not a risk of flight; b.) the defendant had failed to meet his burden to show he would not be a danger to the community; and c.) COVID-19 was not an exceptional circumstance that would support the defendant's release.

7 18 U.S.C. 3143(a)(2). Subsection (a)(2)(A)(i) applies to defendant's who elected to have a trial.

defendant is not likely to flee or pose a danger to any other person or the community, the Court can order the defendant's release.[8]

## 3. Burden of Proof

Once the defendant pleaded guilty, the burden of proof fell upon him to prove to the Court that he met the requirements of Title 18, United States Code, Sections 3143.[9]

## 4. Argument

The defendant has not met his burden to prove any of the required findings the Court must make in order to release him while he awaits sentencing. The United States will address each of the prerequisite factors below. But first the United States addresses the defendant's attempts to draw comparisons with his co-defendants and to divide his criminal conduct into two distinct chapters.

## 4.1 Detention decisions focus on the individual; comparisons between defendants are neither appropriate, nor do they advance the defendant's cause

The law does not contemplate comparing defendants to ensure that all have been treated the same with respect to pre-sentence custody status. In determining whether there are no conditions that will reasonably assure the defendant's appearance, the Court must consider the available information concerning the risk of flight or risk of danger to the community that each particular defendant poses.[10]  It is an individualized determination.

---

8 18 U.S.C. 3145(c) and 18 U.S.C. 3143(a)(1).
9 Fed. R. Crim. P. 46(c); *United States v. Affleck*, 765 F.2d 944, 946 (10th Cir. 1985); *United States v. Strong*, 775 F.2d 504, 505-06 (3d Cir. 1985).
10 18 U.S.C. § 3143(a).

The detention status of some other defendant—or even a co-conspirator—does not change the risk of flight posed by this defendant. Nor does it change the level of danger this defendant poses to the community, if released.

The defendant has previously encouraged both the Court and Judge Pead to draw comparisons between him and his out-of-custody co-codefendants.[11] In his fourth request for release, the defendant now encourages the Court to again draw comparisons with several of his co-defendants. In each of his attempts to draw favorable comparisons, the defendant has left out several points of comparison that help explain why the Court and two other courts have previously held him in custody while some of his co-defendants were released. As the examples below help show, even if the Court were to compare the defendant with his co-conspirators, there would be ample reason to find the defendant had not met his burden to prove he was not a risk of flight or danger to the community.

For example, the defendant, unlike any of his released co-defendants, committed obstruction of justice by alerting the site administrators for AlphaBay that Pharma-Master's account had been compromised and needed to be shut down. By so doing, the defendant prevented agents from assuming control of the Pharma-Master account and running it surreptitiously for a period of several weeks. Agents would have had access to the account through Mario Noble who, unlike the defendant, cooperated fully from the moment he was first contacted by investigators.

---

11  *See* Doc. 72, at 12; Doc. 336, at 2, 5.

During those weeks, had the defendant not obstructed justice, agents could have generated thousands of leads for investigators throughout the country based upon real-time orders from Pharma-Master's customers. The agents could have engaged customers in communications—making excuses for orders that had not shipped, asking for additional addresses, suggesting they communicate through other, more trackable channels, etc. The agents could have attempted to set up a nation-wide take down for Pharma-Master's biggest customers—drug dealers who were ordering thousands of pills at a time. But the defendant's loyalty to Pharma-Master precluded all those efforts.

Further, the defendant is the only one of his co-defendants who has extensive ties to a foreign country and left the United States as a result of his involvement in the criminal enterprise. He has shown that he is adept at moving from place to place and picking up odd jobs to fund his travels.

Finally, the defendant is Mr. Shamo's most sophisticated co-conspirator. Mr. Shamo's theory of the case at his trial was largely to blame the defendant. The United States had its hands full trying to use re-direct examination to elicit testimony from the co-conspirator witnesses that while the defendant may have been the smartest, most capable co-conspirator, Mr. Shamo was the ringleader.

7

### 4.2 The defendant's crimes should not be divided into separate parts

In an effort to avoid greater liability for the manufacture and distribution of Fentanyl, the defendant argued that his criminal conduct should be divided into two distinct chapters that should not be lumped together—his hands-on conduct in 2015 and his remote, computer-based conduct in 2016.[12] But the defendant's efforts in 2015 are a significant reason why the enterprise was so successful at manufacturing and distributing Fentanyl in 2016. The defendant helped recruit participants. He helped train Ms. Tonge and Ms. Bustin in their role as packagers and shippers. And most importantly, he mastered the use of the pill press.

Successfully assembling, calibrating, maintaining, and running a pill press requires a certain set of knowledge, skills, and abilities, all of which the defendant possessed and used. The efforts made by Mr. Shamo and Mr. Paz in 2016 stood on the shoulders of the defendant's work in 2015.

In addition, the defendant argued that when he returned to criminal conduct in 2016 he "only provided customer service and he gave directions to no one."[13] However, the defendant must have felt more involved when he listed his work for the Pharma-Master enterprise as the top entry on his résumé:[14]

---

12 Doc. 342, at 9; Doc. 336, at 6-7.
13 Doc. 336, at 7; amended in Doc. 342, at 9, to read: "had limited involvement and gave directions to no one."
14 Bates number 002-008-116-00045.

## Drew Crandall

28 princess Street, Kangaroo Point
Brisbane QLD

+61 431 474 304

## Work Experience

*Freelance customer service and software work (06/'16 – 11/'16)*

- Answered customer service emails and made sure all questions were answered within 48 hours.
- Wrote simple WPF programs to help track sales, daily totals, and issue tracking.
- Used simple scripting to output results to Excel to visualize the data.
- Created a simple recipe and inventory management program to help a customer budget, eat healthier, and reduce food waste.

Customer service only begins to describe his involvement in 2016. And he was particularly proud of his efforts in mastering the pill press—he lists his formula applications in the last bullet point.

The email shown below from the defendant to Ms. Tonge and Ms. Bustin reveals that the defendant was not a disinterested, hourly employee for Pharma-Master; he was still working towards the shared, mutual benefit of those with him in the enterprise:

```
Subject:     10-5reships
From:        shortbread66@sigaint.org
Date:        Wed, October 5, 2016 11:06 am
To:          passthepeas@sigaint.org
Cc:          americansteam@sigaint.org
Priority:        Normal

Your scales are still coming up slightly short on some orders. (3-6% short
or so)
I'm going to list a reason for the reship from now on, not to criticize
you at all because you guys are awesome, but just so you are aware of them
and hopefully we can spot trends better this way

Thanks :)

Attachments:
10-5PassThePeas.txt
10-5Pharma.txt
[10-5PassThePeas.txt]
```

Ms. Tonge and Ms. Bustin did not hand-count pills for shipment; they estimated quantities by weighing groups of pills. The defendant explained in his email that their scales were giving incorrect weights. The bad scales led to orders being 3-6% short on pills. He explained that when he sends Ms. Tonge and Ms. Bustin a list of customers to whom they need to reship pills, he is going to start to list the reason why. That way, he explained, "we" can better spot trends. He did not say "you can spot trends" or "Aaron Shamo can spot trends." He said "we."

The defendant, understandably, would like to distance himself from the manufacture and distribution of Fentanyl. The facts, however, show his efforts were integral to the enterprise.

The United States has previously indicated where the defendant's culpability falls in relationship to his co-defendants:



There was nothing presented at the trial of Mr. Shamo that has changed where the defendant or his co-conspirators fell in this pyramid showing relative culpability.

## 4.3 The defendant has not met his burden to show that he is not likely to flee if released

The defendant has likewise failed to show that he has transformed himself to a degree that he is no longer a risk of flight. The Court found that the defendant was a risk of flight after hearing evidence and argument at the November 2017 evidentiary hearing. Several of the defendant's renewed arguments were made previously, including that he was cooperating with law enforcement, had support from his family, had employment options, and was not as culpable as other defendants. The defendant has done little to explain why those arguments now support a finding that the Court did not make when he first advanced them.

Before, the defendant was facing the possibility of a lengthy sentence if convicted. Now, the defendant knows he will face the Court at his sentencing and that the sentence may be lengthy. He knows better now than he did in 2017 the wide-ranging and devastating effect caused by the enterprise. He also knows that Mr. Shamo's trial strategy was partly to paint the defendant as the most-capable, most-likely-leader of the organization. His incentive to flee has increased, not decreased.

Finally, the defendant argues that he is not a flight risk because he could work for

his mother's catering company or for other, unspecified family members, if released.[15]

That argument was also made in 2017. In response, it should be noted that the defendant

has not earned an honest wage in the United States since the fourth quarter of 2015, as

this wage data from the Department of Workforce Services shows:

| SSN: ████████   Name: DREW CRANDALL | | | | | |
|---|---|---|---|---|---|
| Employer ID | Employer Name | Quarter | Wages | Name | Used |
| 3487131-1 | DATA2LOGISTICS, LLC | 4/15 | 5,202 | D CRANDA | N |
| 3487131-1 | DATA2LOGISTICS, LLC | 3/15 | 2,589 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 1/15 | 396 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 4/14 | 7,851 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 3/14 | 6,883 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 2/14 | 7,893 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 1/14 | 6,512 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 4/13 | 7,805 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 3/13 | 7,045 | D CRANDA | N |
| 2015741-1 | CATCHA CAMA INC | 2/13 | 513 | D CRANDA | N |
| 3027910-0 | EBAY INC. | 2/13 | 567 | D CRANDA | N |
| 4507430-0 | 360 SECURITY SOLUTIONS LLC | 1/13 | 1,613 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 4/12 | 2,799 | D CRANDA | N |
| 0674535-5 | ADECCO USA, INC. | 3/12 | 202 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 3/12 | 4,221 | D CRANDA | N |
| 0674535-5 | ADECCO USA, INC. | 2/12 | 769 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 2/12 | 3,109 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 1/12 | 4,228 | D CRANDA | N |
| 1947390-0 | A PLUS BENEFITS OF IDAHO, INC. | 4/11 | 1,269 | D CRANDA | N |
| 4527140-0 | BEACON BACK-OFFICE SOLUTIONS, LLC | 4/11 | 2,560 | D CRANDA | N |
| 1947390-0 | A PLUS BENEFITS OF IDAHO, INC. | 3/11 | 5,719 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 2/11 | 1,820 | D CRANDA | N |
| 1947390-0 | A PLUS BENEFITS OF IDAHO, INC. | 2/11 | 2,872 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 1/11 | 3,081 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 4/10 | 3,438 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 3/10 | 4,766 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 2/10 | 4,086 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 1/10 | 4,296 | D CRANDA | N |
| 1646680-0 | TELEPERFORMANCE USA | 4/09 | 640 | D CRANDA | N |
| 3049381-1 | HERITAGE MANAGEMENT SERVICES, INC. | 4/09 | 2,689 | D CRANDA | N |
| 3049381-1 | HERITAGE MANAGEMENT SERVICES, INC. | 3/09 | 444 | C DREW | N |
| 7057060-0 | PAY PROS OF UTAH, LLC. | 3/09 | 2,400 | D CRANDA | N |

The defendant held many jobs, but none for very long. Jobs for the defendant are easy-

come, easy-go. A promise to work for his mother's catering company during a pandemic

when the restaurant and catering industry is imploding does not meet his burden to prove

---

15 *See* Doc. 336, at 6; Doc. 342, at 9, n. 8.

he is no longer a flight risk.

## 4.4 The defendant has not met his burden to show that he is not a danger to another person if released

It is the defendant's burden to prove by clear and convincing evidence that he no longer poses a danger to any person in the community. He has failed to do so. The danger the defendant poses to the community arises from the combination of his greed and abilities. Neither has waned since his arrest.

Successfully assembling, calibrating, and running a pill press is no mean feat. Anecdotally, DEA agents and the undersigned prosecutor investigated two other groups who attempted to press Fentanyl pills in Utah in 2016 and 2017.[16] The first group had a pill press, inert ingredients, and a Fentanyl analogue. Their pills were poorly pressed; their quality control was deeply disturbing—they would test batches of pills on themselves, causing more than one overdose event. Their inability to press pills that even closely resembled real oxycodone pills prevented them from causing widespread harm.

The second group obtained a pill press and Fentanyl, but they were wholly unable to press powder into pills. By contrast, the defendant mastered the use of a pill press in 2015. Mr. Shamo and Mr. Paz stood on his figurative shoulders when they converted the press into a Fentanyl press. The defendant was able to do what other criminals could not—he assembled, calibrated, and ran a pill press.

---

16 *United States v. Jetter*, 2:16-cr324-DB; *United States v. Jepson*, 2:17-cr-431-TC.

The defendant understands how to communicate with co-conspirators using encrypted communication applications and processes. He understands how best to avoid detection when shipping contraband through the mail. He knows how to use cryptocurrency to hide the paper trail that accompanies traditional drug trafficking offenses. He has been educated on how the Pharma-Master enterprise was caught—and given a blueprint for how to avoid arrest next time.

His abilities, combined with his greed, make the possibility that he would return to drug trafficking too high to risk his release pending sentencing. Knowing that he faces a potentially lengthy sentence would further erode his incentive to live crime-free in the short window of time in which he would be released.

### 4.5 The problems associated with COVID-19 do not support the defendant's release

The defendant argues that it would be improper under the Eighth Amendment to keep him in a county jail during the COVID-19 crisis. Courts in the District of Utah and elsewhere have recently denied similar claims, even in pretrial detention settings where the burden is not on the defendant.[17]

---

17 *See e.g.*, *United States v. Holt,* 2:19-cr-413-CW, minute entry at ECF No. 22 (D. Utah Mar. 22, 2020) (district judge upholds detention order and notes because of "[t]he current COVID-19 pandemic, pretrial is not able to adequately supervise the defendant."); *United States v. Jones*, No. 1:17-CR-00582 – CCB-2, 2020 WL 1323109, at 1 (D. Md. Mar. 20, 2020) (recognizing the serious health risk of COVID-19 and underlying health conditions of the defendant but ordering defendant's continued detention under the 3142(g) factors notwithstanding); *See also*, *United States v. Hamilton*, NO. 19-CR-54-01 (NGG), 2020 WL 1323036, at 2 (E.D.N.Y. Mar. 20, 2020) (finding COVID-19 pandemic insufficient reason to justify release under the circumstances of the case); *United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at 4 (D. Conn. Mar. 19, 2020) (defendant has not shown that the COVID-19 plan proposed by the BOP is

The defendant relies on the speculative prospect of a COVID-19 outbreak at the Tooele County Jail, the detention facility where he currently is housed, as the exceptional circumstance for which the Court should consider releasing him under Title 18, United States Code, 3145(c). He made this same argument to Judge Pead. Of it, Jude Pead wrote:

> Lastly, to the extent defendant argues that COVID-19 is a compelling or exceptional reason for his release, the court is not persuaded. The court appreciates the challenging and evolving nature of the pandemic and is concerned with the health of those who are incarcerated. Yet, defendant does not suggest, let alone provide evidence of, any particular vulnerability his health poses. Nor does he argue any existing remedy and treatment plans of the facility at which he is housed, even assuming it is required, would be inadequate.[18]

The two particular points Judge Pead cited in his decision should also guide the Court's decision here: (1) the defendant has not provided any evidence that he is particularly susceptible to adverse health complications if infected with COVID-19; he has not alleged any pre-existing health conditions that would raise his level of risk; and

---

inadequate to manage the pandemic within defendant's correctional facility or that the facility is unable to adequately treat the defendant); *United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at 3 (D. Md. Mar. 17, 2020) (noting that as concerning as the COVID-19 pandemic is, resolving an appeal of detention must be an individualized assessment of the factors required by the Bail Reform Act, and finding the defendant's underlying health conditions insufficient to rebut the proffer by the United States regarding precautionary and monitoring practices sufficient to protect detainees from exposure to the virus); *But see United States v. Stephens,* No. 15-CR-95 (AJN), --- F. Supp. 3d ---, 2020 WL 1295155, at 1-2 (S.D.N.Y. Mar. 19, 2020) (finding that COVID-19 was a "compelling reason" for release under § 3142(i) but releasing defendant due to new evidence that belied that defendant was a danger to the community).

18 Doc. 341, at 3.

(2) the defendant has not shown any way in which the preventative steps undertaken by the Tooele County jail are deficient.

Indeed, despite being more than two months into the pandemic, there have been no reported cases of COVID-19 at the Tooele County jail. And the vast majority of those who are infected recover without hospitalization or extensive medical treatment. There is little reason to think the defendant—a healthy, thirty-three-year-old male housed at a facility where no one has tested positive for COVID-19—is facing exceptional circumstances such that he should be considered for release under Title 18, United States Code, Section 3145(c).

The criminal justice system's response to COVID-19 cannot simply be to release prisoners who are a danger to the community or a risk of flight.  Doing so would put the public at serious danger and shift the burden of supervision from the jail facility to the already taxed U.S. Pretrial Services Offices. Moreover, the U.S. Marshals Service and many of its local contractual partners have taken, and continue to take, precautionary measures to prevent transmission of COVID-19.  To that end, the defendant's motion should be denied.

### 4.5.1 Releasing the defendant and others similarly situated would place an undue danger on the community and an unmanageable burden on Pretrial Services

The United States appreciates the defendant's concerns about COVID-19.  This is an unprecedented crisis that is also resulting in great anxiety for people outside of jail. The United States may be more receptive to some defendants' motions for release if the

traditional supervision by U.S. Pretrial Services were in place.  However, U.S.

Probation's ability to supervise defendants in the community during the COVID-19

pandemic is (understandably) greatly curtailed.

It is the United States' understanding that Pretrial Services officers are currently

unable to participate in field work.  Home visits are not being conducted.  Instead,

Pretrial Services officers are relegated to far less effective video-telephonic products such

as FaceTime.  Additionally, pretrial defendants are unable to meet with their Pretrial

Services officer at the Probation Office.  This means Pretrial Services is unable to

provide in-person contacts with supervised defendants.  Without face-to-face interactions,

the Pretrial Services officers are unable to monitor defendants effectively.

Additionally, while vendors are still conducting drug testing, defendants need only

claim illness, knowing they will be excused from this testing.  Moreover, for defendants

in need of recovery support, neither drug and alcohol nor mental health group meetings

are being held.  Additionally, community group recovery meetings are not being held

during this crisis.[19]  While Pretrial Services officers may be using FaceTime, or other

technological means of checking in with pretrial defendants, these tools are an ineffective

substitute for in person contacts and are inadequate to accurately determine whether

defendants are complying with their terms of pretrial release.

---

[19]     Utah Support Advocates for Recovery Awareness ("USARA") notes that effective 3/16/2020 "USARA Recovery Community Centers statewide will be closed and there will not be any group recovery meetings held or any individual recovery coaching appointment until after April 1st, pending further public health official notices." https://www.myusara.com

Also, before a defendant is placed on release, a Pretrial Services officer usually must vet the proposed residence and meet the proposed third-party custodian and other residents who live there.  A flood of release orders would force these Pretrial Services officers to place released individuals in unvetted residences, without the usual in-person transition supports and without the many pretrial and community resources typically available.  *To be clear, Pretrial Services is currently unable to perform its core function of home visits.*[20]

The speculative prospect of catching COVID-19 at the jail where the defendant is housed does not diminish the public interest in keeping the defendant off the streets. Because our entire community infrastructure is compromised during this pandemic, courts arguably should detain more dangerous defendants pretrial, not fewer, as Pretrial Services does not have the usual combination of conditions to reasonably assure the safety of the community during this pandemic.  If the Court did release the defendant, and other defendants, such release would not only endanger the community, it would quickly stretch the bandwidth of existing Pretrial Services beyond its breaking point.

To be sure, one case by itself would not strain the system.  But if the Court released the defendant, then undoubtedly an avalanche of defendants would also seek

---

[20]    The United States Attorney's Office understands why these in-person and in-home meetings should not occur.  Such meetings would expose all parties to a heightened risk of infection, and its subsequent risk of spreading such infection.  But these limitations underscore the reasons that the defendant should remain incarcerated during this time.  The defendant simply will not be afforded adequate supervision as the "combination of conditions" typically available by Pretrial Services are not currently available.

release.  Each defendant would make the generic argument, now being made by the defendant, for release to reduce contact with other persons who are detained.[21]

Awarding relief here, and in similar cases, would place a substantial and unwarranted burden on Pretrial Services.  Pretrial Services has a finite number of resources available and a finite number of employees to supervise pretrial defendants.  They have a limited number of electronic monitoring devices and resources to monitor these devices.  Pretrial Services officers typically rely on in-person contacts to conduct their work, an area already disrupted during this pandemic.

The United States is greatly concerned about the defendant being released.

### 4.5.2 The local jails have established procedures to avoid a widespread COVID-19 outbreak

The Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis.[22]  Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release.  While the pandemic is evolving daily, to the best of the United States' knowledge (based upon daily updates), no cases of COVID-19 have been found in any of the jail populations in Utah where federal defendants are housed other than the Salt Lake County Adult Detention Center.

The local jails have implemented substantial precautionary measures to mitigate

---

21 *See, e.g.*, *United States v. Holt,* 2:19-cr-413-CW, minute entry at ECF No. 22.
22 18 U.S.C. § 3142 (g)(3)(A).

this risk of infection.  For instance, all the detention facilities utilized by the U.S. Marshals Service in Utah have implemented enhanced screening based on the CDC guidelines.  Contracting jails have also ceased in-person visitation.  Contracting jails are refusing to accept individuals showing symptoms unless and until they are cleared by a medical professional.  A number of facilities have significantly limited the number of new inmates into the facility.  Some facilities are restricting movement of inmates between pods.  Additionally, all state and federal court hearings are being held remotely, so inmates are not being transported to and from courthouses.

Despite all of the precautionary measures being implemented in our jails and in our communities, we are all at risk of infection.  The defendant does not allege that he has COVID-19 or even that he has been exposed to any individuals with COVID-19.  In this way, he is not seeking release based on his *actual* "physical and mental condition." Instead he relies solely on the *possibility* of becoming infected.  To be clear, a detainee's possibility of becoming infected is exacerbated during this pandemic, whether incarcerated or out on release.  Even if he is released, he faces the danger of being infected by this virus.  The Court should keep the defendant detained.

**4.6 Alternatively, the defendant can be moved to an isolation cell**

In correspondence with the United States' Marshal's Service about a different defendant, the undersigned prosecutor learned that the Court has the option of recommending to the Marshal's Service that a defendant be placed in an isolation cell at the jail. Doing so would significantly lessen the defendant's contacts with other individuals. In that way, it would also significantly lessen his chances of contracting COVID-19. If the defendant requests to be placed in an isolation cell, the United States is willing to join his request.

While the COVID-19 virus is new, health claims by detainees are not.  Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008).  These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside.  *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999).  In this case, the defendant has not made a factual record that his needs will not be met while detained. Granting a defendant's motion for release based on a general, speculative claim of harm is not consistent with the defendant-specific analysis required by 18 U.S.C. §§ 3142, 3143, and 3145.

### 4.7 The defendant need not wait to be sentenced

The defendant's sentencing hearing need not be as far off in the future as he suggested. The defendant argued that his sentencing hearing will not occur in the foreseeable future due to the COVID-19 outbreak, ongoing evaluations for Mr. Shamo, and the defendant's agreement with the United States to be sentenced last among his co-defendants.[23]

But Mr. Shamo's evaluations have been completed—and the results suggest Mr. Shamo is now ready to be sentenced. And although the United States has agreed that the defendant can wait to be sentenced last, the United States is willing to see the defendant be sentenced first. If the defendant choses to wait to be sentenced last for tactical reasons, it is his choice to do so. But it is not a good reason to release him prior to his sentencing hearing.

### 5. Conclusion

For the foregoing reasons, the Court should deny the defendant's fourth request for release.

Dated this 23rd day of April, 2020.

JOHN W. HUBER
United States Attorney

/s/ *Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

---

[23] Doc. 336, at 2.