JAMES C. BRADSHAW (#3768)
MARK R. MOFFAT (#5112)
BROWN, BRADSHAW & MOFFAT
422 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 532-5297
Facsimile: (801) 532-5298
jim@brownbradshaw.com
mark@brownbradshaw.com
*Attorneys for Drew Crandall*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br> v. <br><br> DREW WILSON CRANDALL, <br><br> Defendant. | Case No. 2:16-CR-631-DAK <br><br> **REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR REVOCATION OR AMENDMENT OF DETENTION ORDER** <br><br> Judge Dale A. Kimball |

The Defendant, Drew Crandall, has moved this Court to Revoke the Magistrate's Order denying Crandall's Renewed Motion for Detention Review. ("Motion to Revoke", ECF No. 342). The Government has filed a memorandum in opposition. ("Opposition", ECF No. 345). Crandall replies as follows.

## ARGUMENT

### CRANDALL MEETS THE REQUISITE CONDITIONS FOR RELEASE AND EXCEPTIONAL CIRCUMSTANCES UNDER 18 U.S.C. § 3145(c)

As conceded by the Government, pursuant to 18 U.S.C. § 3145(c), this Court has the authority to release Mr. Crandall if it finds exceptional circumstances exist and if the

Court finds, by clear and convincing evidence, that Crandall is not likely to flee or pose a danger to any other person or the community. (Opposition at 4-5). The Government argues that Crandall has not met this standard. Crandall addresses each of the Government's arguments in turn.

**A.    The Magistrate's Denial of Crandall's Renewed Detention Motion Is Based on Outdated Facts.**

The Government justifies that Magistrate Pead correctly and fully applied the law in denying Crandall's renewed motion for release. (Opposition at 4).  To the contrary, not only did the Magistrate issue his opinion mere hours after the Government submitted its Opposition and before Crandall had any ability to reply,[1] but it appears that Magistrate Pead's conclusions were firmly grounded in this Court's findings made from the initial detention hearing held over two years ago in November 2017.[2] The Magistrate's analysis of Crandall's "real and tangible flight risk" did not incorporate any evidence adduced at Mr. Shamo's trial that directly refutes those prior findings – prior findings based upon the Government's characterization of its then-anticipated evidence.

But, as demonstrated by both Crandall's Renewed Detention Motion and his most

---

[1] A review of the email filing notifications shows that the Government filed its Opposition to Crandall's Motion for Review of Detention (EFC No. 340) at 11:21 a.m. on April 7, 2020.  The Magistrate's Order denying Crandall's Motion (ECF No. 341) was filed this same day at 5:33 p.m.

[2] *See* Order Denying Defendant's Renewed Motion for Detention Review ("Magistrate Order", ECF No. 341 at 2-3 (citing to Detention Order dated November 21, 2017 (ECF No. 80)).

2

recent Motion to Revoke the Magistrate's detention order, much has been revealed during the past three years[3] while Drew Crandall has been detained in the Tooele County Jail. This Court is now in an entirely different position in it ability to assess both the issues and the facts after having actually heard the testimony and evidence presented at trial. As a result, this Court does not have to rely on the Government's characterization, but is now positioned to draw its own conclusions regarding Mr. Crandall's attitude, conduct, his amenability to supervision, as well as any associated threat and flight risk.

Overall, this Court need not show any deference to findings entered before the trial took place since such findings were dependant upon characterizations as to what the evidence might be and how it should be considered. This Court is uniquely situated to make these determinations based upon its own observations regarding the facts presented and perhaps, just as importantly, with a view regarding the sincerity, veracity, and the comportment of all of the witnesses on the stand at the trial.

**B.    It Is Appropriate and Necessary for the Court to Compare Crandall's Conduct to That of Other Co-Defendants Who Are Not Detained**

In it's Opposition, the Government first argues that comparing Crandall to the other co-defendants who are currently released with no supervision or conditions is not appropriate. (Opposition at 5-6). However, it is both appropriate and necessary for the Court to make this comparison because, while the question of detention is an

---

[3] Mr. Crandall has been in custody since May 5, 2017, when he was arrested in Hawaii on the way to his own wedding.

individualized inquiry, comparison of Mr. Crandall to equally or more culpable co-defendants directly undercuts the Government's argument that Crandall's conduct alone puts him in the category of being dangerous or a flight risk.

The Government is correct that dangerousness or risk of flight is an individualized inquiry. But, a comparison between Crandall and the other non-detained co-defendants highlights the conduct the Government finds to be dangerous or a potential flight risk. What the Government cannot do, however, is argue in one breath that certain conduct makes someone a danger or risk to society, and then in the next breath, chart the hierarchy of the organization and take the position that release is appropriate and risk may be managed as to a different co-defendant who engaged in the same or worse conduct. That is exactly what the Government does here, and such illogical and ad hoc arguments made to unjustly impair the liberty of one and not another must not be condoned.

Moreover, the Government's argument that there is ample reason to find Crandall is a risk of flight and danger to the community even if compared to the others, not only falls flat but appears, at least in part, to be based upon unwarranted factors. (Opposition at 6). The Government argues that Crandall, unlike any of the other released co-defendants, committed obstruction of justice by alerting the site administrators for AlphaBay that Pharma-Master's account had been compromised and needed to be shut down. (*Id.*). The Government also argues that Crandall is the only one of the co-defendants with extensive ties to a foreign country who left the United States, thus demonstrating he is adept at

moving. (Opposition at 7). And, the Government asserts that Crandall is Mr. Shamo's most sophisticated co-conspirator, somehow justifying his detention and not any others. (Opposition at 7). All of these narrow comparisons are "cherry picked", devoid of any attempt at objectivity, and critically, ignore the actual evidence.

First, the Government attempts to blame Crandall for the shut down of Pharma-Master's account, and contrasts his conduct to that of another co-defendant who they claim "cooperated fully *from the moment* he was first contacted by investigators." (Opposition at 6). As for alerting Alpha Bay, Mr. Crandall (like many others) read a KSL news story about the raid on Mr. Shamo's residence while he was still in Asia. He thereafter sent a message to an Alpha Bay administrator. At trial, as he did previously to investigators, Mr. Crandall expressed his regret about his horrible judgment in that moment: "I just wanted to get rid of all evidence and get rid of everything that connected me to this and just completely stop it." (Tr:D.C.(105)). Though admittedly bad judgment, Crandall did not thwart the investigation in any manner. And, what Crandall did is only known because Crandall, himself, was honest and forthcoming with the Government and disclosed his actions in his very first interview. The agents conducting those interviews have characterized Crandall as being honest and consistent throughout all of his interviews, including at trial. The Government's suggestion that somehow its ability to use the web site for additional covert investigation was compromised because of Crandall is simply not supported by the history. The precise events regarding how and when Alpha

Bay learned of Mr. Shamo's arrest are simply not known, but the truth is that it is very unlikely that Crandall's single message had any impact. No doubt, what he did was wrong and Crandall regrets it. But is cannot be forgotten that he sent that message after multiple press releases had been issued by ICE, HSI, the US Postal Service, and the United States Attorney's Office. The window of opportunity for this continued covert operation had closed well before Drew Crandall ever acted.

    Perhaps the most troubling aspect of the Government's argument about Crandall's purported obstruction of justice is the reference to co-defendant Mario Noble who they contrast to Crandall as being "unlike the defendant [he] cooperated fully from the *moment* he was first contacted by investigators". The Government paints a false distinction. As the Court is aware, Mr. Crandall was intercepted by agents as he flew into Honolulu. After answering a few questions, Crandall invoked his sixth amendment right to have counsel with him before continuing. *In the very first week* after being transferred to Utah, Crandall met with agents and prosecutors and gave a full and complete statement of his actions. That full and honest accounting has continued through the trial. Despite Crandall's extensive cooperation, the Government seems to be suggesting that Crandall's cooperation is somehow of lesser value because he did it with the benefit of counsel rather than simply on the terms allowed by the agents and prosecutors that had flown to Hawaii to seize him at his wedding. Asserting a constitutional right does not suggest Crandall is a danger or a flight risk. He has fully cooperated and his testimony at trial

was powerful and valuable and should not be discounted because it came after he invoked his Sixth Amendment rights.

The Government also reverts back to its own "culpability chart" as evidence of the relative culpability between the co-defendants from the Government's perspective. (Opposition at 10). Relative culpability should be tied to something objective, however, such as time spent in the organization or money paid over time. This chart and ranking is not, nor does it claim to be, grounded in objective factors. And the lack of objectivity raises concerns about inappropriate factors being elevated as determinative. Of note, even according to the Government's own culpability chart, Paz and Crandall are on the same level of the conspiracy. Yet Paz, who repeatedly hid money and lied to the agents, remains out of custody without any supervisory restrictions. (*Id*.; *also* Motion to Revoke at 9-10 and n.11).

Overall, when true and accurate comparisons are made – comparisons based in the actual evidence rather than the Government's speculative mischaracterizations– those comparisons show that Crandall has fully cooperated and been honest in all dealings with agents since retaining counsel. There is just nothing in this history that suggests he is a risk to flee or to harm others if released.

**C.      It Is Appropriate and Necessary for the Court to Consider the Two Distinct Chapters of Mr. Crandall's Involvement in the Conspiracy.**

Facts matter. The truth matters. And, Drew Crandall breaking away and leaving

7

this organization matters and cannot simply be ignored. In now arguing that the Court should not view Crandall's actions during distinctly separate times, the Government again fails to accept what the evidence so clearly reveals. (Opposition at 8-11).

By way of example, the Government asserts that were it not for the pill press used in the beginning of the operation that the Fentanyl distribution would not have happened. (Opposition at 8). Indeed, the Government asserts that "[t]he efforts made by Mr. Shamo and Mr. Paz in 2016 stood on the shoulders of the defendant's work in 2015." (*Id*.). In making these assertions, the Government ignores the evidence. The truth – as borne out by the evidence – shows that when Crandall announced he was leaving, there was no large scale pill press and there were no opiates.[4] To get the large scale operation up and running, *Paz and Shamo* bought not one, but two new presses. Both were assembled and operated without any assistance from Crandall, and the original small press was never used for fentanyl. And, Crandall's leaving the country should also not be used against him. Indeed, *it was the Government* that elicited the testimony showing Crandall did so *to get away from Shamo and make a clean break.*[5]

---

[4] Shamo and Crandall put a small pill press together, but it was small and only used for Xanax.

[5] For example, the Government questioned Crandall at trial:

> Q. Once you left the country, how much direction did you have over the organization?
> A. None.
> Q. Did that ever change?

8

Overall, the facts and the evidence undercut the Government's suggestion that Crandalls' efforts were integral to the manufacture and distribution of Fentanyl. (Opposition at 10). The testimony at trial was clear– Crandall left to get away from Mr. Shamo who was always pushing to sell more dangerous drugs; and Crandall left before any fentanyl was sold.  Looking back, it also becomes clear that Crandall was actually a tempering influence on Mr. Shamo who spun completely out of control when Crandall broke away. There is every reason to conclude that it was Crandall who actually had held Shamo back. (Motion to Revoke at 7-8).

**D.     This Court Should Find by Clear and Convincing Evidence That Crandall Is Not Likely to Flee or Pose a Danger to the Safety of Any Other Person or the Community If Released Pursuant to 18 U.S.C. § 3143(a).**

---

| | | |
|---|---|---|
| A. | No. | |
| Q. | Who made the decision to start pressing and selling pills laced with Fentanyl? | |
| A. | Aaron did. | |
| Q. | Did you have any involvement in that whatsoever? | |
| A. | No. | |
| Q. | Were you in the United States when those pills were being pressed? | |
| A. | No. | |
| Q. | Who made the decision to start pressing and selling pills laced with Fentanyl? | |
| A. | Aaron did. | |
| Q. | Did you have any involvement in that whatsoever? | |
| A. | No. | |
| Q. | Were you in the United States when those pills were being pressed? | |
| A. | No. | |
| Q. | Did you ever run that Fentanyl pill press, pressing Fentanyl pills? | |
| A. | No. I have never seen that press before. | |

It cannot be reiterated enough – Mr. Crandall has the support of an incredible family that has stood by him. They sat through his testimony and know what he did. They remain willing to post their home with the Court as an assurance of his appearance. Drew's fiancé, Sasha Grant, has also stood by and continues in her support of him. Those who know and love Drew know that he will appear before the Court for sentencing. This manner of support is unusual in such a serious offense and speaks volumes as to who Drew is and who this family is.

The Government argues that Crandall fails to show "he has transformed himself to a degree that he is no longer a flight risk." And in fact, the Government argues that his "incentive to flee has increased, not decreased." (Opposition at 11). Crandall does not claim "sudden transformation" but asks, instead, that the Court make an informed decision as to his risk not based upon Government hyperbole, but with having had the benefit of now fully understanding the case based upon the actual evidence adduced at trial, as well as the Court's first hand observations of this family and Crandall himself.

Also, under the Government's logic, every person charged with this manner of offense has the incentive to flee. But it is the strong and binding family and personal ties that insure Drew will face the consequences of his behavior. Not only do Drew's parents know that will happen, this Court now has the background and evidence to reach that same conclusion.

The Government is also wrong in its assertions that Crandall poses a danger to the

community, especially in the reasoning that "[t]he danger the defendant poses . . . arises from the combination of his greed and abilities." (Opposition at 13). Again, the Court should reject the faulty characterizations of the Government and make an independent assessment of Crandall's essential character traits based upon what the Court, itself, observed at the trial. Despite their label of greed, what the Government wholly fails to address in their argument is the relatively small amount of money that Crandall actually received – less money than any other participant. His almost naive interactions with Mr. Shamo suggest he could be manipulated, and belie the notion that he was greedy himself. The truth is that Crandall had no idea as to the amount of money being made by those at the top of this operation.

Finally, in regard to his ability to get back into criminal life, the facts demonstrate that Crandall was a reluctant participant at all times, and lest it be forgotten, a particpant who walked away. With the skills he has and with his incredible support group, Drew Crandall has the ability and desire to make his future into a productive life.

### E.     Exceptional Circumstances Exist for Release

Lastly, the Government argues that the COVID-19 worldwide pandemic and health crisis does not suffice as an exceptional circumstance. Again, the Government is wrong.

In its Opposition, the Government maintains that any perceived danger from contracting the virus is speculative and that Crandall is a "healthy, thirty- three- year- old male" and therefore does not meet the requirements for release. (Opposition at 16). This

reasoning is flawed for several reasons.

First, the Eighth Amendment's prohibition against cruel and unusual punishment contemplates not only actual harm, but the risk of potential harm is considered. As noted in the Motion to Revoke, the Eighth Amendment also proscribes indifference to *future* harm. *See Helling v. McKinney,* 509 U.S. 25, 33 (1993). And with the virus spreading quickly, the risk to inmates is cruel and unusual under both the Utah and federal constitutions because today's society has chosen not to tolerate the risk of mass gatherings, communal living, or insufficient hygiene. (Motion to revoke at 16-18).

Second, the mere fact that defendant is now a "healthy, thirty-three-year-old male", does not exclude him from the risk of serious injury or death as a result from a COVID-19 infection. In fact, recent studies have found that many in their 30's and 40's who have exhibited no other risk factors, have died from strokes as a result of being infected with the novel virus.[6]

As stated in Crandall's previous motion, jails and prisons are the most dangerous places to be right now, with the jails having little to no tools to combat the virus. As such, this Court should find that the COVID-19 pandemic is a compelling and exceptional reason that warrants Crandall's immediate release.

---

[6] *See* Ariana Eunjung Cha, *Young and middle-aged people, barely sick with covid-19, are dying of strokes*, WASH. POST (April 25, 2020 at 12:12 p.m.) https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/.

DATED this 28th day of April, 2020.

/s/ James C. Bradshaw
JAMES C. BRADSHAW
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April, 2020, I electronically filed the foregoing *Reply to Government's Opposition to Motion for Revocation or Amendment of Detention Order* with the Clerk of Court using the CM/ECF system which sent notification of such filing to the to all parties and co-defendants.

/s/ Kayla Marker