ANDREA T. MARTINEZ, Acting United States Attorney (#9313)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. DREW WILSON CRANDALL, Defendant. | Case No. 2:16-cr-00631-DAK  UNITED STATES' RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM  Judge Dale A. Kimball |

The United States submits this response to the Defendant's sealed Sentencing Memorandum to 1) buttress the PSR writer's determination that the Defendant receive a guideline enhancement for being a leader/organizer; 2) support the PSR writer's determination that the Defendant receive guideline enhancements for maintaining a drug premises; 3) rebut the contention that the wage-earning co-conspirators, including the Defendant, were unsophisticated; and 4) support the Base Offense Level calculated based upon the drugs distributed by the Pharma-Master organization.

**1. The Defendant was a leader-organizer; the PSR writer correctly attributed a role-in-the-offense enhancement to him.**

The Defendant recruited, managed, trained, or led several participants in his enterprise with Mr. Shamo during 2014 and 2015. During 2016, he continued to lead, albeit in a diminished capacity. The Defendant agreed in his Statement in Advance of Guilty Plea that his relevant conduct was to be considered by the Court at sentencing—and while, strictly speaking, that might require the Court to impose a four-level increase for his role in the offense, the United States appreciates the nuanced, thoughtful approach taken by the PSR writer, who instead gave the Defendant a two-level increase for his role-in-the-offense. The two-level increase recognized that the Defendant was the co-founder of the organization while taking into account his diminished leadership role in 2016.

The Defendant was a leader. As the Defendant explained in his Sentencing Memorandum, being a leader includes recruiting other participants or giving direction to them, along with claiming a larger share of the fruits of crime like the Defendant did in 2014 and 2015. *See United States v. Snow*, 663 F.3d 1156, 1162-63 (10th Cir. 2011).[1] To be specific, the Defendant recruited and/or trained T.E., Gygi, Tonge, Bustin, and Paz, among others. He taught them their roles in the organization, whether it was as a package receiver, pill press operator, or packaging and shipping drugs in a way designed to avoid law enforcement detection.

---

[1] The Defendant also correctly noted that the United States needed to prove by a preponderance of the evidence that the Defendant qualified for each guideline enhancement. To do so, the United States proffers evidence taken from trial transcripts, interview reports, and exhibits seized during the investigation.

**1.1 Ms. Tonge and Ms. Bustin**

In teaching Ms. Tonge and Ms. Bustin their roles, the Defendant met with them in their home. Bustin recalled that the Defendant showed her and Tonge how to package the pills properly, to ensure that product was not damaged during shipment or discovered by law enforcement. Bustin explained that the Defendant directed her and Tonge to put the pills in Mylar bags because they could not be x-rayed, and to include an invoice inside each package. Bustin related that in the beginning the Defendant would bring narcotics in "Ziploc baggies or gallon baggies" to their residence for repackaging and shipment.

The Defendant set up an encrypted email account—passthepeas@sigaint.org—for Ms. Tonge and Ms. Bustin. The Defendant wrote them the following instruction email. It had both public and private keys for PGP encryption attached with instructions. The instruction email outlined how Ms. Tonge and Ms. Bustin were to use PGP keys to encrypt and decrypt messages sent between co-conspirators. The email read as follows:

> Subject: asc file to import
> From: passthepeas@sigaint.org
> Date: Wed, July 8, 2015 6:43 am
> To: passthepeas@sigaintevyh2rzvw.onion
> Priority: Normal
> here is the asc file attached to this.
> pen the gpg keychain program from your applications folder. then at the top go to file > import > and choose this file you've downloaded.
> now when you have a text file to send to us, right click on it >> bottom of that menu and choose services > gpg encrypt file
> then the box that comes up, you should choose gene001 key in the top box to encrpyt the file with. the bottom box is for signing your message, which means aaron can detect any evidence of tampering with the encryption. for now dont worry about doing that.
> delete this after reading and importing this asc file.
> Thanks

The Defendant sent at least one payment to Ms. Tonge through Venmo for $500.

In October 2016, when working overseas in an order processing and customer service role, the Defendant noticed Ms. Tonge and Ms. Bustin were making mistakes and took it upon himself to correct them—like an engaged leader should. He wrote that their scales—used to weigh pills rather than count pills for larger orders—were giving quantities to customers that were between 3% and 6% short of the order total. The Defendant explained that he would now include in his records the reason a customer's order had to be reshipped so "we can spot trends better this way." Spotting trends; giving correction to subordinates—subordinates who the Defendant personally trained; and unilaterally deciding to change the types of records being kept by the organization all show the Defendant was still a leader in 2016. Here is his email:

```
Subject:    10-5reships
From:       shortbread66@sigaint.org
Date:       Wed, October 5, 2016 11:06 am
To:         passthepeas@sigaint.org
Cc:         americansteam@sigaint.org
Priority:       Normal

Your scales are still coming up slightly short on some orders. (3-6% short
or so)
I'm going to list a reason for the reship from now on, not to criticize
you at all because you guys are awesome, but just so you are aware of them
and hopefully we can spot trends better this way

Thanks :)

Attachments:
10-5PassThePeas.txt
10-5Pharma.txt
[10-5PassThePeas.txt]
```

**1.2 T.E.**

T.E. explained that that he worked with the Defendant for an online retailer and that the Defendant had introduced him to Shamo. T.E. stated that approximately a year prior to his interview with investigators, he was approached by the Defendant, who inquired if T.E. would be interested in making a little extra money. The Defendant explained that his address would be used to receive shipments on behalf of Shamo and the Defendant. T.E. described Shamo and the Defendant using the term "co-partners" while referring to their business. T.E. estimated that he received approximately five parcels over an estimated six-month period.

**1.3    Luke Paz**

Mr. Paz explained that the Defendant was getting ready to leave the country and that he and Mr. Shamo wanted Mr. Paz to be the Defendant's replacement—specifically, the person who pressed the pills. Mr. Paz recalled that when the Defendant, Mr. Shamo, and Mr. Paz met together to train Mr. Paz on running the pill press, the Defendant did the training. It appeared to Mr. Paz that the Defendant was the one who knew the most about how the machine worked. Mr. Shamo, Mr. Paz testified, was listening, not training—the Defendant was giving direction and instruction to both of them.

As a leader, the Defendant recruited and directed, as these four examples indicate. In 2014 and 2015, he claimed a larger share of the fruits of the crime. The PSR writer was thoughtful, deliberate, and correct when she assigned a two-level increase to the Defendant for the Defendant's leadership role in the offense.

**1.4 Less than minimal?**

Against the backdrop of the strong evidence that shows the Defendant was a leader, the Defendant has elected to petition the Court for the exceptionally rare role-in-the-offense reduction for being a less-than-minimal participant—a reduction for those whose roles are so "extraordinarily minute" that a reduction for being a minor or even minimal participant is insufficient. His request should be denied.

Even by the two standards the Defendant suggests—income and participation—the Defendant cannot be found to have been a minor participant, let alone a less-than-minimal participant. To be considered a minor participant, a defendant must be "substantially less culpable than the average participant in the criminal activity." USSG 3B1.2 Application Note 3(A) (2016). The guidelines draw the comparison with the average *participant*, rather than the average co-defendant, recognizing that not all participants are charged, especially in large DTO cases like this one.

Here, below, is Trial Exhibit 17.06, which shows the participants in the criminal activity. A green box has been placed around those who are substantially less culpable than the Defendant— each of these less culpable participants were either engaged for less time in the enterprise, paid less than the Defendant, or both. A yellow box has been placed around those who are less culpable than the Defendant, but more culpable than those in green boxes.



None of the package receivers or other participants on the bottom row earned as much as the Defendant.

When the Court considers the Defendant's total income earned from his drug trafficking endeavors, the Defendant earned more than Ms. Noriega, Ms. Tonge, Ms. Bustin, Mr. Gygi, or Mr. Noble.[2] The Defendant, who was a full participant in the drug trafficking enterprise from 2014 through 2016, minus seven months, participated in the enterprise for more time than any participant other than Mr. Shamo.

In both a mathematical and a common-sense approach to the phrase *average participant*, the Defendant cannot be considered substantially less culpable than the average participant. Instead, nearly all of the participants are substantially less culpable than the Defendant—a finding that is unsurprising given that the Defendant was a leader in the enterprise.

---

[2] The Defendant conceded this point in his Exhibit A, Report of Brent Robbins, page 7.

7

The Defendant went to great lengths to partition the enterprise into three chapters that have their breaks when he left the country and then later resumed his online customer service and order processing work. He then asked the Court to ignore his work in the first chapter—his efforts in all of 2014 and 2015.

However, the Defendant agreed in his Statement in Advance of Guilty Plea that the Court should consider his relevant conduct. Relevant conduct includes his work in 2014 and 2015, during which time the Defendant and Mr. Shamo built the drug trafficking enterprise, refined and perfected its processes, and recruited and trained participants. He cannot divorce himself from his essential, devastatingly effective work in 2015.

By the time the Defendant left the country with his fiancée in November 2015, he had worked diligently for months to ensure that the enterprise could press counterfeit pills; ship them using *stealth;* communicate using sophisticated encryption applications, programs, and email accounts; and earn substantial profit while doing so.  His greed—the moral failing that led him into the enterprise—gave him the incentive he needed to leave the enterprise on sure footing. He, after all, expected a future payout for his efforts.

Above all else, the Defendant should be held to account for cracking the pill press enigma. Pressing high quality counterfeit or fake pills is exceptionally difficult.[3] It required someone capable of tackling difficult mechanical and scientific problems. Correctly building and calibrating a pill press and perfecting a recipe for counterfeit drugs was the Defendant's most devastating contribution to the enterprise—by it, he showed the others like Mr. Shamo and Mr. Paz what was

---

[3] As anecdotal examples, the undersigned prosecutor helped investigators seize pill presses and prosecute would-be pill pressers both before and after the Defendant's offenses. In every instance, no matter the sophistication level of the suspects, they were unable to successfully press a pill that came even remotely close to a legitimate oxycodone tablet.

possible. Paz and Shamo stood on the Defendant's shoulders when they developed their Fentanyl pill recipe.

And the Defendant was proud of his pill pressing accomplishment. Long after he left the country, he still included his work with Mr. Shamo as the top entry on his résumé:

**Drew Crandall**
28 princess Street, Kangaroo Point
Brisbane QLD
+61 431 474 304

**Work Experience**

*Freelance customer service and software work (06/'16 – 11/'16)*
- Answered customer service emails and made sure all questions were answered within 48 hours.
- Wrote simple WPF programs to help track sales, daily totals, and issue tracking.
- Used simple scripting to output results to Excel to visualize the data.
- Created a simple recipe and inventory management program to help a customer budget, eat healthier, and reduce food waste.

The first three bullet points refer to his customer service and order processing work. But the last bullet point is a veiled reference to his triumph with the pill press.

The Defendant further showed leadership initiative when he obstructed justice. Upon learning in November 2016 that Mr. Shamo had been arrested, the Defendant purchased data for his phone, set up a mobile hotspot, logged into Pharma-Master's account on AlphaBay and began deleting evidence.

The Defendant then sent a private message to an AlphaBay Administrator telling the administrator that the account had been compromised by law enforcement and to shut down Pharma-Master's account. The Defendant finished deleting messages and then destroyed his physical copy of his Pharma-Master records. No one directed the Defendant to obstruct justice, he took the initiative. The Defendant directed AlphaBay on behalf of Pharma-Master to shut down Pharma-Master's account. By doing so, the Defendant ensured that law enforcement would have

been unable to work with Mr. Noble to take over the account and generate investigative leads for investigators across the country for a period of weeks following Mr. Shamo's arrest.

There is a reason Mr. Shamo's theory of defense at trial was that the Defendant was the real leader of the enterprise. The Defendant and Mr. Shamo started out as partners. Each contributed startup capital. They divided the roles between themselves in the beginning. The Defendant had the aptitude and disposition of a leader. To find that the Defendant held a less-than-minimal role (or even just a minor role) would first require the Court to disregard nearly all the evidence from this case. Instead, the Court should accept the recommendations of the PSR writer and give the Defendant a two-level increase for his role in the offense.

**2. The Defendant maintained a drug premises on Murphy Lane with Mr. Shamo; he should receive the two-level enhancement.**

Prior to Mr. Shamo's move to his residence on Titian Way, Mr. Shamo and the Defendant lived with roommates on Murphy's Lane. It was at their Murphy's Lane residence that the Defendant packaged drugs for redistribution; argued with Mr. Shamo when a roommate received a visit from HSI regarding a drug package sent to their Murphy's Lane address; built his first pill press; calibrated the pill press; pressed counterfeit Xanax pills; and perfected his counterfeit pill recipe. In 2014 and 2015, the Defendant maintained a premises for the purpose of manufacturing and distributing controlled substances.

The Defendant contends that while he was on the lease at Murphy's Lane, in the latter half of 2015, he spent less time at the Murphy's Lane residence than before. However, scaling back the time he spent at the residence does not absolve him from the two-level enhancement. His distribution and manufacturing work at the home—during months of which he had no other job or

10

income aside from the drug trafficking enterprise—cannot be ignored. The PSR writer correctly calculated his guidelines.

**3. The Defendant and his co-conspirators acted with a high degree of sophistication.**

The Defendant specifically, and his co-conspirators generally, acted with a remarkable degree of sophistication. They sold contraband on the dark web, took payment in the form of cryptocurrency, exchanged cryptocurrency without creating a traditional paper trail by using peer-to-peer exchanges, communicated using encrypted apps, and encrypted files using PGP-level encryption and then sent the files using a dark web email platform.

But the Defendant submitted a report from a retired FBI agent that claimed that because several of the co-conspirators received regular wages for their drug trafficking work, the co-conspirators showed a lack of sophistication. The United States respectfully suggests that the Court need not put stock in the opinion of the retired agent. It is very likely that the retired agent has never been the case agent on a case that involved dark web drug trafficking where payment was made using cryptocurrency, the peer-to-peer exchange of cryptocurrency, the use of sophisticated encryption applications and email accounts, or the use of PGP programs to further encrypt files sent over dark web email accounts.[4] The Defendant and his co-conspirators acted with a high level of sophistication.

In short, the Defendant relied upon the opinion of a retired agent who assumed that he previously worked sophisticated cases and, when an aspect of this case did not match his prior cases, he labelled it unsophisticated. Such assumptions often lead to incorrect conclusions.

---

[4] Should the retired agent send case information to the undersigned prosecutor that meets the sophistication prerequisites outlined, the undersigned prosecutor will retract his statement at the time of sentencing.

**4. The pill count that set the Base Offense Level is reliable.**

Finally, the pill count that set the Base Offense Level is reliable and supported by strong evidence. The PSR writer calculated the Defendant's Base Offense Level by drawing from Trial Exhibits 15.00, 15.02, and 15.02a, which include the screenshots of Pharma-Master's feedback-linked sales on AlphaBay and a corresponding chart and summary that showed the total number of Fentanyl-pills sold by Pharma-Master in the feedback-linked sales data. The Defendant, echoing one of Mr. Shamo's claims on appeal, claims that the feedback-linked data is unreliable hearsay. The Court previously rejected this claim after Mr. Shamo's pre-admission hearing, in which HSI Investigative Analyst Robin Biundo laid foundation for Exhibits 15.00, 15.02, and 15.02a.[5]

Neither Mr. Shamo in his appeal nor the Defendant in his sentencing memorandum mentioned Trial Exhibit 14.30 when they made their claims. Trial Exhibit 14.30 consists of 1,984 pages of orders sent to Pharma-Master for pills.[6] Each page of the exhibit contains multiple orders.

The daily order sheets that make up Exhibit 14.30 were not created by AlphaBay—they were created by the Defendant and his co-conspirators. The daily order sheets were not captured on the dark web—they were seized on Mr. Shamo's iMac computer and from the Sigaint email account used by Ms. Tonge and Ms. Bustin.

The daily order sheets contained in Exhibit 14.30 show thousands of customers who ordered Fentanyl-laced fake oxycodone pills—the order sheets also show the quantity ordered, the

---

[5] See Dkt. 176, United States' Memorandum in Opposition to Defendant's Motion in Limine, for a proffer of the foundation for those exhibits and an explanation showing why they are not hearsay.
[6] Trial Exhibit 14.30 is too large in file size to attach to this response. The Court has a copy in the trial record; the United States would happily provide a copy on a disk to either the Court or the defense if it would be of any assistance.

date of the order, and the address to which the pills should be sent. Exhibit 14.30 is independent, uncontested proof that Pharma-Master distributed hundreds of thousands of Fentanyl-laced fake oxycodone pills. The Defendant cannot avoid responsibility by claiming his Base Offense Level was calculated based upon unreliable figures. His guidelines have been correctly calculated by the PSR writer.

Respectfully submitted this 24th day of June, 2021.

ANDREA T. MARTINEZ
Acting United States Attorney

/s/ *Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney