```
 1                 IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3

 4
        UNITED STATES OF AMERICA,     )
 5                                    )
                  Plaintiff,          )
 6                                    )
             vs.                      )
 7                                    )
        DREW WILSON CRANDALL,         )   Case No:  2:16-CR-631
 8                                    )
                  Defendant.          )
 9      _____  )
                                      )
10                                    )

11

12

13

14

15

16
                  BEFORE THE HONORABLE DALE A. KIMBALL
17
                           April 30, 2020
18
              TELEPHONIC MOTION FOR REVIEW OF DETENTION
19

20

21

22

23
                           Reported by:
24             KELLY BROWN HICKEN, RPR, RMR
                          801-521-7238
25
```

1

```
 1                        APPEARANCES OF COUNSEL

 2     FOR THE UNITED STATES:        OFFICE OF THE US ATTORNEY

 3                                   BY:  S. MICHAEL GADD

 4                                        Attorney at Law

 5                                   111 SOUTH MAIN, STE 1800

 6                                   SALT LAKE CITY, UTAH  84111

 7

 8     FOR THE DEFENDANT:            BROWN BRADSHAW & MOFFAT PLLC

 9                                   BY:  JAMES C. BRADSHAW

10                                        Attorney at Law

11                                   422 N 300 W

12                                   SALT LAKE CITY, UTAH 84103

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                SALT LAKE CITY, UTAH, THURSDAY, APRIL 30, 2020

 2                          *   *   *   *   *

 3                THE COURT:  Good morning, everyone.  This is

 4      Judge Kimball.  We're on the telephone today in matter of the

 5      United States of America vs. Drew Crandall, 2:16-CR-631.  And

 6      on the telephone we have Mr. Drew Crandall, we have his lawyer

 7      Mr. James Bradshaw, and Mr. Greg Crandall, his father.  We

 8      also have from the US Attorney's Office Mr. Michael Gadd,

 9      Mr. Vernon Stejskal and Mr. Kent Burggraaf.  And we also have

10      Mr. Jacob King from the probation office.  And somebody else

11      is joining us, I suppose.

12                All right.  Mr. Bradshaw, you may proceed.

13                MR. BRADSHAW:  Thank you, Your Honor.  I appreciate

14      you accommodating this in these challenging times.  As I was

15      thinking about this this morning it occurred to me that

16      everybody who sits in jail and goes before the judge promises

17      to be crime free, to not flee and to be compliant of all

18      orders.  And, you know, it's tricky for a court sometimes to

19      figure out who's going to have success and who's putting forth

20      empty promises.  But I think the facts and circumstances, the

21      record and the circumstances in this situation of

22      Drew Crandall indicate very strongly that in fact he's going

23      to be fully compliant.  And I'm not going to belabor this, I'm

24      just going to be brief, but there are a few things I think are

25      very important.
```

1                 The first thing --

2                 THE COURT:  I should say -- excuse me,

3    Mr. Bradshaw, I should say two things.  First, I neglected to

4    mention that here in the courtroom with me we have my

5    courtroom deputy, A court reporter and one of my law clerks,

6    and also I've read all of your papers.  Pardon me.  Go ahead.

7                 MR. BRADSHAW:  No.  I appreciate that.  And I will

8    be brief.  I'm not going to belabor this.  I think the Court

9    is well versed in this case and in this situation.

10                But the thing that I would focus on and note first

11   is I do think family matters a lot.  And in a situation like

12   this love and support of family means a great deal, not only

13   in terms of compliance and success on pretrial release, but,

14   you know, in life overall and getting away from a life of

15   criminal behavior.  The fact that Drew has this incredible

16   support that's willing to give him a job and willing to post

17   their house and willing to support him in tough times, and

18   it's a huge factor in predicting how he's going to do.

19                The other thing that occurs to me that really tips

20   the scales in this case is he's been in custody for three

21   years.  And he's not about to, I mean maybe this is the wrong

22   way to put it, but flush it down the toilet by going out and,

23   you know, have a dirty urine or getting in trouble or engaging

24   in criminal behavior or trying to flee.  That would just be

25   idiotic beyond belief.  The fact that he has essentially three

1    years of time served in the bank is every motivation of him in

2    the world for him to comply and succeed.  He's not going to

3    engage in criminal behavior prior to sentencing.  I think he's

4    going to tow the line and do everything he can to prove to the

5    Court that he can be productive and functioning and do well.

6    And obviously that's going to do nothing but inure to his

7    benefits if he's able to do that.  I think it's somewhat of an

8    absurd notion to suggest that he's going to throw his family

9    who's willing to post their home under the bus and flush that

10   three years way and try and do something crazy just doesn't

11   make sense.

12        The burden of proof is on the defendant to show

13   that he's not a flight risk and he's not a danger.  It's sort

14   of a -- it's sort of a strange legal setup, if you will, in

15   the sense that, I mean, this Court obviously has to look at

16   every defendant who promises and says, I will do the things

17   order, I will comply, and determine whether they can be

18   managed in terms of their flight risk and danger to the

19   community.  So it's, you know, is there a way to manage these

20   promises?

21        And I think in this circumstance the record and the

22   circumstances indicate that in fact, you know, compliance is

23   what's going to happen.  The posting of the family's home, the

24   three years of time served, changes from when he last

25   appeared.  And I really do think the most important change is

1    this Court has had the benefit of listening to all the

2    testimony and listening to Mr. Crandall, listen to him testify

3    and listen to him tell the story of what he did, acknowledging

4    his own behavior, his insights as to how that happened and

5    what happened and understanding the case.  The Court doesn't

6    need to rely on how the government characterizes or how the

7    defense characterizes.  The Court knows this case obviously

8    better than I do and I think is in a good position to make

9    judgments of those sorts.

10         Unless the Court has specific questions about these

11   issues I think we're prepared to submit that --

12         THE COURT:  Let me ask you one question.

13         MR. BRADSHAW:  -- and then respond.

14         THE COURT:  One of your arguments relates to the

15   Corona virus risk.

16         MR. BRADSHAW:  Yes.

17         THE COURT:  What do we know about that, if

18   anything, in the jail where Mr. Crandall is incarcerated?

19         MR. BRADSHAW:  I don't -- I mean, my understanding

20   is that Tooele County Jail is reportedly Corona virus free.

21   They try to reduce their capacity, I think they're the highest

22   capacity jail right now in the state, because they're above

23   60 percent.  Everyone else has tried to release more inmates.

24         But it's a time bomb.  County jails particularly

25   are at such a huge risk because of the rotating nature of

1    people coming in.  Prison facilities can control who comes in

2    and where they've been and, you know, the time period before

3    they come in.  County jail cannot.  It's effectively like, I

4    don't know, a Navy ship or a cruise ship that has a constant

5    stream of new people coming in.  And the problem is that once

6    it hits, it's just going to spread like crazy.

7            And I understand the government takes the position

8    that he's young and Corona virus hasn't hit the Tooele County

9    Jail, and both of those things are true.  But there are still

10   risks involved and associated with this pandemic.  And people

11   who can be reasonably supervised should be released, and

12   Mr. Crandall is in that position.  And I think based on these

13   extraordinary circumstances that we face, it makes sense to

14   release him at this point.

15           THE COURT:  Thank you, Mr. Bradshaw.

16           Mr. Gadd?

17           MR. GADD:  Yes, Your Honor.  This is Mr. Gadd.

18   Maybe I'll start with the exceptional circumstances of the

19   Corona virus, and then after addressing that I'm hoping to

20   just address two other things that were brought up in the

21   defendant's reply.  The first is what I think is a logical

22   fallacy, and then the second is correction of the facts as it

23   relates to Mr. Crandall's obstruction of justice.

24           So first the Corona virus.  Just responding quickly

25   to what Mr. Bradshaw said, the jail are at an initial

1    disadvantage because they don't have control over what

2    defendants are brought to them.  But that's only to a degree.

3    They can work with local law enforcement to make sure that the

4    people who are brought to them are not showing any symptoms.

5    And then one of the other things the jails are doing that

6    makes them more like a prison is their 14-day quarantine for

7    anyone who comes in.  They can isolate those people in the

8    cell until they can determine either through a test or through

9    a sufficient quarantine period that those people don't have

10   the symptoms and they be can released a reduced but general

11   population.

12            So speaking now about exceptional circumstances.

13   The defendant cited the Eighth Amendment case McKinney for the

14   notion that future harm fell under the purview of Eighth

15   Amendment.  McKinney is a fascinating case.  It was decided in

16   1993.  It was a pro se case brought by a prisoner in Nevada.

17   He brought it under, it was a 1983 action, so under Title 42

18   Section 1983, and he sought damages, of course.  But he also

19   wanted an injunctive relief because he was being forced to

20   share a prison cell with a five-pack-a-day smoker.  And his

21   argument was, I'm being harmed by this smoke.

22            The problem is in 1993 was that the harm from

23   secondhand smoke manifested itself years down the road, and

24   case law surrounding the Eighth Amendment hadn't caught up to

25   that.  So Justice White writing for the majority explained

8

1      that future harm does fall under the Eighth Amendment, but it

2      must me, and this is his quote, it must be sure or very likely

3      to cause serious illness or needless suffering.

4              So in many ways in the McKinney case, the

5      secondhand smoke case, is distinguished from Mr. Crandall.

6      First the remedy that each person sought.  McKinney wanted a

7      cell in the nonsmoking section.  Mr. Crandall wants freedom.

8      He wants to be released.  Second, the future risk of harm can

9      be distinguished.  I don't think there is a doctor in this

10     country who would say that long term exposure to secondhand

11     smoke isn't a near certain recipe for a future lung ailment

12     such as emphysema are even cancer.

13             But with Covid 19 there's a great deal we don't

14     know.  What we do know is that two or three months into this

15     crises there's a small but still likelihood that Mr. Crandall

16     will be exposed to Covid 19 at the Tooele County Jail.  It's

17     worth celebrating that local jails, particularly Tooele

18     County, has so far in this crisis kept it out of their jail.

19             Second, even if it sneaks into the jail it's

20     unknown whether or not he'll catch it.  Third, it's unknown

21     whether he will suffer from any particularly harmful effects

22     or could perhaps he'll be like one of the more than 2 million

23     New Yorkers who have the antibodies but were asymptomatic.

24     That came out in the news this week.  They're testing randomly

25     people from New York City, and 25 percent of the population

1    has the antibodies.  But certainly, they're not counting any

2    of those cases because those people aren't showing symptoms,

3    they're not going to the hospital, they're not suffering any

4    harm.

5              There's a great deal we don't know about it.  But

6    what we do know is that the defendant is a healthy 33-year-old

7    man in a jail that has never had a confirmed case and that has

8    policies and procedures in place to try to keep it out and to

9    remedy it as soon as they discover it.

10             So there's an objective factor in McKinney.  Even

11   though he won before the Supreme Court, it was remanded back,

12   and McKinney had to show that he was being exposed to

13   objectively high levels of secondhand smoke.  If that

14   objective were here Mr. Crandall could not show today or in

15   the past and hopefully not in the future that he's ever been

16   exposed to Covid 19.  His jail is safer than my neighborhood.

17   In my small neighborhood we have two cases right now.

18             It's kind of like Mr. Crandall wants to argue that

19   he should be released because he's at risk of future harm from

20   secondhand smoke from a facility that doesn't allow tobacco

21   products that screens everyone, both prisoners and employees

22   alike, who comes and goes for tobacco products and has

23   procedures in place to aggressively investigate and stamp out

24   any tobacco product use that might put him in the jail.  That

25   essentially is where we're at on exceptional circumstances.

```
 1              Had there been cases where a defendant in custody

 2    who has significant preexisting condition that would make them

 3    a terrible risk if they were to catch Covid-19, of course.

 4    But for most of the defendants in most of the cases where this

 5    issue has been presented district courts across this country

 6    their release is being denied.

 7              Second, if we can look at this what I would believe

 8    is a transposition fallacy, a logical fallacy that has to do

 9    with the dangerousness and the conduct.  So it was argued that

10    essentially if the enterprise's actions were dangerous all the

11    defendants should have been held in custody.  But since not

12    all the defendants were held in custody, the enterprise's

13    actions weren't dangerous.

14              That transposition fallacy is probably best summed

15    up in what some people refer to as a joke, but it helps

16    explain this idea more clearly.  It goes like this.  Just

17    because nobody complains doesn't mean parachutes never fail.

18    If parachutes were failing, people would complain.  Since no

19    one complains parachutes are not failing.

20              The logic just doesn't work, and that's the same

21    here.  I don't know how anyone can sit through the three-week

22    trial that Your Honor set through and not recognize the

23    extreme harm of the action of the enterprise.  And at least

24    from my perspective as an advocate it permits every

25    codefendant in this case starts out with a major strike
```

1      against them.  That issue, remember the dangerousness to the

2      community, I don't think can be evaded.  It's a major strike

3      against every one of them.  And I think at that point the

4      Court needs to look at the rest of their actions and the

5      remaining 3142 factors to determine whether they should be

6      detained.  In some cases it's meant defendants were released

7      and in others detained.

8              Lastly if I could just talk briefly about some of

9      the facts surrounding our accusations and Mr. Crandall's

10     offense of his obstruction of justice.  In their reply between

11     Pages 5 and 6 Mr. Crandall indicated that my version of events

12     was not supported by history, specifically, quote:  It is very

13     unlikely that Crandall's single message to Alpha Bay had any

14     impact.  And then they went on to argue that it shouldn't be

15     forgotten that Mr. Crandall sent his message after multiple

16     press releases had been issued by ICE, HSI, the US Postal

17     Service and the United States Attorney's Office.

18             I don't want to project any blame on the defendant

19     or his attorneys because I recognize they weren't living

20     through this at the time.  They came in months after the fact.

21     Mr. Stejskal and I lived through it, and it's a little clearer

22     in my memory and I'll come back and research it, so I want to

23     set a few facts straight.

24             First, we knew in December of 2016, seven months

25     before Mr. Crandall admitted it, that Mr. Crandall had alerted

1    Alpha Bay to shut down PharmaMaster storefront.  We figured it

2    out with Mario Noble's help.  We knew that he had done it.  It

3    was one of the reasons we were not willing as the defense has

4    previously suggested to just pick up the phone and call

5    Mr. Crandall.  We knew he was actively obstructing justice.

6    He sent this message, there was an exhibit at trial, I'm happy

7    to pull it up if the Court wants to read it again.  But he

8    sent this message shortly after learning of Mr. Shamo's

9    arrest, and he sent it to an administrator for the Alpha Bay

10   cite indicating that the PharmaMaster account was compromised

11   and needed to be shut down.  And that action by Mr. Crandall

12   was 100 percent responsible for Alpha Bay closing the

13   PharmaMaster account.  It had nothing to do with press

14   releases.  In fact, the press releases from those federal

15   agencies and the United States Attorney's Office that were

16   cited by the defense, those came six months after Mr. Crandall

17   told Alpha Bay to shut down the cite.  Six months.  They were

18   the end of May 2017.

19          On the Dark Web anonymity is king.  There was no

20   one at Alpha Bay and none of Mr. Crandall and Mr. Shamo's

21   customers knew Mr. Shamo's real name.  Alpha Bay had no idea

22   that PharmaMaster was tied to Mr. Shamo and his arrest.  Alpha

23   Bay learned it because Mr. Crandall told them, and that's why

24   they shut down the account.  Had he not known it my agents, as

25   I explained in the brief, my agents could have pulled together

1    a nationwide takedown.  We've seen it in other contexts, most

2    recently in child pornography investigations.  Agents

3    somewhere in the US will take over a Dark Web hosting website

4    for child pornography, and they'll run it for a couple weeks

5    to generate leads to go across the country for people who are

6    downloading and sharing those images and videos.  And then

7    there will be a nationwide takedown to great effect.  That was

8    our hope in this case, and we were unable to do it because of

9    Mr. Crandall's actions.

10         I think that's all I have that I wish to bring

11   before Your Honor.  I know that Your Honor knows the case well

12   because of the trial, and I also think it's been briefed well.

13   I'm happy to answer any questions that the Court may have.

14         THE COURT:  Isn't it harder these days to travel

15   anywhere?  Is he really a flight risk?  Is anybody a flight

16   risk these days?  Mr. Gadd?

17         MR. GADD:  Yes, Your Honor.  So in thinking about

18   Your Honor's question, whether or not it's hard to travel I

19   can't speak to that.  I know, you know, there were still

20   airlines flying, still passports being issued.  I know people

21   are still traveling.  I have a neighbors who have to travel

22   for work.  I don't know if it's become harder because I don't

23   think the enforcement has changed, you know.

24         I think that question is probably best analyzed by

25   looking at the incentives he faces.  So I think Mr. Bradshaw

1    indicated it will be idiotic to fleeing.  I'm not sure that's

2    the case.  I think incentive would be to flee.  Here's what

3    he's looking at.  And I recognize he spent two years in

4    custody, but any economist will tell you sunk costs are sunk.

5    His incentive is he knows and hopefully at a point not too

6    distant from now, that he will be sentenced by Your Honor, and

7    he has a chance to receive a significant sentence.  And he

8    knows that the United States won't be asking for a credit for

9    time served sentence.  Even his attorneys do.  He knows the

10   guideline range.  He knows now better than he has in the past

11   that extent of the harm caused by his actions.  And he knows

12   what it's like to be incarcerated.  And I don't want to put

13   words in his mouth, but I suspect he hates it.  There's few

14   defendants who like it.  I think he has every incentive to

15   flee.  In my mind the incentive has increased, not decreased.

16        THE COURT:  Well, I don't know what sentence -- I

17   don't have sentencing recommendations for anybody yet, but --

18   and I guess most of that is up to me, isn't it?

19        MR. GADD:  Yes, sir.  100 percent.

20        THE COURT:  He cooperated.  He testified at some

21   length.

22        Anyway, anything else you want to say?

23        MR. GADD:  No, sir.

24        THE COURT:  Mr. Bradshaw?

25        MR. BRADSHAW:  Yeah.  I'd like to respond to a

1   couple things briefly.

2            THE COURT:  Before you do -- Mr. Bradshaw, before

3   you do, does your client want to say anything?

4            MR. BRADSHAW:  No.  I don't think so.

5            THE COURT:  All right.

6            MR. BRADSHAW:  Judge, in terms of the Eighth

7   Amendment case and, you know, Mr. Crandall's ability to

8   recover, I mean, Eighth Amendment talks about obviously cruel

9   and unusual punishment and recovering damages.  And I think

10   Mr. Gadd is absolutely correct in citing that standard -- you

11   know, Mr. Crandall's not asking -- not citing to Covid 19

12   circumstances as a reason he should be paid money or recover.

13   He's citing it as the statute requires as the exceptional

14   circumstance which the Court can rely upon to make the

15   findings necessary to conclude that, in fact, he can be

16   managed on release.  And it is a factor.  It's just something

17   that the Court should consider.

18            And in weighing Covid 19, it's not just a matter

19   of, will Drew Crandall get it?  Will Drew Crandall be

20   hospitalized and have harm?  There's a worldwide attempt to

21   try to reduce the population of custody facilities because

22   everyone knows it's inevitable.

23            The Cook County Jail, it's not a matter of if it's

24   happened yet, it's just such a danger because of the

25   circumstances that it makes sense if someone can be managed on

1    release to get them on release and put them there, and

2    Mr. Crandall oddly fits into that.

3            As to this idea of transitional fallacy, we are not

4    arguing that there was -- that somehow there was no harm from

5    this conspiracy or the people involved in the conspiracy were

6    all -- I'm sorry.  I didn't even follow some of that.  But

7    equity does matter.  I mean, people should be treated the same

8    in some sense.  People who are similarly situated should be

9    treated similarly.

10           And the reality is that Mr. Crandall has been in

11   custody for three years, and I don't think anybody anticipated

12   that this case would take three years to get to the place

13   where it has.  And it's just not known.  And that's not

14   anyone's fault, but it has been three years and it's gone on a

15   long time.  And the reality is that people who are equally or

16   more culpable of him have been out and some of them without

17   even pretrial provision.  And that's just the reality in this

18   case that matters.  That is something that the Court can

19   consider.  And if they've been successfully managed, and

20   everything that Mr. Gadd talks about, the fact that they're

21   facing large sentences, the fact that he believes the logical

22   thing to do is to flee, it applies to everyone.  It applies to

23   everyone in this case.  It's just true.

24           And one of the realities also that, you know, the

25   United States doesn't address is this idea that it's not just

1    the Court that makes a finding that this person can be

2    managed, and this person can't.  The government has a big role

3    in who's released and who's not.  If the government is not

4    asking for detention obviously we never get to this point.

5    And some of the defendants, they've never sought detention.

6    They never attempted to have a hearing or have it considered

7    by a court.

8            Inequity does matter.  I mean, if the courts are

9    about anything it's similarly situated people should be

10   treated in a similar matter, and that's just an issue in this

11   case.  It's out there it's real.

12           And as to the obstruction, I mean, Drew Crandall

13   did do a terrible thing.  He tipped off, you know, the Dark

14   Web that in fact decided to compromise after he read about it

15   in a newspaper article.  So I mean, I have to go back and look

16   at the record again, but I thought when I went back and looked

17   there were news releases that were issued before these

18   newspaper articles were written.

19           And it may or may not be that in fact he was the

20   sole source and sole reason.  But this idea that they would

21   have been able to go on for months and conduct these covert

22   investigations after it had been in the newspaper I just don't

23   think that stands up.  And what really concerns me about that

24   argument and this distinction is this notion that the

25   comparison to Mario Noble who immediately cooperated.  And

1    what concerns me is there's at least the perception or the

2    possibility that Mr. Crandall has been treated differently

3    because he didn't, when these agents or prosecutors flew to

4    Hawaii, you know, when his wedding was scheduled and

5    confronted him at the airport, he did invoke his right to

6    counsel and said, I'm not going to talk to you.

7           And there's at least the appearance that perhaps

8    because he did that he's being treated differently because he

9    didn't play by their terms.  I mean, he did ultimately and, in

10   fact, testified.  I mean, I watched part of the trial.  What I

11   watched he was not just a good witness, he was their best

12   witness.  The Court's certainly in a position to make that

13   determination better than I am because you watched, you were

14   there for all of it.  But he was a very good witness and open

15   and cooperative.  And the agents have told me personally that

16   they thought he was open and cooperative and consistent

17   throughout over the three years.

18          So this idea that, you know, he should be treated

19   differently because he didn't immediately come forward, he

20   agreed to meet with law enforcement in the first week he was

21   in the continental United States.  It wasn't delayed in any

22   sense.  The only delay was he didn't do it at the airport

23   without counsel.  He said, I want to get counsel and then

24   we'll deal with it.

25          We called immediately, and we said, he will

1    cooperate.  And he has cooperated at all time since.  So he is

2    manageable, and I would ask the Court to so find.

3                THE COURT:  Thank you.  I'll take this matter under

4    advisement and get a ruling out probably early next week.

5                We'll be in recess.

6                MR. BRADSHAW:  Thank you very much, Your Honor.

7                THE COURT:  Thank you.

8        (Whereupon, the court proceedings were concluded.)

9                            *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF UTAH          )

 2                           ) ss.

 3    COUNTY OF SALT LAKE  )

 4              I, KELLY BROWN HICKEN, do hereby certify that I am

 5    a certified court reporter for the State of Utah;

 6              That as such reporter, I attended the hearing of

 7    the foregoing matter on April 30, 2020, and thereat reported

 8    in Stenotype all of the testimony and proceedings had, and

 9    caused said notes to be transcribed into typewriting; and the

10    foregoing pages number from 3 through 20 constitute a full,

11    true and correct report of the same.

12              That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14              And hereby set my hand and seal, this _____ day of

15    _____ 2021.

16

17

18

19

20              _____
                     KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```